Filed 10/22/13  P. v. Zavala CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036028 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC813723) |
| v. | |
| MARK ANDREW ZAVALA, et al., | |
| Defendants and Appellants. | |

Following a jury trial, defendants Mark Andrew Zavala, Scott Alan Hensley, and Jonathan David Rodriguez were convicted of three counts of robbery (counts one through three) (Pen. Code, §§ 211-212.5, subd. (c))[1] and defendants Zavala and Hensley were also convicted of assault with a firearm (count four) (§ 245, subd. (a)(2)).  For all of the crimes of which defendants were convicted, the jury found true the criminal street gang allegations (§ 186.22, subd. (b)(1)(C)).  As to counts one through three, the jury found true that defendant Zavala had personally and intentionally discharged a firearm (§ 12022.53, subd. (c) and (b)) and that both defendants Hensley and Rodriguez were principals in the offense and at least one principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) and (e)(1).)  The jury also found true that defendant

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

1

Zavala had personally used a firearm in the commission of the assault (count four) within the meaning of section 12022.5, subdivision (a).

Defendant Hensley admitted a prior conviction within the meaning of Three Strikes law (§§ 667, subd. (b)–(i), 1170.12), a prior serious felony conviction (§ 667, subd. (a)), and two prior prison term allegations (§ 667, subd. (b)). Defendant Rodriguez admitted a prior prison term allegation (§ 667, subd. (b)).

The court sentenced defendant Zavala to a total prison term of 33 years, defendant Hensley to a total prison term of 31 years, and defendant Rodriguez to a total prison term of 22 years.

Each of the defendants appeals and raises multiple contentions. We affirm the judgments.

I

*Procedural History*

By first amended information filed on January 15, 2010, defendants were charged with committing three counts of second degree robbery (§§ 211-212.5) against three victims, specifically Mitchell French (count one), Richard Dowdy (count two), and Jeffrey McBee (count three), on or about July 23, 2008. Defendants Hensley and Zavala were charged with committing an assault with a firearm upon Joseph Esquibel (§ 245, subd. (a)(2)) on the same date (count four). The information contained gang and other sentence enhancement allegations against defendants and a Three Strikes allegation against defendant Hensley.

Before trial, defendant Hensley filed in limine motions to exclude hearsay evidence of prior offenses and activities allegedly connected to him and to bifurcate the trial of the gang enhancement allegation (§ 186.22, subd. (b)). Defendant Zavala also filed a motion in limine to exclude gang-related evidence on the ground that there was no evidence the charged crimes were gang related or alternatively, to bifurcate the trial of

the gang enhancement allegations. Defendant Rodriquez's counsel joined in the other defendants' motions. The court denied the motions to exclude gang evidence and to bifurcate the trial.

Defendant Zavala then filed a separate motion to exclude all references by Sergeant Livingston, the prosecution's gang expert, to accusatory statements made by Kyle Moneyhun and recited in Campbell Police Department reports because their admission would violate his right to confrontation under the Sixth Amendment as set forth in *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*) and *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266] (*Davis*).

A jury was selected. Trial commenced on April 7, 2010.

On April 8, 2010, toward the end of the testimony of French, one of the alleged victims, an issue arose regarding his conduct in front of the jury while under oath as a witness. The trial court separately spoke with two jurors, Jurors No. 9 and 5, excused Juror No. 9, denied requests to excuse Juror No. 5 and Jurors No. 2, 3, and 6, and denied motions for mistrial.

On April 9, 2010, out of the presence of the jury, the trial court disallowed Sergeant Livingston from testifying as to Moneyhun's statements.

The jury returned guilty verdicts and true findings against all defendants.

II

*Evidence*

A. *Prosecution's Case*

At trial, R.B., who was then 18 years old, testified that he had been a friend of Kyle Moneyhun, whose street name was Ghost. Before the robbery, R.B. was living on the streets and spending most of his time with Moneyhun. At that time, R.B. was "kick[ing] it with northerners." Most of the people with whom he hung out were affiliated with northerners.

3

Earlier on the day of the robbery, R.B. and Moneyhun went to Michelle's house, where they had been four or five times before, to drink. Everybody there was drinking. R.B. drank beer and smoked a joint.

While at Michelle's house, R.B. heard people "talking about doing a robbery." One of the people was Mark, who had dark skin and a ponytail called a "chongo" at the back of his head. R.B. had heard other people refer to Mark as "Little Savage."

Moneyhun was the person who came up with the idea of robbing a marijuana dealer named Mitch. Moneyhun had met Mitch through R.B. and both of them had bought marijuana from Mitch, who sold it from his garage. R.B. knew that Mitch had a safe, in which he kept his marijuana, in his garage. Around July 2008, R.B. was smoking marijuana daily, sometimes more than once a day. R.B. did not want to be involved in the robbery because Mitch was a "good drug dealer" and he wanted to continue buying from him. He was also concerned that Mitch would be able to identify him.

In addition to Mark, J-Dog, and Michelle were among those who "wanted in" on the robbery. R.B. had met Mark and J-Dog once or twice before. Mark and Michelle had an argument about her participation because "she had a little kid." Mark told Michelle that she could not go and Michelle seemed upset. There was discussion about the need for cars to get away. The plan was to call SJU, the San Jose United gang, to obtain one or two cars for the robbery. Michelle was going to make that call to a friend. R.B. heard talk about obtaining guns. Mark indicated that he was willing to shoot if he had to. Mark left Michelle's house to get a gun.

At some point, everybody else left Michelle's house. Moneyhun and R.B. went to the light rail station. R.B. received a call from his friend Gabby, who lived next door to Mitch, while they were waiting for the light rail. Gabby had been Moneyhun's girlfriend for a while. Barrgan and Moneyhun took the light rail downtown, where they waited to be picked up.

4

The next day, R.B. and Moneyhun returned to Michelle's house. As they were leaving, the police arrived and they were taken to the downtown Campbell Police Department. R.B. was interviewed by an officer. He remembered telling officers that someone named J-Dog had been part of the discussion. R.B. testified that he did not want to be a snitch then and he did not want to be a snitch at trial.

R.B. testified that he did not recognize Mark or J-Dog in court but R.B. also remarked that the men looked different because their hair had grown out. At trial, R.B. picked out Mark, who had been at Michelle's house, from a six-photograph lineup, which was admitted into evidence. R.B. initially denied mentioning the name Peanut to police. After looking at the transcript of his recorded police interview, R.B. acknowledged that it appeared he had said Peanut was the person who would get the cars but he did not remember saying so and he did not know Peanut.

Jeffrey Allen McBee testified that, at roughly 6 p.m. on July 23, 2008, he was at his friend Mitchell French's house on Jones Way in Campbell.[2] French had a recording studio in his detached garage. A male named Richard (also known as Oso) was there.

Around 6 p.m., McBee left French's detached garage and walked to the street, where he came upon four people, one woman and three men. It was a very bright summer day. At trial, McBee had no doubt that the three defendants were the three men in that group. McBee "got a strange vibe" from the group and asked, "What's happening, guys?" McBee had known French since high school and he knew most of his friends but he had not seen these individuals before.

McBee followed the group, which had entered French's backyard unannounced. McBee heard someone asking in a loud voice for Craig. McBee peered into the backyard from the gate and saw French standing outside the doorway to the garage. The people in

---

[2]     For the sake of clarity, we will generally refer to Mitchell French as French and to Stephanie French, his wife, as Stephanie.

5

the group were walking around the backyard, "checking out things," and asking for Craig. McBee estimated he was 15 to 20 feet from defendant Hensley and the others. French was telling them that there was no Craig there and they needed to get out of his backyard.

The group left the backyard and filed past McBee. McBee saw them head down the sidewalk toward the next door neighbor's house. When McBee asked who those people were, French said, " 'I have no idea who those guys were.' " McBee and Richard remained with French in the garage.

Sometime later, defendant Zavala, who McBee described as Hispanic, stepped into the garage, signaled them to be quiet by putting his finger to his lips, and pulled out a revolver, which "looked like a snub nose .38 caliber pistol." Richard hit the deck and lay down. Defendant Zavala ordered McBee to get down on the ground but McBee was paralyzed in fear. Defendant Hensley entered the doorway and blocked the exit. Hensley was holding a pistol and pointed it at French. Someone commanded McBee to " 'put his stuff out on the table.' " McBee complied and put his cell phone on an electrical spool table.

Defendant Zavala said to McBee, "Get the fuck down or I'll blow your fucking head off." He said it a couple of times in an angry and frantic voice and moved closer before McBee, who was in shock, lay down. Defendant Hensley, whom McBee described as white, was shouting orders at French.

McBee heard defendant Zavala tell defendant Hensley, "Watch those mother fuckers." Defendant Hensley said, "I got these mother fuckers. Don't worry. Just get going with the money." Defendant Hensley put his knee in McBee's back and put his gun to McBee's head.

Out of the corner of his eye, McBee could see that defendant Zavala had his gun on French, who was standing. French appeared terrified. Defendant Zavala was striking French with a gun, swearing, and shouting commands at him to open his safe.

6

McBee could hear, but could not see, the safe being opened. McBee heard a conversation between defendant Zavala and French regarding a second safe. French indicated that the safe was not his and he did not know the combination. Zavala or Hensley said to the other to make sure to take everything. McBee heard some rustling around in the room and then felt hands going through his pockets.

The victims were told to stay down and count to 100. Out of the corner of his eye, McBee saw someone grab a guitar.

When the victims got up, they found that a bass guitar and electric guitar were missing and the safe was wide open. McBee had lost a small amount of cash and some medical marijuana that had been taken from his pocket.

When the police arrived, McBee provided descriptions of the robbers. At trial, McBee testified that he definitely remembered defendant Hensley's and defendant Zavala's faces and the tattoos on Hensley's neck. McBee identified them as two of the group that had been there before the robbery.

Defendant Zavala's haircut at trial was different from the haircut he had during the robbery. At the time of the robbery, defendant Zavala had a "homey cut," which McBee described as "a shaved head with a bun in the back and a little ponytail going down the back of the neck." McBee described the second robber, whom he identified as defendant Hensley, as Caucasian or white, in his late 20's or early 30's, between five foot, 10 inches to six feet tall, and about 180 pounds, with a tattoo on his neck.

McBee admitted at trial that, during the afternoon before the robbery, he had smoked approximately half of a marijuana cigarette. He had previously told police and testified that medication, by which he had meant marijuana, had been stolen from him during the robbery. R.B. indicated that French and he were medical marijuana patients.

7

McBee had reported to police that, on the day before the robbery, he had seen a suspicious person hanging out at the corner of Jones Way and Smith. He later learned that the person was Ghost.

McBee was shown multiple photographic lineups on different days by different officers. McBee believed that Richard Dowdy (Oso) was involved in the robbery because he told McBee that he was not going to identify people that he recognized from the incident.

Stephanie French testified that Mitchell French was her husband and they had two children. On the date of the robbery, her family resided at 835 Jones Way in Campbell and she and their children were at home. Her husband had two friends visiting, Jeff McBee and a man they knew as Oso, and the three men were in their detached garage. They had known McBee for about 10 years and he was a good friend of her husband.

At about 6 p.m. that day, three men and a woman entered through a side gate and came to Stephanie's open back door. The woman asked for someone named Craig. Stephanie told them no Craig lived there. Her husband came out of the garage and asked, " 'Who are you? What are doing in my backyard.' " She heard someone respond, "You don't know who you're messing with." Stephanie subsequently put her head back out and asked if everything was okay; French indicated they had left. At trial, Stephanie recognized defendant Hensley; she was certain that he was one of the people at her back door. She indicated the other males may have been Hispanic.

Stephanie knew that her husband had a safe in the garage. The safe contained over $1,000. According to her, French's friend had asked him to keep another safe for a month or two. Stephanie acknowledged that French was a medical marijuana patient. She denied having any knowledge that he sometimes sold marijuana from the garage.

French and McBee subsequently came into the house; French told Stephanie that they had just been robbed. Somebody called 911. The police arrived and separately

8

interviewed each of them. Stephanie gave police a description of the person whom she identified at trial as defendant Hensley.

Wells French, who goes by the name Mitchell, testified. On July 23, 2008, he came out of his garage and saw a woman and some men whom he did not recognize in his backyard. They asked about a person named Craig and he told them a Craig did not live there. The female said, " 'You don't know who you're fucking with." They left through the gate.

French returned to the garage. At about 6 o'clock, French was in the garage with McBee and Oso. French acknowledged that he had smoked a little marijuana and had drunk a few beers.

When the incident began, the first thing French saw was a gun. He later described it to police as a snub-nose .38. The gun was pointed at his face and he was told to get down. Both his safe and a friend's safe were there. French was ordered to open his safe, which was "kind of hidden, but not fully." It contained "some pot and a lot of cash." He was struck in the back of the left knee and in his mouth. French subsequently told the officers that he was pistol whipped. When asked whether he was scared, French said, "Absolutely."

In addition, French's Motley Crue wallet was taken from his person and two guitars were taken from the garage, which was thrashed. He was on the ground during most of the incident. He heard them talking. He remembered being told to count to 100.

At trial, he said that he could not be 100 percent sure that anyone in the courtroom was in his backyard that day. French testified that he could not remember what the person holding the gun to his face looked like. He indicated that the incident happened very quickly. He gave descriptions to police after the incident and, at trial, he confirmed that he told the police the truth and the event was then fresh in his recollection. French

9

recalled describing one person as a white adult male, about six feet tall, and about 180 pounds and with a tattoo on the right side of his neck.

French denied telling an officer that he received a death threat on his cell phone or that he was hiding out at a friend's house because he was scared for his life. He admitted repeatedly telling the prosecutor that he did not want to come to court and he was scared for himself and his family.

On cross-examination, French testified that he did not believe Oso had anything to do with setting up the robbery. French had known McBee since he was "a little kid" and he was 39 years old at the time of trial. French and McBee both had medical marijuana licenses; they smoked marijuana together.

French acknowledged sometimes keeping marijuana in his safe but he claimed that he ordinarily kept the money paid for using his recording equipment in it. He thought he had $800 to $1200 in the safe at the time he was robbed. He admitted that he had marijuana growing in his backyard.

French knew Ghost and he admitted giving marijuana to Ghose. French denied ever selling marijuana.

French indicated that the descriptions that he had given police were of the people he had seen in his backyard, not the robbers.

On redirect examination, French confirmed that he was 60 percent sure that defendants Hensley and Zavala were the people that held him at gunpoint in his garage. On recross-examination, French recalled that, about a year earlier, he was asked whether anybody in court had come to his garage that day and he testified that he could not "make 100 percent identity" and none of the people looked familiar to him.[3]

---

[3] French testified at the preliminary examination on April 1, 2009.

10

Richard Dowdy, who testified under a grant of use immunity, indicated that he did not want to be labeled a snitch. In July 2008, Dowdy was hanging out in French's detached garage located in the City of Campbell. McBee was there as well; they were playing music and drinking beer. Dowdy looked toward the door, saw a snub-nose revolver pointed at his face, and he immediately went to the ground. Dowdy had a prior robbery conviction and he knew the routine. He claimed that he kept his face down until the robbers left and he was not able to identify anyone.

Dowdy heard people talking to French; French was "making little noises like he's getting beat up." At some point, Dowdy was instructed to count to 100. Dowdy lost a cell phone, his car keys, and his wallet containing one dollar in the robbery.

Dowdy knew that French had a safe in the garage and there was another safe that belonged to one of French's friends in the garage. He described them as being in plain view.

Dowdy remembered talking to an officer shortly after the robbery. He indicated that he subsequently spoke with a detective, who treated him as a suspect and executed a parole search of his house.

Maria Elena Vasquez lived at 845 Jones Way at the corner of Smith Avenue. She testified that at around 6 o'clock in the evening on a day in July 2008, she saw her nephew, defendant Rodriguez, whom she identified at trial, outside her house and then he knocked on the door. Defendant Rodriguez told her that he had been dropped off. He was in her house for about five minutes and then he said he was leaving. At trial, she could not remember if she had seen him getting into a car. After she read the police report, she stated that he left in a car.

About 25 to 30 minutes later, looking out her south facing window, Vasquez saw a black Lexus stopped near the corner of Smith Avenue and Jones Way. Vaquez saw defendant Rodriguez standing on the street corner and looking around. Vasquez also saw

11

a different nephew, Joseph, who was about 37 years old, getting out of a truck parked near the corner of Smith and Jones. She denied that she told officers that she saw what happened next but she admitted telling officers that she was looking out the south window of her house.

Vasquez acknowledged seeing two people run across the grass in front of her house toward Smith Avenue and defendant Rodriguez. She could not recall giving descriptions to police. A portion of the police report was read into the record: "Maria described S-3 as Hispanic male adult with a long ponytail on the back of his head. S-2 was described as a white male adult." Vasquez then recalled that the two people, a white male and a dark male, were running toward Smith Avenue and defendant Rodriguez and one had a guitar.

At trial, Vasquez initially could not recall telling an officer that she saw Joseph start running toward the Lexus but she later remembered that she had told the officers that information. Vasquez testified that she saw Joseph screaming and running toward Smith Avenue and the black Lexus when he was "going after the guys."

Vasquez saw defendant Rodriguez run from the corner toward the Lexus, but she claimed that she did not see defendant Rodriguez get into the Lexus. Vasquez could not recall telling an officer that she saw them loading property into the vehicle or she saw defendant Rodriguez get into the vehicle's back seat. Another portion of the police report was read into the record: "Maria said she was looking out of a window on the south side of her house and observed S-2 and S-3 loading the property into the vehicle."

Vasquez denied telling officers that she saw a person on the passenger side of the vehicle pull out a gun and shoot at Joseph. She saw the black Lexus drive away.

About 10 to 15 minutes after the incident, Vasquez received a call from defendant Rodriguez.

12

Vasquez said that she remembered being shown photographs by police but she had been unable to identify a photograph of either the driver or front seat passenger of the black Lexus.

Gabriella Vasquez[4] testified. She lived at 845 Jones Way, which was on the corner of Smith Avenue. Mitch and his family lived next door.

Gabriella admitted that, on the night of the incident, she told police officers that she was scared to talk to them. She also confirmed that the police had come to her house and told her that she had to testify; she had told police that she was scared to testify and she did not want to be a snitch. She testified that she did not want to be a snitch.

Gabriella identified defendant Rodriguez in court and confirmed that he was a relative. At first, Gabriella could not remember that, on July 23, 2008, her attention was drawn to four or five people walking toward the backyard of the house next door. She denied seeing defendant Rodriguez walk to the next door neighbor's backyard. She admitted talking to a police officer on the night of the incident but she denied saying that she saw defendant Rodriguez walking toward that backyard with others. She could not remember telling police that she saw a male with a braided ponytail and shaved head, a white male with curly hair and glasses, defendant Rodriguez, and a female go to the backyard next door.

Gabriella recalled that defendant Rodriguez came to her home, visited, and left. She claimed that he was in her house about 30 minutes and she could not remember telling officers that he had been there for five to 10 minutes. She had been surprised to see defendant Rodriguez because she had not seen him for a year or two.

Gabriella did not remember telling an officer that she had seen "a black-colored, four door car, possibly a Pontiac." She acknowledged that a car drove away but indicated

---

[4]     To differentiate her from Maria Vasquez, we will generally refer to Gabriella Vasquez as Gabriella.

13

that she did not see the people with whom defendant Rodriguez left. She thought she might have told a police officer that they returned 30 minutes later.

Gabriella did not recall telling officers that she had seen defendant Rodriguez on the corner and denied saying that she had seen him run over to the car and get into the back seat. Gabriella did recall hearing her mother, who was at the window, say, "Oh, that's fucked up," and then going to the window herself. Gabriella saw her cousin Joe saying something and then being shot at. She heard the gunshot. She could not recall telling police that "the guy with the ponytail shot at him." She explained that a "chongo" was "a ponytail in the back of the head with no hair around it." After reviewing a transcript of her interview with police, Gabriella conceded that the interviewing officer had asked the length of the ponytail and she had indicated about six inches.

Although Gabriella could not remember telling the police many things at trial, she indicated that, on the evening of the incident, she had tried to tell the officers everything that she had seen.

On cross-examination, Gabriella remembered seeing a male with a ponytail and an otherwise shaven head, a male with brown, curly hair, defendant Rodriguez, and a female. She could not recall seeing a fifth person, specifically an older, more heavyset male wearing a white Raiders jersey. When asked where she was when she saw people walk toward Mitch's house, she indicated she was in the living room of her house looking out a window facing Jones Way. She also remembered the male with curly brown hair driving away in the car that had been parked on Smith Avenue facing west.

Gabriella knew Moneyhun and confirmed that he was known as Ghost. Around the time of the robbery, Moneyhun was coming over to her house and hanging around with her. She denied seeing Moneyhun go to Mitch's house and come back with marijuana but she admitted knowing that Mitch had marijuana.

14

Joseph Ramon Esquibel[5] testified.  On the night of the incident, Esquibel was returning to his home at 845 Jones Way, which was on the corner.  When Esquibel drove up to his house, he saw a male, who he has since learned is related to him, standing on the corner.  As Esquibel was walking toward his house, he saw two males, whom he had never seen before, coming from the house of his next-door neighbor Mitch and running across his lawn toward Smith Avenue.  They passed within a couple feet of him.  They had guitars and a tin can in their hands.  Esquibel told the two, " 'This is not going to happen,' " by which he meant "robbing his neighbor."  He told the people in his house to call 911.  The two men went to a dark-colored vehicle facing westbound on Smith and jumped in.

Esquibel was on the sidewalk about five feet from the vehicle.  The passenger pulled out a gun and Esquibel was scared that he was going to be shot.  The passenger pointed the gun slightly away from Esquibel and fired.  The bullet hit one of the rocks on the side of Esquibel's house and a piece of rock hit Esquibel in the face.  Esquibel started running.  He ran to the front of his house and then went to check on Mitch.

At trial, Esquibel could not recall telling the police many things or providing particular descriptions of the driver and passenger.  He could not recall telling officers that the person standing on the corner appeared to be a lookout.  Esquibel acknowledged that he had heard that his cousin, Victor Esquibel, was a category three member of the Nuestra Familia.  Esquibel could not identify anyone in court but he acknowledged that on the night of the incident he gave descriptions of the two people who ran past him to police.  Esquibel stated that he had told the truth to the police to the best of his ability and the incident was then fresher in his recollection than it was at trial.  He remembered that

---

[5]     Our references to "Esquibel" are to witness Joseph Esquibel, not Victor Esquibel.

the day after the incident he identified the shooter from a photographic lineup shown to him by an officer.

Esquibel testified that he told the truth to the best of his ability at the preliminary examination. His prior testimony regarding the heights of the driver and passenger was read into evidence.

Brian Sessions, an officer with the City of Campbell Police Department, testified. He was the first officer to arrive at Jones Way on July 23, 2008.

The first person with whom Officer Sessions made contact was Esquibel. Esquibel told Officer Sessions that he saw a white male and a Hispanic male running from his neighbor's house; they were carrying guitars. Esquibel told them to stop but they continued running. Esquibel gave descriptions of the two men. A salient feature of the white male was a visible tattoo on his upper chest; he was about five feet, 10 or 11 inches tall and had a thin build. The Hispanic male had a dark complexion and a braided ponytail.

Officer Sessions was told by Esquibel about an individual standing on the corner of Smith and Jones. Esquibel referred to him as "a lookout" and described him as a thin Hispanic male, five feet, four inches tall, approximately 22 years of age, who was wearing a black and white hat.

The officer said that Esquibel reportedly yelled into the house for his mother to write down the license plate. The man on the corner ran to the black Lexus, grabbed its rear license plate and, Esquibel believed, pulled the plate off the car. That individual then got into the back seat. The white male got into the driver's seat and the male with the ponytail got into the right, front seat of the black Lexus.

As Esquibel approached the vehicle, the white male told the front seat passenger, " 'Cap the mother fucker.' " The front seat passenger had pointed a black, snub-nose revolver at him and said something to the effect, " 'I'm going to fucking cap you,' or, 'I'm

16

going to blast you[.]' "  Esquibel feared he was going to be shot and backed up.  The front seat passenger with a ponytail had turned the gun slightly and fired a shot in Esquibel's direction.

Officer Sessions also interviewed Richard Dowdy.  Dowdy told him that he believed there had been two robbers because he heard them talking to each other but he had seen only the pistol pointed at him.  He heard one tell the other, "Take everything you touch."  He described the gun as a black, .38 caliber, snub-nose revolver.

Officer Sessions also spoke with McBee.  McBee described the four people who had walked up to French's residence before the robbery: (1) a Hispanic male, (2) a white male in his late 20s, approximately 180 pounds, about five feet, 10 inches to six feet tall, with tattoos on his neck, (3) a Hispanic male adult, possibly with Pacific Islander heritage as well, with a dark ponytail and shaved head, and (4) a Hispanic female.  McBee indicated that, during the robbery, the robber with the ponytail took money and some marijuana out of his pocket while he was lying on the garage floor.

Spencer Billman, a police officer with the Campbell Police Department, responded to 835 Jones Way at about 6:30 p.m. on July 23, 2008.  He interviewed Stephanie French, who described four individuals who had come to her home that day.  She stated that two of them were "possibly Mexican guys."  A third was a white male adult, approximately six feet, one inch tall, with a thin build and a "snaggle tooth," in his late 20s.  The fourth person was a Hispanic female adult in her late 20s.

From French, Officer Billman obtained descriptions of four individuals who had entered his backyard.  French described a Hispanic male adult, a white male adult about six feet tall with tattoos on his neck, a black or Hispanic mixed race male adult who had a braided ponytail of dark brown or black hair and an otherwise shaved head, and a Hispanic female adult.

17

Officer Billman was told by French that two of the original four had returned.  The male with the ponytail had a handgun, a black snub-nose revolver, which he pointed at French.  That person demanded to know the location of French's safe; he pushed French to the floor and pointed the gun at French's head.  That person again asked about the location of the safe and pistol-whipped the right side of French's face.  French opened the safe and the person stated, " 'Grab everything you can.' "

Carlos Guerrero testified that in July 2008, he was a police officer with the City of Campbell.  On the night of the Jones Way robbery, Officer Guerrero interviewed Gabriella Vasquez.  Gabriella indicated that she was scared to talk with him because her cousin was one of the suspects and she did not want to be a snitch.  She indicated that her cousin and the people he hung out with were gang members.

Gabriella told Officer Guerrero that she had seen her cousin, defendant Rodriguez, passing by her house and then standing with others in the driveway of her next-door neighbor.  She thought it was a group of about five people.  In addition to defendant Rodriguez, she had described a male with a braided ponytail and an otherwise shaved head, a white male with curly hair and glasses, a Hispanic female about 17 or 18 years old, and an older, stocky Mexican male wearing a white Raiders jersey.  She said that she saw the male with the braided ponytail and the male with the curly hair and glasses enter her next door neighbor's backyard and then come out after a very short time.  The group began moving back toward her house.  Defendant Rodriquez broke off from the group, he went to her front door, and he spoke to her very briefly.  The rest of the group entered a black vehicle parked to the side of her house on the corner of Smith and Jones.  The black car drove into the court on Jones Way and circled to the front of her house and yelled for defendant Rodriguez.  He told Gabriella that he had to go, went to the car, and got into its back seat. Gabriella described the driver as having a light complexion, glasses, and curly brown hair.  He had a tattoo on his upper chest and possibly on his right forearm.  She

18

told the officer that he looked "like a nerd" and the other males looked like gang members.

Officer Guerrero was told by Gabriella that, about 30 minutes later, she again saw a black vehicle. She heard the vehicle's driver say, "Cap that fool." She heard a gunshot.

A short time after the robbery, most likely the next day, Officer Guerrero interviewed R.B. R.B. and Moneyhun were together when Officer Guerrero picked them up at Michelle Stojkovic's house on the day after the robbery. The officer was under the impression they had a close relationship.

R.B. said that, on July 23, while he was at Michelle Stojkovic's house, there was talk about robbing someone who lived off Virginia. The intersection of Jones Way and Smith is approximately a half block off Virginia. R.B. indicated to him that Moneyhun and he were merely smoking and listening to the discussion. He thought J-Dog was there and Mark and J-Dog were "the main leaders of the conversation." R.B. did not tell the officer that it was Moneyhun's idea to target French.

The officer testified that R.B. had reported that Mark and J-Dog talked about being desperate for money and drugs. Mark had said they needed some stolen cars to do the robbery. R.B. believed that two cars were going to be used in the robbery; he heard that Peanut from SJU was "the person who was going to come up with the cars." R.B. indicated there was an exchange in which Michelle said that she wanted to be involved but Mark told Michelle that she could not be involved in the robbery. Mark had a ponytail at the back of his otherwise shaven head, which R.B. referred to as a "chongo," which is Spanish for ponytail.

According to Officer Guerrero, R.B. indicated that he did not participate in the robbery because the proposed victim was his marijuana dealer, whom he knew personally, and he wanted to buy marijuana from French in the future. He told Officer Guerrero that he liked French and knew French had a family. R.B. explained that he did

19

not warn French because he was afraid of retaliation and he did not want to get involved. He later backtracked, claiming that he really did not know French was the target.

R.B. told Officer Guerrero that, after leaving Michelle's house, Moneyhun and he had walked to the Campbell light rail station to take the light rail to the Discovery Museum. R.B. informed the officer that at 6:06 p.m., after reaching the light rail station, he received a call from Gabriella Vasquez and learned of the robbery and the gunshot.

Officer Guerrero showed photographic lineups to a number of individuals. French identified a photograph of Michelle Stojkovic as the suspect female and rated his certainty as eight or nine on a scale of 10. McBee was not able to identify her. French, McBee, and Dowdy did not identify defendant Rodriquez in a photographic lineup containing his photograph.

Natalie Gedman testified that she had met a person by the name of Peanut through acquaintances and seen him a handful of times before July 22, 2008. In court, Gedman identified defendant Hensley as Peanut. One night he came to her house and asked to borrow her car and she gave him permission to use it. She claimed her car was gone for about 24 hours.

At about 6:45 on July 23, 2008, Gedman received a telephone call from an unknown male from a private number telling her that her car would be parked outside. She opened the front door and discovered her keys were on a table on the front porch; her car was outside. She denied noticing that anything was wrong with her car.

At some point, Campbell police officers came to Gedman's house and asked her if she drove a black Lexus. She told them she did. She remembered telling the officers that she had lent her car to Peanut. She acknowledged that the police mentioned the license plate cover. She denied having any recollection that a coworker had pointed out to her that the vehicle's license plate frame was bent.

20

The following day, an officer returned with a photographic lineup. She looked at six photographs and picked out a person whom she said looked like Peanut but his hair seemed different.

Tom Rogers testified that he had been a Campbell police officer for 19 years at the time of trial. He was the primary investigating officer assigned to the case.

On the night of July 23, 2008, Officer Rogers spoke with Maria Vasquez and recorded their conversation. Vasquez reported observing, from inside her house, a vehicle pull up. Her nephew defendant Rodriquez came to the door and they talked. After leaving her house, defendant Rodriguez had entered a black Lexus vehicle with chrome rims and the car had driven away. The vehicle had contained three males and one female.

Officer Rogers was told by Vasquez that the vehicle returned about 30 minutes later. Two individuals, who Vasquez described as a Hispanic male with a long ponytail in the back of his head and a white male, started walking toward 835 Jones Way. Looking out from the front doorway, she later noticed them running back toward the vehicle with some property. She moved to the window. She saw the two men putting the property into the car. Defendant Rodriguez, who had been standing in front of her house, ran to the vehicle and got into the rear seat. She saw the male with the ponytail pull out a gun and fire one bullet in the direction of Esquibel. Officer Rogers had gone to the location and seen where the bullet had struck. It was the officer's impression that Vasquez was attempting in good faith to cooperate with the police investigation.

The next day, July 24, 2008, Officer Rogers picked up Esquibel and McBee and took them to view Moneyhun at another location where he was being held by detectives. During the field showup, Esquibel recognized Moneyhun and said, "That's Ghost." He said Moneyhun was not present during the robbery but Moneyhun had been at French's house a few days earlier. McBee did not recognize Moneyhun.

21

At about 4 o'clock on July 24, 2008, Officer Rogers showed a photographic lineup containing a photograph of defendant Zavala to Esquibel. Esquibel identified defendant Zavala as the person who had shot at him.

The next day, July 25, 2008, Officer Rogers contacted French at another person's house. French would not come out to the living room; he was in a back bedroom with the light turned off. The officer went to the bedroom and was able to convince French to turn on the light so they could talk. French explained that "he was scared for his life and he didn't want to stay home." French said that a death threat had been left in his cell phone's voice mail: "You're dead. We're coming after you."

Officer Rogers showed French the same lineup containing defendant Zavala's photograph. French stopped at defendant Zavala's photograph and said, "I think that's him. The face looks the same." French identified him as the person who entered his garage and pointed a gun at him.

Officer Rogers learned from speaking to other officers and witnesses that French was a marijuana dealer and he was known to have safes in his garage.

On July 29, 2008, Officer Rogers showed a photographic lineup containing a photograph of defendant Hensley to McBee. McBee made a positive identification of Hensley.

Officer Rogers also showed a photographic lineup containing a photograph of defendant Hensley to Esquibel, but he was unable to identify the defendant. Officer Roger also showed a photographic lineup containing a photograph of defendant Rodriguez to Esquibel but Esquibel did not identify anyone.

At some point, Officer Rogers spoke to Michelle Stojkovic, who admitted to him that she went to French's house. She gave an innocent explanation for her presence. She said that she did not know anything about a proposed robbery.

22

Officer Rogers testified that defendant Hensley was arrested late on July 31, 2008 or in the early morning hours of August 1, 2008.  The officer learned that defendant Zavala had surrendered to the Campbell Police Department on the morning of August 1, 2008.

On August 6, 2008, Officer Rogers showed French a lineup containing a photograph of defendant Hensley.  French was unable to make an identification.

Officer Rogers also questioned Dowdy that day.  McBee had shared his suspicion that Dowdy had been involved with the robbery because Dowdy told McBee that he was not identifying people whom he recognized in lineups because those people would be his "homies" if he "went away."  When confronted, Dowdy told Officer Rogers that he was not going to snitch because that would be a death sentence for him in prison.  Dowdy said he did not want anything to do with the case.

In the course of the investigation, Officer Rogers received information that the suspect vehicle, a black Lexus with chrome rims, may belong to defendant Hensley's girlfriend who lived off Branham Lane near Camden Avenue.  On August 6, 2008, Officer Rogers located a black Lexus in that neighborhood in a carport; he noted that its rear license plate was bent up.  The officer ran a registration check on the vehicle and obtained the name and address of the person to whom the vehicle was registered. Officer Rogers went to the particular unit and Gedman answered the door.  Gedman's boyfriend, to whom the vehicle was registered, was already in custody and she was driving the car.  She denied knowing the suspects and denied loaning her car to anyone.

The next day, officers conducted a probation search of Gedman's apartment.  This time, Gedman told Officer Rogers that she had loaned the vehicle to Peanut on July 22 and then received a phone call about the vehicle at about 6:45 on July 23.  A coworker had pointed out the bent license plate to her.  Officer Rogers and another detective

23

searched the vehicle. Dowdy's DMV medical examiner's certificate was found between the center console and the passenger seat.

Under the authority of a search warrant, Officer Rogers examined text messages sent from defendant Hensley's cell phone. A message sent at approximately 4:04 p.m. on July 22, 2008, said, "[K]eep this to yourself, but I'm pushing against Northern Riders. Two hella fools tried to claim the title but they don't want to live the life." Several minutes later, he sent the message: "I got my own squad called WAR, Warriors and Riders, and we don't accept PCs, period, no rats, no pussies." At approximately 11:20 p.m. on July 22, 2008, defendant Hensley sent the message: "I got my Lexo and I'm mobile, solo. Can we meet?"

Dan Livingston, a sergeant with the City of Campbell, whom the court recognized as an expert with respect to Norteno criminal street gangs and street gangs in general, provided background information on the Nuestra Familia (NF) and Nortenos. Norteno street gangs emulate the NF and identify with the color red, the number 14, and the letter "N." Sureno street gangs identify with the color blue, the number 13, and the letter "M" for Mexican Mafia, which is basically their parent group. The Nortenos war with the Surenos on the streets.

Sergeant Livingston testified that the Shalu Gardens (SLG) gang has approximately 20 members, is an ongoing organization, and associates with northerners and it shares their common signs and symbols. The focal area of the gang is the "Nido/Adler area of Campbell off Winchester." The gang claims the City of Campbell as their territory and it had committed assaults throughout the city. When asked about the primary activities of the gang, the sergeant indicated that the gang had been involved in the sale of marijuana and methamphetamine, assault with a deadly weapon, auto theft, and robbery. His opinion about the gang's primary activities was based on prior arrests

24

and investigations, conversations with crime victims and witnesses, and criminal histories of active members of the gang.

Sergeant Livingston estimated that he personally had been in contact with at least 10 separate Shalu Garden gang members. He identified those persons as gang members based on their tattoos, talking with them, observing their associates, and talking with victims and community members.

In Sergeant Livingston's opinion, the robbery was committed for the benefit of, at the direction of, and in association with the Shalu Gardens criminal street gang. That opinion was based on his review of the facts of the case, including the persons present at the planning stage, those "people who assisted along the way," and the manner in which the crime had been planned and carried out. The sergeant indicated that his opinion partially rested on the fact that the two primary people planning the crime, defendants Zavala and Rodriguez, were influential members of the Shalu Garden gang. This information was based upon "prior contacts, speaking with other people, reviewing police reports."

In his opinion, everybody else present during the planning stage was either a Norteno gang member or an associate. He believed that R.B. associated with Norteno gangs, Moneyhun was a Norteno gang member, Michelle Stojkovic was a Norteno gang associate.

Sergeant Livingston testified about two "pattern" offenses, one occurring on March 21, 2008 and another occurring on June 5, 2007. Certified copies of two conviction packages were admitted into evidence.

The March 21, 2008 offense was an assault involving four suspects at an elementary school. The victim was chased by the suspects and one of the suspects yelled, "Shalu," during the assault. Sergeant Livingston indicated that shouting out the name of one's gang during commission of a crime credits the gang, intimidates and scares the

25

victim, and earns the gang and its member respect in the gang community. A gang member gains credibility through assaulting people, committing certain crimes, engaging in displays of violence and having lots of money from drug sales.

The June 5, 2007 crime involved three males in a car that approached a male walking in the area of 238 Curtner. Two men got out of the car. One of them, Rigoberto Patino, an SLG member, struck the male victim with a cane or stick and the other man called the victim a "scrap," a derogatory term for a Sureno gang member. When the victim tried to get away, the car ran over him and he was injured.

The sergeant explained that anyone who cooperates with police risks being labeled a snitch and being physically assaulted or worse. A community member that reports gang crimes may be terrorized or harassed by gang members.

In reaching his opinion that the crime was for the benefit of a criminal street gang, Sergeant Livingston also took into consideration the fact that they called on members of the Norteno San Jose Unidos to provide transportation for the robbery. He explained that "[o]ftentimes Norteno gangs will commit crimes with other Norteno gangs" and "tend to associate with each other, based on going into custody, family relationships, [and] going to school." The sergeant also considered the statement that was made during planning, "I have no problem shooting somebody if I need to." He stated a person is "not going to garner much respect in the gang community" if the person is "squeamish about using a gun . . . ."

The sergeant's opinion was also buttressed by the fact the target of the robbery was a drug dealer. Gangs are involved with the sale of controlled substances and oftentimes know who is holding quantities of drugs. A targeted drug dealer is less likely to call or cooperate with police because the victim is himself committing a crime and because the victim may fear the gang members.

With respect to defendant Rodriguez's gang affiliation, Sergeant Livingston testified that defendant Rodriguez has four dots tattooed across the knuckles of his left hand. Defendant Rodriguez's moniker or street name, which is J-Dog, is tattooed on his right arm. The defendant "has an 'S' on his right forearm and a 'J' on his left, which stands for San Jose." The sergeant viewed the defendant Rodriguez's "MySpace" page and saw a photo of defendant with other gang members in which the defendant is holding up a "W" with his fingers, which indicates West Side San Jose. There was also a picture of him with Camilo Parra, an SLG member, who is holding up a "W" with his right hand. Defendant Rodriguez's "MySpace" page features the "gangster's prayer" on a red background. In the "about me" space, he talked "about the gang lifestyle and the Nido/Adler area." There is a picture of a handgun with several rounds of ammunition next to it and another picture of a bag of marijuana with the caption, "The more you smoke, the more . . . I make."

Sergeant Livingston testified to a number of incidents indicating gang membership. On March 25, 2002, the San Jose Police Department became involved in an incident reportedly involving defendant Rodriguez. Defendant Rodriguez and another male had fought. Four days earlier, defendant Rodriguez challenged the male to fight after approaching and asking him what gang he was in and telling him that he, defendant Rodriguez, was in the West Side Mob. The West Side Mob is one of the larger Norteno gangs on the west side of San Jose.

In another reported incident, which occurred September 13, 2003, defendant Rodriguez, who at that time had the four dots tattooed on his knuckles and his moniker tattooed on his arm and was wearing a red shirt, attacked a Sureno affiliate and punched and kicked him. An hour earlier, defendant Rodrieguez had called the victim a "scrapa," a derogatory term for a Sureno. The San Jose Police Department report described defendant Rodriguez as "a known affiliate with a Norteno gang."

During a January 25, 2004 contact between defendant Rodriguez and the San Jose Police Department, the defendant had a steak knife concealed in a pocket and a red rag in his rear pocket, and he claimed to be a Norteno. Defendant Rodriguez had explained that the knife was for his protection and "it's a rough neighborhood."

After a gang-related fight at Prospect High School on March 31, 2004, a vehicle in which defendant Rodriguez was a passenger was stopped by the San Jose police. When defendant Rodriguez was contacted, he indicated his Norteno gang affiliation. The driver was arrested for bringing a knife onto campus.

On August 19, 2005, defendant Rodriguez was contacted by Campbell police in the area of Nido and Adler behind 620 Nello, where defendant Zavala lived in unit one and Rigoberto Patino lived in unit four. In his pockets, defendant Rodriguez had a knife wrapped in a red bandana, a steak knife, and two large rocks. The previous night there had been a large fight in that vicinity involving the discharge of a gun. Officers had found a black SJ hat, a San Jose Sharks hat, and a bat in the street. Norteno gang members identify with the San Jose Sharks hockey team.

On November 19, 2005, the Campbell police received a report of a disturbance at a large apartment complex on Nido in the area of Nido and Adler and a complaint that the manager was being harassed by a large group. Officers, including Sergeant Livingston, responded. A large group walking away from the location was contacted. Some were dressed in gang clothing. Defendant Rodriguez was wearing a red jersey and a red and black Huelga bird hat; the Huelga bird is a common sign of Nortenos. He had a motorcycle chain. Defendant Rodriguez's brother was wearing a red shirt under a red sweatshirt. Defendant Zavala was wearing a San Jose Sharks jersey. Victor Hernandez, a known SLG member, had a red bandana hanging out of his pocket. Ronald Delgado, a known SLG member, was wearing a black and white SL hat for Shalu and other members were either wearing red or black and white. Shalu members wear black and white when

28

they do not want to draw a lot of attention to themselves. Sergeant Livingston spoke to Robert Denavario, a known SLG associate, who said all males with him were SLG members. A minor female, who said she was a relative of Victor Hernandez, also said all males in the group were SLG members.

On December 16, 2005, Sergeant Livingston assisted in a probation search at 620 Nello, unit two. Defendant Rodriguez was there as well as the probationer. In a room containing items associated with defendant Rodriguez, Sergeant Livingston found a backpack with XIV written on the bottom and a Huelga bird. Inside the backpack, the sergeant found a CD with XIV and SLG written on it. In the closet, he found a shoe box containing SLG indicia and mail and other items with defendant Rodriguez's name on them. Marijuana packaged for sale was discovered in the backpack. While the search was being conducted, defendant Zavala, Rigoberto Patino, and a third male attempted to intimidate the officers and were confrontational. Sergeant Livingston later received a notarized letter from defendant Rodriguez claiming the marijuana and backpack were his.

On July 24, 2008, during a classification interview, defendant Rodriguez admitted northern affiliation.

In an August 20, 2008 letter written to his estranged wife, defendant Rodriguez referred to himself as a "mother fucking solider at heart." Sergeant Livingston explained that gang members, and Nortenos in particular, often describe themselves as soldiers. The letter also indicated that a certain man would "get handled" if he continued to disrespect the defendant's mother and son and that his estranged wife could tell that man that he was not going to have to deal with only the defendant. According to the sergeant, this meant that the person would have to deal with somebody from the gangs.

With regard to defendant Hensley's gang affiliation, Sergeant Livingston's information came from four former male gang members who had dropped out. One had been a high ranking NF member and three were former members of Nuestra Raza. Three

29

of the men had pending cases and were hoping to receive a lesser sentence by working with the sergeant; the fourth man, Mr. Lastra, had no pending case and was out of custody.

Sergeant Livingston had learned that defendant Hensley formerly was a member of Nuestra Rasa, which is an arm of the NF, but he had left that organization and joined with the Northern Riders, a group forced out of the NF organization. A solid star on the left side of the head signifies membership in Nuestra Raza. The sergeant testified that defendant Hensley has a broken star on the right side of his forehead, which expresses disrespect for the NF organization. The defendant also has "W-A-R" tattooed on his neck. Mr. Lastra had told Sergeant Livingston that defendant Hensley claimed to be starting a new group called Warriors and Riders, which explained the significance of the "W-A-R" tattoo. Defendant Hensley's street name was Peanut.

In a 2002 police report, defendant Hensley was identified as a Norteno gang member by his ex-girlfriend's mother. At that time, the women were being harassed and were in fear for their safety because of defendant Hensley's gang association.

In 2007, defendant Hensley was directed to commit an assault at the direction of the Northern Riders because he had disrespected some members and, if he did not do so, defendant Hensley would be assaulted by an unknown Northern Rider. Sergeant Livingston testified about text messages that he believed had been sent by defendant Hensley. One message indicated to the sergeant that defendant Hensley was breaking away from the Northern Riders. Another text message stated, "I got my own squad called WAR, Warriors and Riders. And we don't accept PCs, period, no rats, no pussies." The sergeant explained that "PCs" refers to persons who have dropped out of a gang and are in protective custody.

As to defendant Zavala's membership in a gang, Sergeant Livingston stated that defendant Zavala has "SJ" tattooed on the back of his arms and "408," which is the area

30

code, tattooed across this stomach. Defendant Zavala also has a tattoo, which reads, "If I die today, no worries tomorrow." The sergeant explained that this tattoo reflects the mindset of a lot of gang members, who tend to live on the edge and believe if something happens to them, it is just part of "the game."

A police report indicated that on November 4, 2005 a police officer made contact with a person wearing a red shirt on Adler Avenue. The self-identified Norteno told the officer that he had been "jumped in behind 620 Nello at Mark Zavala's direction by an associate . . . ." The gang member identified defendant Zavala "as running Shalu Gardens at that time."

On March 15, 2006, a search of defendant Zavala's residence, located at 620 Nello, unit one, was conducted by Sergeant Livingston pursuant to a warrant. The search uncovered gang indicia. Scribblings of "Shalu," "SLG," and similar terms and handgun ammunition were found in his room. In the garage, the sergeant found SLG graffiti and monikers carved into a bench.

On June 20, 2006, defendant Zavala was contacted at 240 Adler after police received a call reporting four males fighting and "somebody shouting something about a Shalu gang."

On November 24, 2006, defendant Zavala was contacted near 2369 South Winchester after a disturbance at a bar and the bouncer had asked certain people to leave. He was with Camilo Parra, whom the sergeant identified as an SLG member. Also, on November 24, 2006, a man flagged down police officers on Adler Avenue and he told them that three males, including defendant Zavala and Parra, had threatened him. Parra had said, "This is the north side. We run this area."

On April 3, 2008, defendant Zavala and Victor Hernandez were seen walking together through a Safeway parking lot in the area of Nido and Adler. Zavala was wearing a red and white hat with "San Jose" printed on it.

31

On July 20, 2008, a San Jose police officer in the area of Lick and Alma advised other officers that "multiple car loads" of Nortenos were in the area looking to jump somebody. Another officer stopped a vehicle leaving the area; defendant Zavala was a passenger. Two other occupants in the vehicle had "NGN" tattoos, which stands for "Next Generation Nortenos," and were on probation with gang conditions. The vehicle contained a metal wrench and stakes, which the reporting officer believed were weapons.

On cross-examination, Sergeant Livingston explained the police's use of field interview cards, which was one way of gathering information, including observations of tattoos and admissions of gang membership. In reviewing the material on defendant Zavala's past contacts with the Campbell Police Department, the sergeant had never found any reference to him being known by the moniker "Little Savage" or "Li'l Savage" aside from what R.B. had told police.

According to Sergeant Livingston, the SLG has been around Campbell since 2001 and the gang was formed by Camilo Parra. The sergeant stated that one of the primary purposes of the Shalu Gardens gang is robbery and at least three members had robbery convictions. He admitted that he had previously testified in March 2010, shortly before trial, that the SLG had not committed any robberies of which he was aware but he had also given the qualification that he would have to check the files. The sergeant believed that he had then explained that he had been belatedly brought into the case and he had not yet reviewed all the material. He acknowledged that the three robbers were juveniles at the time of the crimes. None of those robberies had been committed by defendant Rodriguez or Zavala.

Sergeant Livingston acknowledged that the original summary of Shalu Garden's predicate offenses, which he had written in about late 2005, did not list any robberies. Another summary of predicate offenses included six offenses committed on various dates through March 21, 2008 but it did not include any robberies. Defendant Zavala was not

32

named as a suspect or participant in those offenses. Insofar as the sergeant was aware, defendant Zavala had never been previously charged or convicted of robbery or any felony. Sergeant Livingston acknowledged that defendant Zavala did not have gang tattoos identifying him as a member of the SLG and that the police reports in this case that he reviewed did not indicate that any perpetrator identified himself as a Norteno or SLG member during the robbery.

On redirect examination, Sergeant Livingston stated that he had a conversation with defendant Hensley while he was in custody because the defendant had wanted to offer information in exchange for assistance in this case. Even though the sergeant specifically informed defendant Hensley that he did not want to talk about the specific facts of the present case, defendant Hensley told Sergeant Livingston that he was present during the crime.

Sergeant Livingston also testified regarding his 2005 encounter, while on patrol, with defendant Zavala and another man across from the defendant's house on Nello. Sergeant Livingston had spoken separately to the other man, who told the sergeant that he was a former NF member and was currently part of "New Flowers," a group of dropouts from the NF organization. The man asked the sergeant not to tell defendant Zavala because Zavala was still active in NF and "he knew what Mr. Zavala would do to him if [Zavala] found out he was a dropout gang member."

Sergeant Livingston reiterated that the present crime, which he characterized as brazen, assisted the gang because it increased its status and provided drugs and property that could be sold. The money could be used to buy guns to protect the gang and to buy alcohol and marijuana to entice others into the gang.

On further cross-examination, Sergeant Livingston confirmed that he had done nothing with the information obtained from defendant Hensley until he was called as an expert in this case.

33

On further redirect examination, the sergeant indicated that he does not document a conversation with an inmate who is offering information in exchange for help in a criminal case. He explained that officers try not to break the trust of the inmates willing to provide information to law enforcement since inmates would be less inclined to cooperate if they learned another inmate's statement had been used against him.

Janet Lacava testified that she knew defendant Zavala and had worked with him at the Safeway on Winchester in Campbell for a couple of years until he was transferred to another Safeway about the beginning of April 2008. When she knew him, he had a ponytail, which was approximately six to eight inches long. She identified him in court.

David Carmichael, a police captain with the Campbell Police Department, photographed defendant Zavala following his arrest on August 1, 2008. Zavala's hair was cut "really short" and he did not have a ponytail. Captain Carmichael identified photographs of defendant Zavala's tattoos. His left arm has a tattooed "S" and his right arm has a tattooed "J." "408" is tattooed on his abdomen. The tattoo on his upper chest reads, "If I die today, no worries tomorrow."

B. *Defendant Zavala's Evidence*

Raj Jayadev, the executive director of Silicon Valley Debug, a community organization that provides assistance to families and youth, testified that the organization was contacted in late July 2008 by defendant Zavala's family who was seeking assistance in helping defendant Zavala turn himself in. Jayadev met with defendant Zavala and, at trial, he identified defendant Zavala in court. Jayadev and Aram James, an attorney that volunteered for the organization, drove with defendant Zavala by car to the Campbell Police Station. Jayadev sat in the rear passenger seat directly behind defendant Zavala, who sat in the front passenger seat. Defendant Zavala's hair was "short-cropped" and Jayadev did not see anything to distinguish any part of the back of Zavala's head from the rest of his haircut.

34

Tiffany Shelton testified that she began dating defendant Zavala when he was 17 years old and she was 20 or 21 years old and she already had a son. Her son turned one while they were together and they later had a daughter.

Shelton was 25 years old at the time of trial. She identified defendant Rodriguez in the court room and indicated he was a friend of defendant Zavala. She had heard defendant Rodriguez called J-Dog.

Defendant Zavala and Shelton began living together in his mother's Campbell home in 2005 and they moved into their own apartment in 2006. He started wearing his hair in a ponytail after the birth of their daughter in August 2007.

During the last week in January 2008, Shelton asked him to leave because he had been seeing someone else and lied to her about it. At that time, defendant Zavala was still wearing his hair in a "Mongolian," which was a ponytail at the back of his head and otherwise "bald."

After Zavala moved out in January 2008, Shelton continued to see defendant Zavala and he regularly visited the children two or three times a week. Defendant Zavala continued to contribute to her expenses and gave her $500 a month for rent.

According to Shelton, she discovered that defendant Zavala was no longer wearing his hair in a ponytail on July 5, 2008 when she was picking up her children from his sister's house and saw him.

Shelton testified that, on the afternoon of July 23, 2008, she got off work around 2 p.m., and then picked up both of her children, then about 11 months old and four years old, from daycare. Around 3:30 or 4 p.m., she met defendant Zavala at his cousin Eric's home in east San Jose. Defendant Zavala did not have a ponytail at that time. Defendant Zavala and she went to a bedroom and had sex. Her children stayed with Eric, his friend, and two or three of Eric's children; the children were in a little pool. Defendant Zavala's mother also came to Eric's house but Shelton did not speak with her. Shelton left with

35

her son when it was starting to get dark; defendant Zavala and their daughter did not go with her. According to Shelton, she returned the next morning to pick up her daughter and take her to school.

Shelton testified that defendant Zavala lost his Safeway job in about the middle of July 2008 and she learned about it approximately a week later.

Shelton was aware that defendant Zavala had turned himself in to the Campbell Police Department on or about August 1, 2008. She had dropped defendant Zavala off at the downtown office of Silicon Valley Debug. Since defendant Zavala had turned himself in, his family had been helping Shelton with her children, including watching them and picking them up from school when needed. She agreed that her life was going to be a lot tougher financially without the $500 contribution from defendant Zavala.

Shelton said that, after defendant Zavala surrendered, she read a newspaper article about the incident that mentioned the date July 23, 2008. According to Shelton, she realized that was the date on which she had seen defendant Zavala.

Shelton denied calling the Campbell Police Department to find out the charges or the date of the charged offense. She indicated that she had called the county jail to find out about the case. Shelton admitted that she had purchased and reviewed the police reports in this case. But Shelton denied reading them before giving a statement that defendant Zavala and she were together on July 23, 2008.

Shelton conceded that she never called the Campbell Police Department to say that they had the "wrong guy." She acknowledged that she knew the location of the police department. She visited defendant Zavala twice a week while he was in custody. According to Shelton, she told Mr. Braun, defendant Zavala's trial counsel, and his investigator that she had not given the information that she had been with Zavala at the time of the robbery to the police because of her many negative experiences with the

36

Campbell Police Department. She claimed to have given that information to defendant Zavala's first attorney.

Shelton had attended the preliminary hearing in April 2009. Shelton conceded that the first time anyone who was in the courtroom at trial heard that she was with the defendant at the time of the robbery was October 2009. Her 2010 trial testimony was the first time that she had told anyone in the judicial system that an innocent man was being prosecuted.

The parties stipulated that if Detective Rogers were recalled as a witness, he would testify that, when he showed the photographic lineup containing defendant Zavala's picture to witnesses, Detective Rogers knew that defendant Zavala was the suspect.

Dr. Robert Shomer, an experimental psychologist, was qualified as an expert regarding the "psychological factors that go into human perception and eyewitness identification." He indicated that under the best of circumstances, an eyewitness identification is far less accurate than fingerprints, DNA, or blood samples. He described a number of studies. There were studies showing that misidentifications had occurred in criminal cases. He discussed the nature of perception and the factors that affect perception. Eyewitness identification can be very inaccurate.

Dr. Shomer indicated that a person's perception changes when a gun is being pointed at him. Research has shown that people are significantly less accurate about the face of a person wielding a weapon than the face of a person holding a pen or something innocuous.

According to Dr. Shomer, after 24 hours, the accuracy of remembered perceptions of a crime scene declines very steeply. Live lineups are far more accurate than photographic lineups because a witness sees the whole body in three dimensions.

Dr. Shomer stated that, in general, showing photographs of suspects one by one is more accurate than showing photographs all at the same time. An exception to this

37

general rule occurs when the administrating officer is aware which photograph shows the suspect. In that circumstance, an officer is less likely to inadvertently influence the outcome if all the photographs are presented at the same time because the officer has difficulty knowing where the viewer is looking. The worst procedure is where the officer presenting the photographs knows the suspect's photograph and can tell which photograph is being examined. A change in the administrating officer's posture, an intake of breath, a focus of attention, or any verbal comment may inadvertently influence an identification. Ideally, the officer presenting the photographs should not know which photograph shows the suspect in the case.

Two criteria were important for assembling a photographic lineup. First, every photograph should match the initial description to the same extent. Second, no photo should stick out like a sore thumb.

Dr. Shomer had an opportunity to view the photographic array for defendant Zavala. He criticized the lineup because only one photograph showed an open-mouth smile and teeth and the remaining photographs showed closed mouths and the person with the darkest complexion had the open-mouth smile. If the suspect was described as a Hispanic male with a dark complexion, only two photos met that description. If the suspect's description was a Hispanic male with a dark complexion and very short hair except for a ponytail, only one photo met that description. The other photograph of a dark-skinned male depicted a man who looked Persian, had very long hair, and very distinct chin hair.

Dr. Shomer judged the Campbell Police Department admonition given to witnesses before viewing a photo lineup to be "[p]retty good."

C. *Defendant Henley's Evidence*

Defendant Hensley testified in his own behalf. In July 2008, defendant Hensley was using drugs on a daily basis. At the time of the robbery, he was "tweaked out on

38

methamphetamine" and he did not think he would have committed the robbery otherwise. But he admitted that he knew he was committing robbery.

According to Hensley, on July 22, 2008, he borrowed a black Lexus from Gedman. He then contacted Smiley. He believed that his text message regarding a black Lexus, to which Sergeant Rogers had testified, had been sent to Smiley.

Defendant Hensley testified that, on July 23, 2008, defendant Hensley and Smiley drove their cars, picked up someone named Listo who got into Smiley's car, and continued to a 7-Eleven. There, the three of them met Michelle and others. Defendant Hensley stated that four or five people got into the Lexus with him. Defendant Zavala, whom he did not know, got into the front passenger seat. Defendant Rodriguez, whom Hensley did not know, Michelle, whom he knew as "Little One," and one or two others got into the back seat. As defendant Hensley continued driving, following Smiley's car, there was a conversation about "robbing some white connect" "for some drugs." The cars stopped; defendant Hensley got out of the Lexus and met with others. He understood that they were going to rob a drug dealer for "dope and money."

Defendant Hensley drove to Jones court and parked on the south corner of Smith and Jones behind Smiley. Defendant Hensley stated he did not have a gun; only defendant Zavala had a gun.

According to defendant Hensley, everyone in the Lexus got out and all of them, except defendant Rodriguez, went to a house on Jones court. They knocked on the door, a male opened the door and let them in, and Michelle asked for "Craig." They decided they were at the wrong house. They proceeded to the house next door and entered the backyard through the gate. Michelle asked for "Craig" and spoke with a female. French was standing in the doorway of the garage and said that they had the wrong house. They left the backyard.

Defendant Hensley went back to the Lexus, backed it into the court, and told everyone to get in. Defendant Rodriguez had gone to his family's house to draw their attention away. Somebody in the Lexus called for defendant Rodriguez.

Defendant Hensley and Smiley drove their cars to a gas station. There, defendants Zavala, Hensley, and Rodriguez and Michelle, Smiley and Listo made a plan to go back to the house and "rob the connects for everything they had . . . ." Eventually, defendants Zavala, Hensley, and Rodriguez headed back to Jones. Defendant Rodriguez stayed on the corner to look out for people coming to "make a drug transaction"; defendants Zavala and Hensley returned to the targeted residence on Jones court.

Defendant Hensley described the crime. Defendant Zavala entered the garage first and said, "Get the fuck on the ground." People were already getting down as defendant Hensley entered. Defendant Zavala said to French, who was not yet on the ground, "[W]here the fuck's the safe's at?" Defendant Hensley said, "Get on the ground."

At first, French acted as though there was no safe. French eventually "kind of crawled" toward the safe and opened it; defendant Zavala was with French. Defendant Hensley denied putting a knee on anyone's back. Defendant Zavala demanded a second safe and told French, " 'I'm going to blast you. Where's the fucking safe at?' " He put the gun's barrel on French. Defendant Hensley may have said, "Take everything you touch." Defendant Hensley did go through the victims' pockets. He indicated to defendant Zavala that it was time to go.

Defendant Hensley grabbed two guitars on the way out and defendant Zavala was carrying a duffle bag. They headed quickly toward the car. A man appeared and tried to grab a guitar from defendant Hensley, saying something to the effect, " 'What are you doing with my friend's shit?' " Defendant Hensley was telling him, " 'Back the fuck up. Just back the fuck up.' " Defendant Hensley heard the male yell, " 'Get the license plate number.' " Defendant Hensley handed one guitar to defendant Rodriguez and, with a free

40

hand, he bent the license plate up so it could not be read.  Defendant Hensley threw the guitar into the back seat of the Lexus and jumped in.

Defendant Rodriguez was in the back seat and Defendant Zavala was in the front passenger seat.  Defendant Hensley yelled out to defendant Zavala, " 'Blast that mother fucker.' "  Defendant Zavala leaned out the window and told the man to back up or he was going to blast him.  Defendant Zavala fired a shot and defendant Hensley thought the man had been hit and he drove away.

Defendant Hensley stopped the car, got out, bent the license plate down, and then continued driving.  He told defendant Rodriguez to lie down so the car appeared to have only two occupants.  Eventually, the three went their separate ways.

At trial, defendant Hensley identified defendants Zavala and Rodriguez in the courtroom.  Defendant Zavala previously had a Mongolian hair style, which is "a short haircut with a big ponytail."

Defendant Hensley explained that the broken star tattoo on his forehead meant "[b]reaking free from oppression."  He affirmed that the broken star was a symbol of the Northern Riders, which is considered to be a gang by law enforcement and the state prison system.  Defendant Hensley viewed Northern Riders as a movement, not a gang.  Northern Riders would say that leaders in NF oppress the underlings in their organization.  Northern Riders are opposed to the philosophies of NF and Nuestra Raza.  He identified Aaron and Sean, the names tattooed on his wrists, as his blood brothers.  The tattoo "Sicilian" refers to his mother's side of the family.  The tattoo "WAR" on his neck was an incomplete tattoo of the word "warrior."  Members of Northern Riders consider themselves to be warriors.  NF or Nuestra Raza members consider themselves to be soldiers.  Soldiers take orders while "[w]arriors do what they feel is right."  Nortenos and Northern Riders are enemies.

41

Defendant Hensley admitted sending the text messages about pushing against Northern Riders and WAR. He indicated that he was separating himself from the Northern Riders. Defendant Hensley acknowledged saying in the text that he had his "own squad called WAR, Warriors and Riders" but he claimed that at the time he sent the text he was by himself.

Defendant Hensley asserted that he participated in the July 23, 2008 robbery to obtain drugs and money for his own benefit. He did not have a gang-related motive and he did not commit the robbery for the benefit of, or in association with, gang members. He admitted, however, that at the time of the robbery, he knew Smiley, Listo, and defendants Zavala and Rodriguez were Nortenos. Smiley had connections with Varrio Horse Shoe, a Norteno street gang. Listo was from SJG or San Jose Grande, which is another Norteno street gang. Defendant Hensley had to assuage Smiley's and Listo's concerns in order to "hang out" with them. Defendant Hensley confirmed that he was known as Peanut.

Defendant Hensley acknowledged his prior convictions of felony assault upon a peace officer and grand theft. He was testifying in the hope of receiving a lesser sentence than he would otherwise. While in custody, he offered to provide information in exchange for consideration in this case. Sergeant Dan Livingston had come to see him.

D. *Defendant Rodriguez*

Defendant Rodriguez presented no evidence.

E. *Stipulations*

The People and defendant Hensley stipulated that SJU or San Jose Unidos or United is a Norteno street gang. They also stipulated that Stephanie French was briefly present in the courtroom during the preliminary hearing. The People and defendant Zavala stipulated that his last day with Safeway was July 13, 2008. The People and all the defendants stipulated that, if Officer Billman were recalled to testify, he would testify

42

that when he responded to the crime scene on the night of the crime, he spoke to Mitchell French and French said that he believed he lost approximately $2,200 from the safe during the robbery.

### III

### *Discussion*

A. *Denial of Motions to Bifurcate Trial*

Defendants argue that the court erred in refusing to bifurcate the trial and the failure to bifurcate trial denied them a fair trial because the gang evidence was highly prejudicial and minimally relevant.[6]

"On a motion to bifurcate trial of a gang enhancement, a defendant has the burden to clearly establish that a unitary trial creates a substantial danger of undue prejudice that requires the gang enhancement to be separately tried. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) A denial of such motion is reviewed for abuse of discretion. (See *id.* at pp. 1048-1050.)

The abuse of discretion standard is deferential and "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) Our review is based on the facts as they appeared at the time of the motion. (Cf. *People v. Lewis* (2008) 43 Cal.4th 415, 452 [denial of severance motion is reviewed for abuse of discretion based on the facts as they appeared when court ruled].)

In *People v. Hernandez*, *supra*, 33 Cal.4th 1040, the California Supreme Court recognized that sometimes bifurcation of the trial of guilt and gang enhancements is appropriate: "The predicate offenses offered to establish a 'pattern of criminal gang

---

[6]     Defendant Hensley also asserts that denial of his motion to bifurcate violated his right to an impartial jury but he offers no separate argument on that claim. We address only the due process claim. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Id*. at p. 1049.)

On the other hand, since a "criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense" (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1048), "less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation. (See *People v. Martin* (1994) 23 Cal.App.4th 76, 81.)" (*Ibid*.) "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. (See *People v. Balderas* (1985) 41 Cal.3d 144, 171–172 . . . [discussing severance of charged offenses].)" (*Id*. at pp. 1049-1050.)

"Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation. In the context of severing charged offenses, [the Supreme Court has] explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]" (*Id*. at p. 1050.) Although bifurcation is not a perfect analogy to severance because "[s]everance of charged offenses is a more inefficient use of judicial resources than bifurcation" (*ibid*.), "a trial court's discretion to deny bifurcation of a charged gang enhancement is broader than its discretion to admit gang evidence when the

44

gang enhancement is not charged. (See *People v. Balderas*, *supra*, 41 Cal.3d at p. 173.)" (*Ibid.*)

A defendant's "not guilty" plea generally puts all elements of the charged crime in issue for purposes of determining admissibility. (See *People v. Daniels* (1991) 52 Cal.3d 815, 858.) "In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.)

Defendants did not demonstrate that gang evidence would be irrelevant to issues of defendants' motive and intent or witness credibility. (See Evid. Code, §§ 210, 351.) In addition, "[t]he rule is without exception that evidence which tends to show preparation looking to the commission of a crime, as well as acts and circumstances in pursuance of its accomplishment . . . , is admissible against one charged with crime. [¶] So, too, the meeting together of persons, prior to the commission of a crime with which they are charged, and the circumstances thereof may be relevant to the questions of preparation and concert of action, and therefore may be properly brought to the attention of the jury." (*People v. Arnold* (1926) 199 Cal. 471, 492.)

In this case, gang monikers connected defendants Hensley and Rodriguez to the crimes. There was evidence that "J-Dog" participated in the planning of the robbery, preparations involved contacting the SJU gang to obtain cars, "Peanut" was the person who was going get the cars, and defendant Rodriguez's street name was "J-dog" and defendant Hensley's street name was "Peanut." There was evidence that defendant Rodriguez was wearing a black and white hat or cap while standing on the corner of Jones Way and Smith Avenue and those colors are sometimes worn by Shalu Gardens gang members. Also, some of the gang evidence was relevant to show why certain witnesses were reluctant to testify or gave testimony that was inconsistent with earlier

45

statements to police. (See Evid. Code, §§ 210, 351.) Defendant Zavala recognizes that gang evidence was relevant and admissible "to explain the testimony and conduct of prosecution witnesses . . . ."

As in *Hernandez,* "defendants did not meet their burden 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried[]' . . ." and the trial court "acted within its discretion in denying bifurcation." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1051.) Neither have defendants shown that the failure to bifurcate violated due process.

In *Spencer v. State of Texas* (1967) 385 U.S. 554, the contention was that "the Due Process Clause of the Fourteenth Amendment requires the exclusion of prejudicial evidence of prior convictions even though limiting instructions are given and even though a valid state purpose -- enforcement of the habitual-offender statute -- is served." (*Id*. at p. 563.) The court rejected the argument: "To say that the two-stage jury trial in the English-Connecticut style is probably the fairest, as some commentators and courts have suggested, and with which we might well agree were the matter before us in a legislative or rule-making context, is a far cry from a constitutional determination that this method of handling the problem is compelled by the Fourteenth Amendment. Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure." (*Id*. at pp. 567-568, fns. omitted.) It also stated: "Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. [Citations.] But it has never been thought that such cases establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure." (*Id*. at pp. 563-564.)

The U.S. Supreme Court has also observed: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We,

therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly." (*Dowling v. U.S.* (1990) 493 U.S. 342, 352 [110 S.Ct. 668] [evidence of prior crime of which the defendant had been acquitted did not violate due process].) More recently, the Supreme Court has stated: "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause. See, e.g., *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (Due process prohibits the State's 'knowin[g] use [of] false evidence,' because such use violates 'any concept of ordered liberty.')" (*Perry v. New Hampshire* (2012) ___ U.S. ___, ___ [132 S.Ct. 716, 723]; see *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70, 112 S.Ct. 475, 116 L.Ed.2d 385; *Spencer v. Texas* (1967) 385 U.S. 554, 562–564, 87 S.Ct. 648, 17 L.Ed.2d 606.)"]; cf. *People v. Fuiava* (2012) 53 Cal.4th 622, 695-700 [admission of evidence of defendant's violent character did not offend due process].)

Further, in this case, the jury was instructed not to conclude from the evidence of gang activity that "the defendant is a person of bad character or that he has a disposition to commit crime." "We presume that jurors comprehend and accept the court's directions. (E.g., *People v. Bonin* (1988) 46 Cal.3d 659, 699.)" (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17; see *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury"].)

We are not persuaded that the trial court's refusal to bifurcate trial of the gang enhancements "so infused the trial with unfairness as to deny due process of law." (*Lisenba v. California* (1941) 314 U.S. 219, 228 [62 S.Ct. 280].)

*People v. Albarran* (2007) 149 Cal.App.4th 214, on which defendants Hensley and Zavala rely to argue that failure to bifurcate resulted in a fundamentally unfair trial, is distinguishable. "Albarran filed a motion for a new trial asserting sufficient evidence did not support the gang allegations and that admission of irrelevant and prejudicial gang evidence warranted a new trial on all charges. The trial court granted the new trial motion with respect to the gang allegations based upon insufficiency of the evidence, but denied it as to the charged offenses, finding the gang evidence was relevant to issues of intent." (*Id*. at p. 217.) In a split decision, the majority agreed that the gang evidence was irrelevant and extremely prejudicial as to the charged offenses and directed the trial court to enter a new order granting the defendant's motion for a new trial on all charges because the gang evidence was " ' "of such quality as necessarily prevents a fair trial." ' [Citation.]" (*Id*. at pp. 217, 231-232.)

*Albarran* can be distinguished first because it did not concern a ruling on a pretrial motion to bifurcate. Second, unlike the situation in *Albarran*, defendants have not established that the evidence was insufficient to prove the gang enhancement allegations or the gang evidence had no legitimate evidentiary purpose.

Defendant Hensley additionally argues that the court's refusal to bifurcate trial compelled him "to select a strategy to minimize the damage that the gang charges could cause" and to waive his privilege against self incrimination and admit his involvement in the crimes but deny the gang allegations. Like many defendants facing a strong prosecution case, defendant Hensley was required to decide whether to exercise his constitutional right to remain silent or testify in his own behalf. In *People v. Caro* (1988) 46 Cal.3d 1035, abrogated on another ground as recognized in *People v. Whitt* (1990) 51 Cal.3d 620, 657, fn. 29, the California Supreme Court rejected a defendant's argument that "by allowing the introduction of evidence of killings for which he might at some future date be tried, the court forced him to surrender his right to testify at penalty phase

in order to preserve his state constitutional privilege against self-incrimination as to the uncharged offenses." (*Id*. at p. 1055.) It stated: "The forced choice of which defendant complains is permissible under the federal Constitution. (See *McGautha v. California* (1971) 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711.)" (*Id*. at p. 1056.) The same is true here. As "the *McGautha* court observed: 'The criminal process . . . is replete with situations requiring the "making of difficult judgments" as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' (402 U.S. at p. 213, 91 S.Ct. at p. 1470.)" (*Ibid*.)

B. *Witness French's Volunteered Statement and Gestures*

1. *Procedural History*

Before French left the witness stand, the court and counsel were made aware of a note written by Juror No. 9 indicating that French had been making facial gestures at defendants and, at one point, he had faced the jury, shielded his mouth, pointed at defendants, and mouthed, "They did it." The note stated that French had also made a " 'FU' " finger gesture at defendants.

On further cross-examination at the end of French's testimony, defendant Zavala's counsel asked French whether he had said or mouthed anything to the jury or made any gestures indicating one or more of the defendants while the attorneys were conferring with the judge. French answered, "Nope."

Following an unreported sidebar conference with counsel and outside the presence of witness French, the court ascertained that two jurors (Jurors No. 5 and 9) had seen or heard French mouth or make a statement not in response to questioning by counsel and three jurors (Jurors No. 2, 3, and 6) had seen some sort of a nonverbal or attempted communication by French. The record indicates that the court confirmed that the jurors who had heard French say something or had read his lips were Jurors No. 5 and 9 and

49

asked the deputy to remove the other jurors  The court separately spoke with Jurors No. 5 and 9.

Juror No. 9 confirmed that she had witnessed what she had written in her note. The juror indicated that she would not be able to assess French's credibility without considering what had been seen and the conduct was coloring her perception of French's testimony.  The court ultimately excused Juror No. 9.

Juror No. 5 had also seen French point to defendants and mouth, "They did it." This juror indicated that she had not seen any other kind of verbal or nonverbal communication by French.  The juror understood that jurors were the sole judges of witness credibility and that testimony constitutes the evidence.  The juror affirmed that she could put aside what she had seen, she could keep those observations from entering into deliberations, and she could judge French's testimony and credibility without reference to that conduct.  The court told the juror that the matter could not enter into her deliberations and could not be discussed with fellow jurors. The court found that there was no need to rehabilitate Juror No. 5 because she had not "indicated in any fashion that she's prejudiced as a result" of observing French's volunteered statement.

The court refused the request of defendant Zavala's counsel to further question Juror No. 5.  The court denied the requests of defendants' counsel to remove Juror No. 5.

With regard to the other three jurors, the court determined that it was unnecessary to question them and they could consider what they had seen because French's conduct constituted demeanor, which was relevant to his credibility.  Defendant Zavala's counsel asked for Jurors No. 2, 3 and 6 to be excused and moved for mistrial since there would be an insufficient number of jurors to continue and because the jury had been "hopelessly" infected.  The court denied the motion for mistrial.

50

2. *Refusal to Discharge Juror No. 5*

Defendant Zavala maintains that Juror No. 5's observation of French's volunteered communication created a presumption of prejudice that was not rebutted and "the court's refusal to dismiss the juror was manifestly erroneous" and impliedly in violation of his right to an impartial jury. Defendant Rodriguez argues that the trial court's denial of the defendants' request to dismiss Juror No. 5 was error and violated his right to trial by an impartial jury. Defendant Rodriguez recognizes, however, that the trial court is the judge of credibility. Defendant Hensley also asserts that the court erred in failing to dismiss Juror No. 5.

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722 [81 S.Ct. 1639, 1642, 6 L.Ed.2d 751]; *In re Hitchings* (1993) 6 Cal.4th 97, 110.)" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (lead opn. of George, C.J.) (*Nesler*).) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial. (*Smith v. Phillips*, *supra*, 455 U.S. at p. 217 [102 S.Ct. at p. 946]; *In re Carpenter*, *supra*, 9 Cal.4th at pp. 648, 656.)" (*Id.* at p. 581.)

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. (*In re Carpenter* [(1995) 9 Cal.4th 634,] 653.) Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra*,

51

16 Cal.4th at pp. 578-579.)  Defendants do not argue that French's communication met the first test.[7]

The California Supreme Court has "found juror misconduct where a juror actively or passively obtains information about a case from *outside* sources.  (E.g., *People v. Ramos* (2004) 34 Cal.4th 494, 518-520 . . . [consideration of outside newspaper articles during trial]; *People v. Danks* (2004) 32 Cal.4th 269, 306-307 . . . [conversation with pastor about the case]; *People v. Nesler, supra,* 16 Cal.4th at pp. 579-580 . . . [overhearing information about the case in a bar and revealing it to fellow jurors].)" (*People v. Gamache* (2010) 48 Cal.4th 347, 398.)  "Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut." (*Nesler, supra,* 16 Cal.4th at p. 579.)  "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.  [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)

In *Nesler*, a juror had remained "in a bar while a woman revealed damaging information about defendant for half an hour," the juror "did not identify herself as a juror," "[s]he did not disclose the outside information or its source to the court," and she

---

[7]     The inherently and substantially likely test "is analogous to the general standard for harmless error analysis under California law."  (*In re Carpenter* (1995) 9 Cal.4th 634, 653.)  "Under this standard, a finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information."  (*Ibid*.)

disclosed this information to other jurors during deliberations and attempted "to persuade them to change their views." (*Nesler*, *supra*, 16 Cal.4th at p. 579.) The Supreme Court characterized the juror's behavior as "serious misconduct." (*Id.* at pp. 579-580.) The court stated that it was required on review to "independently determine whether, from the nature of [the juror's] misconduct and all the surrounding circumstances, there is a substantial likelihood [the juror] was actually biased, i.e., was unable to put aside her impressions or opinions based upon the extrajudicial information she received and to render a verdict based solely upon the evidence received at trial." (*Id.* at pp. 582-583.) It determined that "[the juror's] repeated, improper use of the damaging information concerning defendant leads us to conclude that there is a substantial likelihood [the juror] was influenced to defendant's detriment by the information she had received outside of court and, therefore, that she was actually biased." (*Id.* at p. 585 and fn. 8.)

In this case, as a threshold matter, it is not clear that Juror No. 5's observation of French's communication constitutes juror misconduct. French was under oath on the witness stand when he volunteered a communication and gestured while counsel and the court were conferring. Evidence Code section 766 provides: "A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." According to a well respected treatise, "[t]estimony of a witness that is not in response to any question falls into the same category as a completely nonresponsive answer." (Jefferson's Cal. Evidence Benchbook (4th ed. 2012) § 28.60, p. 536.) In contrast, in *Caliendo v. Warden of California Men's Colony* (9th Cir. 2004) 365 F.3d 691, upon which defendants Zavala and Rodriguez rely, a critical prosecution witness spoke with multiple jurors in the hallway for approximately 20 minutes. (*Id.* at pp. 693, 698.)

Although defendant Zavala's counsel questioned French about his volunteered communication and gestures, none of the defense counsel, presumably for tactical

reasons, chose to draw any further attention to French's volunteered statement by asking the court to strike it. A party's failure to timely move to strike volunteered evidence waives any claim that the evidence was erroneously admitted. (Evid. Code, § 353, subd. (a); see *People v. Jennings* (1991) 53 Cal.3d 334, 373-375 [objection to witnesses' volunteered, nonresponsive answers waived by failing to object, move to strike, or request curative admonition]; cf. *People v. Cooper* (1991) 53 Cal.3d 771, 836 ["When . . . a jury innocently considers evidence it was inadvertently given, there is no misconduct" and there is reversible error only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error].)

Even assuming that Juror No. 5's observation of French's volunteered communication indicating defendants' guilt gave rise to a presumption of prejudice, the presumption was adequately rebutted during the trial court's exchange with Juror No. 5. "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (*People v. Nesler*, *supra*, 16 Cal.4th 561, 582.) "Courts may properly rely on [a juror's] statements to determine whether a juror can maintain his or her impartiality after an incident raising a suspicion of prejudice. [Citations.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1304.) We defer to the trial court's implicit credibility determinations regarding Juror No. 5's repeated assurances that she could evaluate French's testimony and credibility without considering his volunteered communication. (*Id.* at p. 1305.) "We may not substitute our reading of the 'cold transcript' in this case for the credibility determinations reached by the trial court after making its inquiry, observing the juror, and listening to his responses. [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) Moreover, unlike the situation in *Nesler*, the record does not disclose that Juror No. 5 shared French's volunteered communication

with other jurors or considered that communication in her deliberations. Based upon the record before us, we conclude there is no substantial likelihood that the juror was actually biased against any defendant. Any presumption of prejudice was rebutted and the trial court properly refused to discharge Juror No. 5.

3. *Refusal to Discharge Jurors No. 2, 3, and 6 and Grant Mistrial*

Defendant Zavala contends that Jurors No. 2, 3, or 6 may have seen the same mouthed communication as Jurors No. 5 and 9 but they have regarded it "as 'non verbal communication or attempted communication,' rather than as a statement." He suggests that if questioned, they might have "reported the same irremediable prejudice" disclosed by Juror No. 9, who was dismissed from the jury. He asserts that the trial court erred in denying his motion to dismiss Jurors No. 2, 3, and 6 and his motion for mistrial. Defendant Rodriguez joins in defendant Zavala's arguments. Defendant Hensley argues that a presumption of prejudice arose from their observation of French's nonresponsive conduct, the trial court should have questioned those jurors to ascertain whether they were improperly influenced, and the presumption of prejudice was not rebutted since the court "failed to make any inquiry to ascertain whether the jurors were affected by extraneous communications." He maintains that the trial court committed reversible error and violated his due process rights to a fair and impartial jury by denying the mistrial motion.

The word "verbal" ordinarily means "of, relating to, or consisting of words." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p.1311.) Jurors No. 2, 3, and 6 did not respond when the court asked, "Did any members of the jury see—hear any statement made by Mr. French . . . ." Rather, in response to further inquiry by the trial court, Jurors No. 2, 3, and 6 indicated, apparently by a show of hands, they had seen nonverbal or attempted communication. The court stated: "Aside from the jurors who say that they heard something or that they read his lips, I'm going to include that, and that was Juror[s]

55

No. 9 and No. 5, right? Okay." The trial court impliedly inferred from its exchange with the jurors that Jurors No. 2, 3, and 6 had not heard French speak or mouth any words and this appears to be a reasonable inference based on the record before us.

As a general rule, the "jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to" the witness's "demeanor while testifying and the manner in which he testifies" and the witness's "attitude toward the action in which he testifies or toward the giving of testimony." (Evid. Code, § 780, subds. (a) and (j).) "A witness's demeanor is 'part of the evidence' and is 'of considerable legal consequence.' [Citations.]" (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; see *People v. Harris* (2013) 57 Cal.4th 804, 856.)

As discussions between counsel and the judge out of the jury's presence indicate, French had exhibited an aggressive demeanor and had exuded an "air of anger and danger" during his questioning. Defendant Zavala's counsel stated on the record that French was "staring in the direction of the defendants" "for the last half of his testimony . . . ." The trial court was concerned that further inquiry would "run the risk of magnifying out of proportion" the " 'F you' gesture." French's brief gestures while counsel and the court were otherwise engaged apparently conveyed a hostile or aggressive attitude toward defendants similar to the demeanor the jurors had observed while he was testifying. We question whether his gestures were the type of extrajudicial information that gives rise to a presumption of prejudice. (Cf. *People v. Harris, supra,* 57 Cal.4th at pp. 854-856; *People v. Cooper*, *supra*, 53 Cal.3d at p. 836.)

In any case, "[t]he trial judge is afforded broad discretion in deciding whether and how to conduct an inquiry to determine whether a juror should be discharged. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 971.) "When a court has been put on notice that there may be good cause to discharge a juror, it 'must conduct a sufficient

inquiry to determine facts alleged as juror misconduct.' [Citation.]" (*Ibid.*) "Our assessment of the adequacy of a court's inquiry into juror misconduct is deferential: We have long recognized that, except when bias is apparent from the record, the trial judge is in the best position to assess the juror's state of mind during questioning. [Citation.]" (*Ibid.*) The trial court did not abuse its discretion by declining to make further inquiries concerning Jurors Nos. 2, 3, and 6 after determining they had not observed French's volunteered communication. We find no substantial likelihood that any of the three jurors who saw French's gestures was actually biased against the defendant.

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions . . . ." [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' (*People v. Collins* (2010) 49 Cal.4th 175, 198.) 'Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' (*People v. Wharton* (1991) 53 Cal.3d 522, 565.)" (*People v. Dement* (2011) 53 Cal.4th 1, 39.) "In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. (*People v. McLain* (1988) 46 Cal.3d 97, 113.)" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.)

French's volunteered gestures did not result in any incurable prejudice. As the court presumably anticipated, the jury received basic instructions regarding setting aside bias and prejudice, what constituted evidence, and evaluating witness testimony and credibility. The jurors could consider French's testimony denying that he had engaged in any volunteered communication or gesture while counsel and the court conferred. The trial court did not abuse its discretion by denying a mistrial.

57

4. *Refusal to Give Proposed Instruction*

After the parties rested, defendant Zavala's counsel requested the following jury instruction: "This relates to during the discussion at the bench between the attorneys and the Court, the witness, Mr. French, made certain signals and gestures which were observed by some members of the jury which he denied making. You may not discuss or consider any information conveyed by these gestures, but you may consider the fact that he made the gestures as serious misconduct on his part, and the fact that he falsely denied making them in assessing his credibility." The trial court declined to give that proposed instruction.

On appeal, defendant Zavala argues that the jurors who did not see French make any signal or gesture may have learned of it from one or more of the jurors who saw something and may have been prejudiced. He maintains that the court's refusal to give the proposed instruction created the "substantial possibility that one or more jurors was biased" against him as a result of French's behavior and violated his rights to jury trial and due process. Defendant Rodriguez attempts to join in these contentions.[8]

Reviewing courts "will not presume greater misconduct than the evidence shows." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.) Moreover, it is "the general rule that a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) It is a trial court's duty to "inform the jury in all cases that the jurors are the exclusive

---

[8] Defendant Rodriguez asserts that he may raise this instructional error even though he did not join in defendant Zavala's request for the proposed instruction, citing section 1259. Defendant Rodriguez's claim of error was not preserved for review. (See *People v. Lee* (2011) 51 Cal.4th 620, 638 [defendant's "failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"]; *People v. Mitcham* (1991) 1 Cal.4th 1027, 1048 [defendant's claim of error was deemed waived because he did not join in codefendant's motion].) In any case, the trial court did not err.

judges of all questions of fact submitted to them and of the credibility of the witnesses." (§ 1127.) An instruction that " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' " is "considered 'argumentative' and therefore should not be given. [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 886.) Defendant Zavala's proposed instruction improperly invited the jury to draw unfavorable inferences regarding French's credibility and the trial court properly declined to give it.

The trial court provided the jurors with adequate guidance on their evaluation of witness credibility and what constituted "evidence" that could be considered by them. They were directed not to let bias or prejudice influence their decision. They were told not to be "biased against the defendants just because they have been arrested, charged with a crime, or brought to trial." They were instructed that, in deciding the facts, they must "use only the evidence that was presented in this courtroom," and "[e]vidence is the sworn testimony of witnesses, the exhibits admitted into evidence, anything else [the judge] told [the jurors] to consider as evidence." The jurors were also told that the attorneys' questions were not evidence and "[o]nly the witness[es]' answers are evidence." The court instructed them to "disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses." The court gave specific guidance regarding the factors relevant to their evaluation of witness testimony and told them to set "aside any bias or prejudice you may have." The court instructed: "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says; or, if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true, and ignore the rest." The trial court's refusal to give defendant Zavala's proposed instruction did not deprive any defendant of a fair trial.

59

C. *Instructional Error Related to Accomplice Testimony*

1. *Failure to Give Accomplice Instructions*

Defendant Zavala contends that the trial court erred in failing to instruct the jury regarding accomplice testimony and the requirement of corroborating evidence and this error violated his constitutional rights to jury trial and due process. He maintains that both witness R.B. and co-defendant Hensley qualified as accomplices. Defendant Rodriguez joins in defendant Zavala's arguments.

Section 1111 states: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." It defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." The statutory definition of accomplice "encompasses all principals to the crime (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960), including aiders and abettors and coconspirators. (*People v. Gordon* (1973) 10 Cal.3d 460, 468.)" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.)

"It is well settled that the phrase 'liable to prosecution' in section 1111 means, in effect, *properly* liable. Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury. Only when such facts are clear and undisputed may the court determine that the witness is or is not an accomplice as a matter of law. [Citations.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 759; see *People v. Williams* (1997) 16 Cal.4th 635, 679 ["Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.]"].)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. (*Boyer*, *supra*, 38 Cal.4th at pp. 466–467.)

60

This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. (*Ibid*.; see CALJIC Nos. 3.11, 3.18; CALCRIM Nos. 334, 335.)" (*People v. Houston* (2012) 54 Cal.4th 1186, 1223-1224.) Since there was evidence showing that defendant Hensley was a principal in the charged crimes (see § 31) and, therefore, an accomplice, the court's failure to give the appropriate accomplice instruction constituted error. (See *People v. Avila* (2006) 38 Cal.4th 491, 562; *People v. Box* (2000) 23 Cal.4th 1153, 1209, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.)

On the other hand, the evidence was not sufficient to support a finding that witness R.B. was an accomplice. A defendant has the burden of proving that a witness is an accomplice by a preponderance of the evidence. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 968.) A person's mere knowledge that a crime might be committed by another in the future or failure to prevent it does not make the person an aider or abettor and, therefore, an accomplice. (See *People v. Horton* (1995) 11 Cal.4th 1068, 1116; *People v. Stankewitz, supra,* 51 Cal.3d at pp. 90-91, *People v. Moran* (1974) 39 Cal.App.3d 398, 413.) "Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice. (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.)" (*People v. Carrington* (2009) 47 Cal.4th 145, 191.) There was insufficient evidence from which to draw a reasonable inference that R.B. intended to, and did in fact, aid, facilitate, promote, encourage or instigate the robbery. (See *People v. Houston, supra,* 54 Cal.4th at pp. 1224-1225.) There was also insufficient evidence from which to draw a reasonable inference that R.B. had the requisite specific intents to be a coconspirator in the robbery. (See *People v. Jurado* (2006) 38 Cal.4th 72, 120, 123.) Evidence of mere association with conspirators is not sufficient to support a finding that a person is a member of a conspiracy. (See *People v. Cummings* (1959) 173 Cal.App.2d 721, 728; see CALCRIM (2012 ed.) Nos. 415, 416, pp. 186, 193.)

61

"A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.  (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1271.)"  (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) " '[E]vidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself (and not simply with its perpetrators).'  [Citations.]" (*People v. Szeto* (1981) 29 Cal.3d 20, 44.)  "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  (*People v. Nelson* (2011) 51 Cal.4th 198, 218; *People v. Gonzales* (2011) 52 Cal.4th 254, 303.)  It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified.  (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1271; *People v. Negra* (1929) 208 Cal. 64, 69–70.)  It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'  (*Fauber*, *supra*, 2 Cal.4th at p. 834.)"  (*People v. Valdez* (2012) 55 Cal.4th 82, 147-148.)

Here, the record contains adequate corroborating evidence, independent of defendant Hensley's testimony (and even independent of witness R.B.'s testimony), tending to connect defendants Zavala and Rodriguez to the commission of the crimes.  At trial, victim McBee was certain the three defendants were in the group that had gone into French's backyard and recognized the faces of defendants Zavala and Hensley from the robbery.   Victims French and Esquibel identified defendant Zavala as a perpetrator in photographic lineups.  Defendant Rodriguez was identified to police by relatives who had seen him at the time and in the vicinity of the crimes.  The California Supreme Court has indicated that courts apply the *Watson* standard of review (*People v. Watson* (1956) 46

Cal.2d 818, 836) only in the absence of sufficient corroboration.[9] (*People v. Gonzales* (2011) 52 Cal.4th 254, 304.)

Defendant Zavala nevertheless argues that a court's failure to give an accomplice instruction violated his rights to a jury trial and due process and the judgment must be reversed unless the instructional omission was harmless beyond a reasonable doubt.  He compares the failure to give an accomplice instruction to a failure to instruct on an element of the offense.  He cites *Neder v. U.S.* (1999) 527 U.S. 1 (119 S.Ct. 1827), which held that a court's failure to instruct a jury on an element of a charged offense is subject to review under the *Chapman* harmless-error standard of review.  (*Neder v. U.S.*, *supra*, 527 U.S. at pp. 8-16; see *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)  The Supreme Court concluded in *Neder* that an erroneous jury instruction that omits an element of the offense did *not* "render Neder's trial 'fundamentally unfair,' as that term is used in our cases." (*Neder v. U.S.*, *supra*, 527 U.S. at p. 9.)  Likewise, a failure to give an accomplice instruction did not result in a fundamentally unfair trial in this case.

Further, defendant Zavala has not cited any authority establishing that accomplice instructions are grounded in or effectuate any federal constitutional right.  We have found only law that undermines his contention.  (See *People v. Gonzales*, *supra*, 52 Cal.4th at pp. 303-304 [discussing standard of review]; *Cummings v. Sirmons* (10th Cir. 2007) 506 F.3d 1211 ["there is no constitutional requirement that the testimony of an accomplice be corroborated by independent evidence"], cert. den. (2008) 554 U.S. 907 [128 S.Ct. 2943].)  Section 1111 merely "codifies common law concerns about the reliability of

---

[9]     Even if the *Watson* standard of review were applicable, we would find no reversible error.

accomplice testimony. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967 . . . .)"[10] (*People v. Gonzales*, *supra*, 52 Cal.4th at p. 303.) The failure to give an accomplice instruction did not violate the defendants' constitutional right to have a jury determine whether every element of a charged offense was proved beyond a reasonable doubt (see *Apprendi v. New Jersey* (2000) 530 U.S. 466, 477 [120 S.Ct. 2348]); it is not subject to the *Chapman* standard of review.

2. *Instruction Regarding Sufficiency of the Testimony of a Single Witness*

In a claim related to the failure to give an accomplice instruction, defendant Zavala argues that the court erred by instructing the jury that the testimony of a single witness sufficed to prove any fact. Defendant Rodriguez joins in these arguments.

The trial court instructed: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." That instruction correctly states the general law with respect to witness testimony (see Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]). The court failed, however, to explain the exception to that rule for accomplice testimony. (See § 1111; CALCRIM (2012 ed.) No. 301, p. 81.)[11]

---

[10] "The cautionary instructions governing accomplice testimony have their roots in English common law. [Citations.] The reason most often cited in support of these instructions is that an accomplice is inherently untrustworthy because he or she 'usually testif[ies] in the hope of favor or the expectation of immunity.' (*People v. Coffey* (1911) 161 Cal. 433, 438 . . . .) In addition, an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability. [Citation.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) "The limitation based on the common law distrust of accomplices as now embodied in section 1111 is much harsher than the common law limitation." (*People v. Tewksbury, supra,* 15 Cal.3d at p. 967.)

[11] CALCRIM No. 301 presently provides: "[Except for the testimony of <insert witness's name>, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can prove any fact. Before you

Even though the court erred by failing to explain the accomplice testimony exception to the general rule regarding the sufficiency of a single witness's testimony, the error was harmless. First, the court admonished the jury to carefully review all the evidence. Second, the court gave detailed and lengthy instructions to the jurors regarding assessing witness credibility. Third, there was ample corroborating evidence. It is not reasonably probable that defendant Zavala would have obtained a more favorable result if the court had instructed regarding the accomplice testimony exception to the general rule regarding the sufficiency of a single witness's testimony. (Cal. Const., art. VI, § 13; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

3. *Due Process*

Defendant Rodriguez asserts that the trial court's instructional errors related to accomplice testimony deprived him of due process. Although we agree that the trial court erred, its errors did not result in a denial of due process.

"Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." (*Dowling v. U.S.* (1990) 493 U.S. 342, 352 [110 S.Ct. 668].) "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." (*Lisenba v. People of State of California* (1941) 314 U.S. 219, 236 [62 S.Ct. 280].)

More than 100 years ago, the U.S. Supreme Court stated: "It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them." (*Holmgren v. U.S.* (1910) 217 U.S. 509, 523-524 [30 S.Ct. 588].) In that case, since "no

conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

such charge was asked to be presented to the jury by any proper request in the case" and the requested instruction did not properly state the applicable law, there was no error. (*Ibid*.) The high court subsequently observed: "Accomplice instructions have long been in use and have been repeatedly approved. See, e.g., *Holmgren v. United States*, 217 U.S. 509, 523-524, 30 S.Ct. 588, 591-592, 54 L.Ed. 861 (1910). In most instances, they represent no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity. See, e.g., *Crawford v. United States*, 212 U.S. 183, 204, 29 S.Ct. 260, 268, 53 L.Ed. 465 (1909)." (*Cool v. U. S.* (1972) 409 U.S. 100, 103 [93 S.Ct. 354].)

In this case, the jury was instructed at length on the evaluation of witness testimony and told to consider, among other things, whether a witness's testimony was "influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided." The instructional errors related to accomplice testimony did not violate due process or render the trial fundamentally unfair.

D. *Right to Confrontation*

1. *Procedural History*

In support of his in limine motion to exclude hearsay evidence of prior offenses and activities allegedly connected to him, defendant Hensley contended that there was a danger of improper use of "evidence of prior activities or offenses of the Shalu Gardens gang, or the Northern Hispanic gangs" and asserted that he was not associated with those gangs. He raised a general objection to "any hearsay evidence which the prosecution may proffer under the guise of expert or other law enforcement testimony." He asserted that "[i]t would be improper for the prosecution to use the gang expert to establish necessary elements of the offense or the gang enhancement as a substitute for testimony by a percipient witnesses, and in a manner which *may* violate defendant's fundamental

66

rights of due process, confrontation and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution." (Italics added.) No particular out-of-court statement was identified. His contemporaneous in limine motion to bifurcate trial of the gang enhancements was based on the prejudicial effect of the gang evidence, not the confrontation clause of the Sixth Amendment to the U.S. Constitution.

Defendant Zavala's in limine motion to exclude gang-related evidence or, alternatively, to bifurcate the trial of the gang enhancement allegations, was brought on the grounds that there was no evidence the charged crimes were gang related or the evidence of "gang-relatedness" was so weak that its admission in the case in chief would be unduly prejudicial. The written motion did not cite *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*) or mention his constitutional right to confrontation.

At the beginning of the hearing on the in limine motions, the court indicated that defendant Rodriguez's counsel had joined in the codefendants' motions to preclude evidence that the crimes were gang-related. The court described the gist of defendant Zavala's argument as the prosecution's lack of evidence relating to gangs and his counsel agreed. The People called Sergeant Dan Livingston as a witness. Defense counsel stipulated that, for purpose of the hearing, Sergeant Livingston was an expert in northern Hispanic criminal street gangs. The sergeant testified at length.

Following Sergeant Livingston's testimony at the hearing on the in limine motions, defendant Zavala's counsel presented argument. He contended that the court should exclude gang-related evidence altogether because the charged robbery was not a gang crime. Zavala's counsel was concerned that the People's gang expert, Sergeant Livingston, was going to recount statements made by Kyle Moneyhun to police. He mentioned that, if Sergeant Livingston were to testify regarding what Moneyhun had told him, those statements would be coming into evidence in violation of defendant Zavala's

67

confrontation rights under the Sixth Amendment as set forth in *Crawford, supra,* 541 U.S. 36 and *Davis, supra,* 547 U.S. 813. Counsel urged the court to at least bifurcate the trial, maintaining that the gang evidence was not cross admissible on issues of guilt and Sergeant Livingston's testimony as a gang expert would include prejudicial hearsay statements.

Defendant Zavala's counsel did not specifically interpose a confrontation objection but he mentioned in the course of argument that he was also going to bring a separate in limine motion based on *Crawford* and noted that several California cases had discussed hearsay related by an expert in relation to *Crawford* but he had not brought case citations with him. Counsel was aware that those cases had found the trial courts had not abused their discretion in allowing the experts to testify to hearsay but he attempted to distinguish those cases on the ground that the hearsay in those cases concerned the defendant's membership in a gang while hearsay in this case would bear on the defendant's guilt. He referred to the New York case of *People v. Goldstein*, 6 N.Y.3d 119.[12] In closing, he argued that the court must bifurcate the trial of the gang enhancements because of the potential "very serious problems" that would be created if Sergeant Livingston testified to his opinion that the robbery was gang related "because of the way it was planned and because of what Mr. Zavala said . . . ." Counsel for defendants Hensley and Rodriguez joined in those arguments.

The prosecutor responded that the gang expert's testimony would not violate *Crawford* because the court would instruct the jury that the sergeant's "testimony as it

---

[12] In *People v. Goldstein* (2005) 843 N.E.2d 727, New York's high court concluded that statements made to a forensic psychiatrist, whom the People retained to testify at trial, were testimonial hearsay offered for their truth. (*Id*. at pp. 729, 733.) The court concluded that the defendant's rights under the confrontation clause were violated when the expert recounted the interviewees' statements without giving the defendant an opportunity to cross-examine them. (*Id*. at pp. 732-734.)

relates to the underlying facts" was not admitted for its truth but only to evaluate the expert's testimony. The court indicated that there was sufficient evidence from which a jury could infer that the crime was gang-related and the gang evidence might be admissible on issues of intent and motive and, accordingly, bifurcation was inappropriate because there was sufficient cross-admissibility. The court denied the motions to exclude gang evidence and the motions to bifurcate the trial.[13]

On April 5, 2011, defendant Zavala filed a separate motion to exclude all references by Sergeant Livingston, the prosecution's gang expert, to accusatory statements made by Moneyhun and recited in Campbell Police Department reports because their admission would violate his right to confrontation under the Sixth Amendment as set forth in *Crawford, supra,* 541 U.S. 36 and *Davis, supra,* 547 U.S. 813. The motion urged the court to reconsider its denial of bifurcation and, absent bifurcation, to "preserve his right to confront the witnesses against him by precluding Sgt. Livingston from making reference to hearsay reports that Zavala and Rodriguez planned the crime and that Zavala threatened to kill a victim or a witness."

A jury was selected. On April 7, 2010, trial commenced.

---

[13] It is critical to note that defendant Hensley's and Zavala's written motions in limine to exclude gang-related evidence because of the danger of improper use or potential prejudice targeted all out-of-court statements related by the prosecution's expert, not specifically testimonial statements. Nontestimonial "basis evidence" to explain expert testimony is clearly not inadmissible under *Crawford* and its progeny (see e.g. *Michigan v. Bryant, supra,*131 S.Ct. at p. 1155 [admissibility of nontestimonial statement is not the concern of the confrontation clause]; *Crawford, supra,* 541 U.S. at pp. 53 [testimonial hearsay is the primary object of Sixth Amendment's confrontation clause], 68 ["it is wholly consistent with the Framers' design" to exempt nontestimonial hearsay statements "from Confrontation Clause scrutiny altogether"]) and *People v. Gardeley* (1996) 14 Cal.4th 605, 617-619. We would find that those pretrial motions were properly denied as overbroad if we were to treat them as motions invoking the Sixth Amendment right to confrontation.

On April 9, 2010, out of the presence of the jury, defendant Zavala's attorney renewed the motion to exclude gang evidence or to bifurcate trial. He also separately moved to exclude Sergeant Livingston's references to gang incidents that did not result in either an arrest or conviction of defendant Zavala because it was "simply a way of spreading Mr. Zavala's bad character in front of the jury . . . ." The court indicated that it would not allow Sergeant Livingston to testify as to Moneyhun's statements but its ruling on bifurcation would stand.

During the extended exchange, defendant Rodriguez's counsel asked the court to not admit evidence of prior arrests because they were not relevant and Sergeant Livingston could explain his opinion based on defendant "Rodriquez's prior admissions and the people he hangs out with and the colors and so forth." The trial court indicated that, once the prosecutor decided which prior arrests he wished to introduce into evidence, the court would discuss it with counsel.

The discussion continued and defendant Hensley's counsel asked the court to exclude evidence that the mother of defendant Hensley's girlfriend identified him as a Norteno gang member because counsel did not "know how any expert can give that any kind of weight" in determining the defendant is a gang member. The court expressed its belief that one question was whether or not the statement by the girlfriend's mother was testimonial. No ruling was made on the request of defendant Hensley's counsel to exclude the evidence and counsel never expressly objected to that evidence on confrontation grounds on the record.

Defendant Zavala's counsel noted there were several individuals who made statements regarding defendant Zavala's gang membership. Counsel moved to amend his prior in limine motion to include that evidence within the motion but he did not state any confrontation objection. Defendant Hensley's counsel then renewed the defendant's motion to bifurcate trial of the gang enhancements. Defendant Zavala's counsel asserted

70

that the sergeant's testimony regarding his opinion would entail the admission of otherwise inadmissible evidence and bifurcation was the only proper solution. The court suggested that the issue was whether *Crawford* applies to statements relied upon by an expert that would be otherwise inadmissible under the confrontation clause. Defendant Zavala's counsel agreed that was issue. The court indicated that it was still thinking. No ruling was obtained on these matters before the People called Sergeant Livingston to testify.

During his testimony, Sergeant Livingston indicated his belief that the robbery was committed in association with, for the benefit of, and partly at the direction of the Shalu Gardens street gang. One of the circumstances contributing to his opinion was the persons present for the planning of the crime. Sergeant Livingston testified without objection: "The two primary people initially who were planning the crime were Mark Zavala and Jonathan Rodriguez, two influential members of Shalu Gardens." When asked why he had said that, the sergeant replied, "Based on prior contacts, speaking with other people, reviewing police reports." Counsel for defendant Zavala objected.

Out of the jury's presence, defendant Zavala's counsel explained that the problem with Sergeant Livingston's testimony was that it implied that he had some knowledge from reading the reports beyond the information provided by witness R.B. Counsel for defendant Rodriguez indicated that Evidence Code section 352 should be applied to the hearsay evidence of planning. Zavala's counsel asserted there was a confrontation issue because Moneyhun and Stojkovic had also made statements to police.

The court noted that the expert had not revealed Moneyhun's and Stojkovic's specific out-of-court statements and indicated the general rule permitted an expert to rely on otherwise inadmissible evidence, including hearsay statements, if the evidence is of the type that experts rely upon in forming an opinion. It ruled that the prosecution's expert could rely on out-of-court statements of other gang members, witnesses, and

71

officers and those statements were admissible with a limiting instruction that they were not offered for their truth.

Defendant Zavala's counsel argued that the sergeant needed to affirmatively say that he was relying on R.B.'s statements because otherwise the jury would be left with "the impression that he's relying on statements made by other people. The court ruled that the expert could not refer to statements made by Moneyhun and Stojkovic regarding defendants Zavala's and Rodriguez's planning of the crime.

The trial court gave a limiting instruction to the jurors, informing them that, although Sergeant Livingston may be relying on the statements of others in reaching an opinion, evidence of those statements were not offered for the truth of the matter and the jurors could not consider the statements for their truth.

Sergeant Livingston then began testifying regarding "pattern" offenses. When the prosecutor asked about an offense committed on June 5, 2007, defendant Zavala's counsel asked to approach and there was an unreported sidebar conference. When the prosecutor continued with questioning and the witness began to answer, counsel interrupted and stated that he had the same objection to the details of that offense and "all other pattern offenses." The court overruled the objection. The record does not indicate the legal ground for the objection.

In connection with his opinions on the defendants' gang membership, Sergeant Livingston testified to, among other things, a number of incidents involving police. The sergeant recounted an incident that occurred on November 19, 2005 where, following a report of harassment, the police contacted a group that included several individuals, including defendants Zavala and Rodriguez, who were dressed in gang clothing. Two known SLG gang members and an SLG associate were present. Two individuals indicated that the males present were all SLG members. After the testimony was

72

adduced, defendant Zavala's counsel objected on hearsay and confrontation grounds. The court overruled the objection.

During redirect-examination of Sergeant Livingston, the trial court reminded the jury that Sergeant Livingston's testimony about others' statements fell under the court's previous instruction and the testimony was being admitted for the limited purpose of showing the basis of the sergeant's opinion and not for the truth of the matter stated.

2. *Appellate Contentions*

On appeal, defendant Hensley complains that Livingston's testimony regarding the basis for his expert opinion whether the robbery was committed in association with, for the benefit of, and partly at the direction of the Shalu Gardens street gang "informed the jury that Livingston was not relying exclusively on [R.B.]." He also attacks Livingston's testimony regarding the defendants' gang membership that was based on out-of-court statements "from persons not offered for cross-examination." He now asserts that the statements made by Moneyhun, Stojkowicz, and others were testimonial hearsay and "Sergeant Livingston was not offering expert opinion testimony but rather serving as [a] conduit for hearsay . . . ." Defendant Zavala joins in defendant Hensley's arguments and asserts that the testimonial hearsay recited by Officer Livingston violated his state and federal right to confront the adverse witness against him. (See U.S. Const. 6th Amend.; Cal. Const., art. I, § 15.)

Defendant Rodriguez similarly argues that the admission of out-of-court statements to show the basis of Sergeant Livingston's opinion that the crime was gang-related violated his Sixth Amendment right to confront witnesses since those statements were hearsay and often testimonial. He states that "it is clear on the record that many of the statements on which Livingston relied are testimonial hearsay, and with respect to others the prosecution failed to meet its burden to establish their admissibility by showing that they did not constitute testimonial hearsay."

73

3. *Crawford and its Progeny*

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." "The Fourteenth Amendment renders the Clause binding on the States. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)."[14] (*Michigan v. Bryant* (2011) ___ U.S. ___, ___ [131 S.Ct. 1143, 1152].) "In *Crawford v. Washington* (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the high court held that this provision prohibits the admission of out-of-court *testimonial* statements offered for their truth, unless the declarant testified at trial or was unavailable at trial and the defendant had had a prior opportunity for cross-examination. (See *Davis v. Washington* (2006) 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224; *People v. Cage* (2007) 40 Cal.4th 965, 969.)" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1158.) "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.)

In *Crawford*, the Supreme Court declined to provide a comprehensive definition of testimonial statements. (*Crawford*, *supra*, 541 U.S. at p. 68.) But it gave some guidance: "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,'

---

[14] Article I, section 15 of the California Constitution provides: "The defendant in a criminal cause has the right . . . to be confronted with the witnesses against the defendant." The California Constitution also states: "In criminal cases the rights of a defendant . . . to confront the witnesses against him or her . . . shall be construed by the courts of this State in a manner consistent with the Constitution of the United States." (Cal. Const., art. I, § 24.)

[citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' [citation]." (*Id*. at pp. 51-52.)

Out-of-court statements, even if offered for their truth, are not ipso facto testimonial. (See *Crawford*, *supra*, 541 U.S. at p. 51 ["not all hearsay implicates the Sixth Amendment's core concerns"].) The Supreme Court explained by way of example: "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted." (*Ibid*.) The court recognized that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." (*Id*. at p. 68.) It also reiterated that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)." (*Id*. at p. 60, fn. 9.)

In *Davis*, the United States Supreme Court held that a victim's initial statements to a 911 operator that identified her assailant, who was at the premises, were not testimonial. (*Id*. at pp. 829) The court made clear the Confrontation Clause applies only to *testimonial* hearsay. (*Davis*, *supra*, 547 U.S. at pp. 823-824.) "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Id*. at p. 821.) The court explained that statements "are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary

75

purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Id*. at p. 822.) In contrast, statements made during police interrogation "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid*., fn. omitted.) Thus, a domestic violence victim's statements to police concerning the past actions of her husband, which presented no ongoing emergency, were testimonial. (*Id*. at pp. 829-832.)

In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [129 S.Ct. 2527] (*Melendez-Diaz*), "Melendez–Diaz was charged with distributing cocaine and with trafficking in cocaine in an amount between 14 and 28 grams. [Citations.]" (*Id*. at p. 308.) At trial, the prosecution placed into evidence "three 'certificates of analysis' showing the results of the forensic analysis performed on the seized substances." (*Ibid*.) The certificates, which "were sworn to before a notary public," "reported the weight of the seized bags" and the analyst's finding that the substance contained cocaine. (*Ibid*.)

The U.S. Supreme court determined in *Melendez-Diaz* that the analysts' certificates were testimonial because they were "quite plainly affidavits" and were made under circumstances that provided an objectively reasonable basis for believing they would be available for use at a later trial. (*Id*. at pp. 310-311.) Consequently, the certificates were "functionally identical to live, in-court testimony" and "the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Ibid*.) It held that "[a]bsent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ' "be confronted with" ' the analysts at trial. *Crawford*, *supra*, at 54, 124 S.Ct. 1354." (*Id*. at p. 311, fn. omitted.)

In the course of its analysis, the Supreme Court explained "the relationship between the business-and-official-records hearsay exceptions and the Confrontation Clause." (*Id*. at p. 324.) "As we stated in *Crawford*: 'Most of the hearsay exceptions

76

covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.' 541 U.S., at 56, 124 S.Ct. 1354. Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (*Ibid*.)

In *Bullcoming v. New Mexico* (2011) ___ U.S. ___ (131 S.Ct. 2705), the defendant was charged with aggravated driving while intoxicated. (*Id*. at p. 2711.) The principal evidence against him was a forensic laboratory report certifying that his "blood-alcohol concentration was well above the threshold for aggravated DWI." (*Id*. at p. 2709.) "At trial, the prosecution did not call as a witness the analyst who signed the certification. Instead, the State called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." (*Ibid*.) The U.S. Supreme Court held that the confrontation clause does not permit "the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification" unless "the analyst who made the certification . . . is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." (*Id*. at p. 2710.) The court stated that "the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." (*Id*. at p. 2716.)

In *Michigan v. Bryant, supra,* 131 S.Ct. 1143, the U.S. Supreme Court held that statements made by a shooting victim to police officers who discovered him mortally wounded in a gas station parking lot were nontestimonial because the objective

77

circumstances indicted that "the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' *Davis*, 547 U.S., at 822, 126 S.Ct. 2266." (*Id*. at p. 1150.) The court observed: "Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." (*Id.* at p. 1155.) It explained: "When, as in *Davis*, the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (*Ibid*., fn. omitted.) The court advised that "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." (*Id*. at p. 1162.)

More recently, in *Williams v. Illinois* (2012) ___ U.S. ___ (132 S.Ct. 2221), in a court trial for rape, the prosecution's expert witness confirmed that an outside laboratory, Cellmark, produced a DNA profile matching a DNA profile produced by the state police laboratory based upon the defendant's blood sample that had been obtained when he was arrested on another occasion. (*Id*. at pp. 2227-2231, 2236 (plur. opn. of Alito, J.).) Cellmark's report was not admitted into evidence. (*Id*. at p. 2230.) The expert testified that Cellmark's business records indicated that the state laboratory had sent the rape victim's vaginal swabs to Cellmark. (*Id*. at pp. 2227, 2230.) A fractured Supreme Court

78

affirmed the judgment of the Illinois Supreme Court, which had upheld the judgment of conviction against a claim that the expert's testimony had violated the defendant's confrontation rights. (*Id*. at pp. 2231-2232, 2244.)

The plurality opinion in *Williams* articulated two independent rationales for its conclusion. (*Id*. at pp. 2228, 2244.) The first reason was that the challenged expert testimony regarding Cellmark's out-of-court statements was not admitted for the purpose of proving the truth of the matter asserted but rather for "the legitimate nonhearsay purpose of illuminating the expert's thought process." (*Id*. at pp. 2228, 2239-2240.) The second basis was that the out-of-court statement was nontestimonial under the objective "primary purpose" test. (*Id*. at pp. 2228, 2242-2243.) The plurality reasoned that the outside laboratory report's "primary purpose," "viewed objectively," was "to catch a dangerous rapist who was still at large" and "not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time," and "not to accuse petitioner or to create evidence for use at trial." (*Id*. at p. 2243.)

In a separate opinion concurring in the *Williams* judgment, Justice Thomas also concluded that Cellmark's out-of-court statements were not testimonial but for an entirely different reason, namely their lack of formality and solemnity. (*Id*. at p. 2225.) He stated that "[t]he Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact," and "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Id*. at p. 2260.)

4. *Forfeiture by Failure to Make a Specific and Timely Objection*

"The right to confrontation may, of course, be waived, including by failure to object to the offending evidence . . . ." (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 314, fn. 3; see also Evid. Code, § 353.) In California, "[t]he general rule is that 'when an in limine ruling that evidence is admissible has been made, the party seeking

exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal' (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3), although a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1171 . . . )." (*People v. Brown* (2003) 31 Cal.4th 518, 547.)

"[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190, overruled on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

The mere mention of *Crawford* or its progeny in the context of arguing a motion to exclude all potentially prejudicial gang-related evidence does not convert the motion into a confrontation objection. Neither do we believe that a blanket, pretrial objection to all "hearsay" evidence proffered under the "guise" of expert testimony suffices to preserve a confrontation claim because the admission of out-of-court statements does not necessarily implicate the confrontation clause; the statements must be both hearsay and testimonial.[15] (*Crawford*, *supra*, 541 U.S. at pp. 51, 60, fn. 9; see *People v. Loy* (2011)

---

[15] The California Supreme Court has stated: " 'On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " [Citations.]'

52 Cal.4th 46, 66 [" 'Not all erroneous admissions of hearsay violate the confrontation clause. . . .   Only the admission of *testimonial* hearsay statements violates the confrontation clause. . . .'  [Citations.]"].)  Further, a global hearsay or Evidence Code section 352 objection to the admission of evidence of the basis of an expert's opinion

---

[Citation.]"  (*People v. Carpenter* (1997) 15 Cal.4th 312, 403, superseded by statute on another ground as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107.)  "Ordinarily, the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem.  [Citations.]"  (*People v. Coleman* (1985) 38 Cal.3d 69, 92, disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32; see *id*. at p. 93 ["trial court abused its discretion by permitting extensive questioning of the expert witnesses on the contents of the letters in which defendant's wife claimed, inter alia, that he had previously threatened her with violence"].)  "Although an expert may base an opinion on hearsay, the trial court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.'  (*People v. Montiel* (1993) 5 Cal.4th 877, 919 . . . .)"  (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172; see Evid. Code, §  352.)  Further, a trial court " 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.'  (*People v. Price* (1991) 1 Cal.4th 324, 416 . . . .)"  (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 619.)  Trial courts seem to have lost sight of these principles with respect to gang evidence and reviewing courts should carefully scrutinize their rulings under Evidence Code section 352.  To avoid undue prejudice from gang evidence *not* admitted for its truth, trial courts may find it necessary in certain cases to require counsel to examine its gang expert in the form of hypothetical questions.  (See *People v. Xue Vang* (2011) 52 Cal.4th 1038, 1048 [an expert may "express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose"]; see also *Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2228 (plur. opn. of Alito, J.) ["Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true.  It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.  While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts.  [Citation.]".)  In this appeal, however, defendants are not challenging any adverse ruling under Evidence Code section 352.

81

does not allow a particular out-of-court statement to be considered in its appropriate context with regard to whether it is in fact testimonial.

In the absence of a timely and specific objection to a particular statement on confrontation grounds, which places the burden on the government to establish the admissibility of the statement (cf. *Idaho v. Wright* (1990) 497 U.S. 805, 816 [110 S.Ct. 3139] [the state, as the proponent of evidence presumptively barred by confrontation clause, has burden of proof]), reviewing courts should not presume that an out-of-court statement given to a law enforcement officer under unclear circumstances, possibly without testimonial purpose, is testimonial. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [error must be affirmatively shown].)

Out-of-court statements obtained by law enforcement officers during criminal interrogations in the course of an investigation of past crime under nonemergency circumstances or in preparation for trial are presumably testimonial. (See *Crawford*, *supra*, 541 U.S. 36, 52 ["Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard"].) Statements given to police for other purposes, however, may not be testimonial. (See *Davis v. Washington*, *supra*, 547 U.S. at p. 822 [statement is not testimonial where "primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency"]; *Michigan v. Bryant*, *supra*, 131 S.Ct. at p. 1155 [statement is not testimonial where it is "not procured with a primary purpose of creating an out-of-court substitute for trial testimony"].) Where the primary purpose of questioning by law enforcement is *not* to "establish or prove past events potentially relevant to later criminal prosecution" (*Davis v. Washington*, *supra*, 547 U.S. at p. 822, fn. omitted), perhaps such as where information is provided to merely deter future criminal activity or maintain institutional security or the safety of those incarcerated, the statement may not be testimonial and not implicate the Sixth Amendment's confrontation clause.

In his dissenting opinion, Presiding Justice Rushing assumes that most, if not all, of the extrajudicial gang-related statements conveyed by Sergeant Livingston were testimonial. His assumption demonstrates the vital importance of requiring a timely and specific confrontation objection to identified evidence and the wisdom of not treating sweeping motions to exclude a nebulous body of out-of court statements relied upon by an expert in reaching an opinion as preserving a claim of *Crawford* error as to any such statement ultimately admitted. The People should be given the opportunity to show that a particular out-of-court statement that will by disclosed by its expert is not testimonial in response to a specific and timely confrontation objection.

Justice Rushing also assumes that unreported side bar conferences or unspecified objections involved the confrontation issue. "Under California law, error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless 'an objection to or a motion to exclude or to strike the evidence . . . was timely made and *so stated as to make clear the specific ground of the objection or motion*.' (Evid. Code, § 353, subd. (a), italics added.) 'In accordance with this statute, [the California Supreme Court has] consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citation.]' (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) Although no 'particular form of objection' is required, the objection must 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' ([*People v. Partida* (2005) 37 Cal.4th 428,] 435.)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 354; see Assem. Com. on Judiciary com, 29B, Pt.1A West's Ann. Evid. Code (2011 ed.) foll. § 353, p. 599.) "A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal."

83

(*People v. Marks* (2003) 31 Cal.4th 197, 228; but see *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [but a new constitutional claim may be considered on appeal if defendant is merely asserting that "the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution"; the reviewing court's "rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well"].)  In general, where a defendant does not expressly object on confrontation grounds at trial, the constitutional claim is not preserved for appeal.  (See *Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 314, fn. 3; *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14; Evid. Code, § 353.)

Although confrontation concerns were repeatedly mentioned, defendants Hensley and Rodriguez have not pointed to any particular out-of-court statement admitted into evidence after a timely and specific confrontation objection was overruled by the court. Although defendant Hensley's counsel objected to an out-of-court statement made by the defendant's ex-girlfriend's mother regarding his gang membership, counsel did not specifically object on confrontation grounds.[16]  Defendant Zavala's counsel raised a

---

[16]     On the record before us, it is not completely out of the realm of possibility that this particular statement was made in an emergency context and, therefore, not testimonial since the police report stated that defendant Hensley's ex-girlfriend and her mother were in fear for their safety.  (See *Davis*, *supra*, 547 U.S. at p. 822.)  Moreover, Hensley's counsel merely complained on the record that counsel "did not know how any expert can give [such a statement] any kind of weight" with respect to gang membership.  The U.S. Supreme Court has not held that an expert's mere reliance on out-of-court statements in forming an opinion violates the confrontation clause.  (See *Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2238, fn. omitted (plur. opn. of Alito, J.) [lack of independent proof of the extrajudicial basis of an expert's opinion may render it irrelevant but "the Confrontation Clause, as interpreted in *Crawford*, does not bar the admission of irrelevant evidence, only testimonial statements by declarants who are not subject to cross-examination"], 2257, fn. omitted (concurring opn. of Thomas, J.) ["It is the expert's disclosure of those [extrajudicial] facts that raises Confrontation Clause concerns."].)  We query whether the paucity of independent evidence to establish the truth of the extrajudicial underpinnings

confrontation objection concerning Moneyhun's and Stojkovic's statements to police and the trial court ultimately ruled that Sergeant Livingston could *not* refer to their statements regarding defendants Zavala's and Rodriguez's planning of the robbery. Although defendant Zavala's counsel also objected to the admission of evidence of the details of the "pattern offenses," the basis of that objection was not preserved on the record. Defendants have forfeited all Sixth Amendment confrontation claims *except* to the extent that their "claims rely on the same facts and legal standards the trial court itself was asked to apply . . . ." (*People v. Riccardi* (2012) 54 Cal.4th 758, 801.) It bears repeating that the trial court granted the only in limine *Crawford* motion, which was brought by defendant Zavala and directed at Moneyhun's statements.

Also, to the extent defendants failed to secure rulings on their confrontation concerns, they were not preserved for appellate review. "As [the California Supreme Court has] held, '[f]ailure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance. [Citation.]' (*People v. Lewis* (2008) 43 Cal.4th 415, 481; see also *People v. Morris* (1991) 53 Cal.3d 152, 195

---

of an expert's opinion goes to only its weight. (Cf. *Delaware v. Fensterer* (1985) 474 U.S. 15 [106 S.Ct. 292] (*per curiam*), 22 [admission of an expert's opinion "did not offend the Confrontation Clause despite his inability to recall the basis for that opinion" because an expert's "inability to recall on the stand the basis for his opinion presents none of the perils from which the Confrontation Clause protects defendants in criminal proceedings" and "the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"], 22 ["[N]othing in the Federal Constitution forbids the conclusion reached by the trial court in this case: that the expert's inability to recall the basis for his opinion went to the weight of the evidence, not its admissibility. [Citations.]"], 22-23 [declining to "decide whether the introduction of an expert opinion with no basis could ever be so lacking in reliability, and so prejudicial, as to deny a defendant a fair trial"].)

85

[defendant forfeited appellate challenge to admission of testimony by failing 'to press for' a ruling 'until he obtained one'].)"  (*People v. Valdez* (2012) 55 Cal.4th 82, 143.)

The U.S. Supreme Court has stated that the "States may adopt procedural rules governing the exercise of [confrontation] objections."  (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 314, fn. 3.)  We cannot overstate the importance of having a governing rule that demands timely, specific, and on-the-record confrontation objections to identified out-of-court statements.  Where such an objection is made, the prosecution has the opportunity to show that a particular out-of-court statement is not testimonial and the trial court can then determine, in the first instance and in the appropriate context, whether the challenged statement is testimonial.  Such a procedure is even-handed and orderly and might reduce appeals raising confrontation claims in California.

5.  *Constitutional Right to Confrontation*

Even assuming defendants' confrontation objections were fully preserved for appeal, we find no basis for reversal.

The trial court did overrule defendant Zavala's confrontation objection to Sergeant Livingston's testimony explaining that his opinion that the crime was gang-related was based in part on "prior contacts, speaking with other people, reviewing police reports" indicating that the two primary people planning the crime were defendants Zavala and Rodriguez, two influential members of Shalu Gardens.  The essence of Zavala's objection was that Livingston's testimony implied that other nontestifying witnesses had made statements to police concerning their planning of the crime.  The trial court could properly reject that argument since R.B. had already testified to the planning of the robbery and Sergeant Livingston did not allude to any other statement by a nontestifying witness to the planning of the robbery.  Defendants have not pointed to any trial testimony recounting Moneyhun's or Stojkovic's statements to police concerning that planning.

86

The trial court also overruled defendant Zavala's express confrontation objection to two out-of-court statements concerning the defendant's membership in the SLG gang, which were made to officers responding to a reported disturbance on November 19, 2005. Sergeant Livingston was one of the responding officers. The basis evidence was explicitly not admitted for its truth.[17]

In this case, the trial court permitted Sergeant Livingston to testify to the extrajudicial basis of his opinion as a gang expert based on principles of California law. (See *People v. Gardeley*, *supra*, 14 Cal.4th at pp. 617-619 [gang expert "could reveal the information on which he had relied in forming his expert opinion, including hearsay"].) "Expert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular

---

[17] We take note that matters within the sergeant's personal knowledge established a strong basis for Sergeant Livingston to believe that defendants Zavala and Rodriguez were SLG gang members. They both had gang-related tattoos and SLG gang indicia associated with them was found during searches in which Sergeant Livingston was personally involved. Sergeant Livingston was one of the responding officers to the November 19, 2005 incident involving a reported disturbance by a large group and defendants Zavala and Rodriguez, who were part of the group, were dressed in gang-related attire. In addition, defendant Hensley admitted at trial that he knew defendants Zavala and Rodriguez were Nortenos. While "[n]ot every crime committed by gang members is related to a gang" (*People v. Albillar* (2010) 51 Cal.4th 47, 60), where defendants "actively assist[] each other in committing crimes" and "their common gang membership ensure[s] that they can rely on each other's cooperation in committing these crimes," there may be substantial evidence to find that the "defendants came together as gang members" to commit crimes and, accordingly, "they committed these crimes in association with the gang. [Citations.]" (*Id*. at p. 62.) As to defendant Hensley, it is important to remember that the gang enhancement established by section 186.22(b)(1) "does not depend on membership in a gang at all." (*Id*. at p. 68.) "Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Ibid*.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Ibid*.)

field in forming their opinions. [Citations.]" (*Id*. at p. 618.) "[B]ecause Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*Id*. at pp. 618-619.)

An out-of-court statement is not "hearsay evidence" if it is not admitted for the truth of the matter stated. (Evid. Code, § 1200, subd. (a); see Sen. Com. on Judiciary com., 29B, Pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1200, p. 4 [A "statement that is offered for some purpose other than to prove the fact stated therein is not hearsay. [Citations.]"]; cf. Fed. Rules of Evid., rule 801(c).) The California Supreme Court has established that an expert witness's recitation of out-of-court statements for the nonhearsay purpose of showing the basis of the expert's opinion "does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]"[18] (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 619.) Here, the trial court repeatedly admonished the jury that the out-of-court statements relied upon by Sergeant Livingston could not be considered for the truth of the matters stated.

---

[18]     On appeal, defendants did not raise an insufficiency of the evidence claim, asserting that the evidence admitted for its truth was insufficient to support the criminal street gang enhancements. Accordingly, that issue is not before us. We nevertheless note that, in addition to the evidence mentioned *ante*, at footnote 17, Sergeant Livingston testified that he had personal contact with at least 10 separate SLG gang members and his opinion regarding SLG being a criminal street gang rested in part on the criminal histories of active gang members. Certified copies of two conviction packages were admitted into evidence. (See *People v. Perez* (2011) 195 Cal.App.4th 801, 804 [certified "prison packets" not testimonial]; *People v. Larson* (2011) 194 Cal.App.4th 832, 836-838 [certified records of prior convictions not testimonial]; *People v. Morris* (2008) 166 Cal.App.4th 363, 373 [certified California Law Enforcement System (CLETS) rap sheet not testimonial].) When considering a challenge to the sufficiency of the evidence to support a gang enhancement, appellate courts must review the entire record in the light most favorable to the judgment. (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)

The California Supreme did not effectively overturn or limit *Gardeley* in its 2012 trio of Sixth Amendment confrontation cases: *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661 [any confrontation clause violation in admitting toxicology analysis of victim's blood was harmless because evidence of guilt was overwhelming]; *People v. Dungo* (2012) 55 Cal.4th 608, 621 [no confrontation violation since criminal investigation was not the primary purpose for the autopsy report's description of victim's body]; *People v. Lopez* (2012) 55 Cal.4th 569, 582 [critical portions of nontestifying analyst's laboratory report on defendant's blood alcohol concentration were not made with the requisite degree of formality or solemnity to be considered testimonial], 585 [notation in report linking defendant's name to blood sample was not prepared with the formality required for testimonial statements].) "[O]nly the ratio decidendi of an appellate opinion has precedential effect [citation] . . . ." (*Trope v. Katz* (1995) 11 Cal.4th 274, 287.) None of the above cases even mentioned *Gardeley*.

We are well aware that *Gardeley* did not address a Sixth Amendment confrontation issue. But it is important to recognize that under California law, the mere admission of evidence of the basis for an expert's opinion, for the limited purpose of assessing the soundness of the expert's reasoning, does not transform the evidence into independent proof of any fact. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 619.) We therefore remain obliged to follow *Gardeley* until a U.S. or California Supreme Court decision dictates a different result.

In *Crawford*, the U.S. Supreme Court confirmed, consistent with its prior decision in *Tennessee v. Street* (1985) 471 U.S. 409, 414 (105 S.Ct. 2078), that evidence *not* admitted for the truth of the matter stated does not implicate a defendant's constitutional right of confrontation. (*Crawford v. Washington*, *supra*, 541 U.S. at p. 60, fn. 9; see *Williams v. Illinois*, *supra*, 567 U.S. at p. 2228] (plur. opn. of Alito, J.) ["Out-of-court statements related by the expert solely for the purpose of explaining the assumptions on

89

which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause"]; but see *id.* at p. 2257 (opn. of Thomas, J., concurring in judgment) ["statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose"]; *id.* at pp. 2268-2269 (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.) [admission of an out-of-court statement to show the basis of an expert's conclusion "has no purpose separate from its truth"].)  Post-*Crawford*, the California Supreme has stated:  "Out-of-court statements that are not offered for their truth are not hearsay under California law (Evid. Code, § 1200, subd. (a); *Smith v. Whittier* (1892) 95 Cal. 279, 293-294 . . .), nor do they run afoul of the confrontation clause.  (See *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177.)"  (*People v. Ervine* (2009) 47 Cal.4th 745, 775-776.) A plurality of the U.S. Supreme Court has observed that "there is simply no way around the proviso in *Crawford* that the Confrontation Clause applies only to out-of-court statements that are 'use[d]' to 'establis[h] the truth of the matter asserted.'  541 U.S., at 59–60, n. 9, 124 S.Ct. 1354 . . . )."  (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2240 (plur. opn. of Alito, J.).)

"The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.  [Citation.]"  (*People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17; see *Richardson v. Marsh* (1987) 481 U.S. 200, 211 [107 S.Ct. 1702] ["The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process"].)  "[T]he assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue.  [Citation]"  (*Tennessee v. Street, supra,* 471 U.S. 409, 415, fn. 6 [admission of accomplice's confession for nonhearsay purpose accompanied by

90

limiting instruction raised no confrontation clause concerns]; see *Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2241 (plur. opn. of Alito, J.) [jury instruction that "out-of-court statements cannot be accepted for their truth" is safeguard against misuse].)

The *Williams* decision does not change our analysis. When the U.S. Supreme Court issues an opinion, "it is not only the result but also those portions of the opinion *necessary to that result* by which we are bound. [Citations.]" (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 67 [116 S.Ct. 1114], italics added.) "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who *concurred* in the judgments on the narrowest grounds . . . .' [Citation.]" (*Marks v. U.S.* (1977) 430 U.S. 188, 193 [97 S.Ct. 990], italics added (*Marks*).) As Justice Chin observed in his concurring opinion in *People v. Dungo, supra,* 55 Cal.4th 608, "neither the plurality opinion nor Justice Thomas's concurring opinion [in *Williams*] can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory." (*Id.* at p. 628 (conc. opn. of Chin, J.).) In *Dungo*, Justice Chin noted that "[i]t took a combination of two opinions—each containing quite different reasoning—to achieve the majority result." (*Ibid.*) Further, as the California Supreme Court has stated concerning *Williams*, "dissenting opinions are not binding precedent. [Citations.]" (*People v. Lopez, supra,* 55 Cal.4th at p. 585.) We do not believe that the common view expressed in Justice Thomas's concurring opinion (in which no other justice joined) and the dissenting opinion in *Williams*, that the extrajudicial basis of an expert's opinion is necessarily considered for its truth, regardless of its admission for a nonhearsay purpose with a limiting instruction, may be taken as a holding of the U.S. Supreme Court since it is not yet the basis of any judgment.

While dicta or a dissenting opinion may signal the future direction of a court, especially when a view is subscribed to by a majority of justices presently on the court,

we must follow the U.S. Supreme Court's binding precedents and leave to that court the prerogative of overruling its own decisions. (See *Agostini v. Felton* (1997) 521 U.S. 203, 237-238 [117 S.Ct. 1997].) Lower courts must be cognizant that the justices' individual views and court membership may change. As Justice Liu has stated: "[N]ose-counting is a job for litigators, not jurists. As a court tasked with applying an evolving line of jurisprudence, our role is not simply to determine what outcome will likely garner five votes on the high court. Our job is to render the best interpretation of the law in light of the legal text and authorities binding on us." (*People v. Lopez, supra,* 55 Cal.4th at pp. 593-594 (dis. opn. of Liu, J.).)

Every appellate justice is bound by controlling precedent, no matter how vehemently or persuasively the justice disagrees with it and no matter how accurately the justice can predict future high court decisions overturning or qualifying that precedent. The doctrine of stare decisis "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." (*Vasquez v. Hillery* (1986) 474 U.S. 254, 265-266 [106 S.Ct. 617].)

"Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court. [Citations.]" (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) "[Lower] [c]ourts are not at liberty to set aside or disregard the decisions of [the California Supreme] Court because it may seem to them that the decisions are unsound. Until reversed or modified by [the] Court, its decisions must be accepted by all inferior tribunals." (*People v. McGuire* (1872) 45 Cal. 56, 57-58.)

Of course, this court, like all state courts, is duty bound to follow the controlling precedent of the U.S. Supreme Court's decisions. (see U.S. Const., art. VI, cl. 2 [supremacy clause]; *People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6 [The U.S.

Supreme Court's "decisions on questions of federal constitutional law are binding on all state courts under the supremacy clause of the United States Constitution. [Citations.]"].) The United States Supreme Court has "final authority to determine the meaning and application" of the federal Constitution. (*Pennekamp v. State of Fla.* (1946) 328 U.S. 331, 335 [66 S.Ct. 1029].) Its decisions on questions of federal law are "binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding." (*Chesapeake & O. Ry. Co. v. Martin* (1931) 283 U.S. 209, 221 [51 S.Ct. 453].)

We will not try to count potential votes of the justices on either the U.S. Supreme Court or the California Supreme Court. As of yet, there is no U.S. or California Supreme Court case holding that testimony regarding the basis for an expert's opinion, which was *not* admitted for its truth at trial, must nevertheless be regarded as admitted for its truth for purposes of the Sixth Amendment's right of confrontation even when a limiting instruction is given.[19] Presently, binding precedent is to the contrary.

Like the trial court, we are bound by the decisions of higher courts regardless of our personal views. The trial court properly concluded that, under presently controlling law, extrajudicial statements not admitted for their truth, but only to show the basis for an expert's opinion, do not implicate the confrontation clause. (See *Williams v. Illinois*, *supra*, 132 S.Ct. at pp. 2228 (plur. opn. of Alito, J.) [It is "settled that the Confrontation

_____

[19] We would agree that the current instruction regarding expert opinion testimony should be rewritten for the sake of clarity and avoiding potential misuse of evidence not admitted for its truth. But none of the defendants raised a claim of instructional error on appeal, arguing that the trial court erred by giving the standard instruction regarding expert testimony or refusing a different instruction that was requested by a defendant. Of course, counsel for defendants were free in closing argument to remind the jury that the "basis evidence" could not be considered for its truth and was not independent proof of any fact and to argue that Sergeant Livingston's opinions should be disregarded or given no weight because they were unsupported by the evidence admitted for its truth.

Clause does not bar the admission of statements not admitted for their truth"], 2235 (plur. opn. of Alito, J.) ["*Crawford*, while departing from prior Confrontation Clause precedent in other respects, took pains to reaffirm the proposition that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citations.]"]; *Crawford v. Washington*, *supra*, 541 U.S. at p. 60, fn. 9 [The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]"]; *Tennessee v. Street*, *supra*, 471 U.S. 409, 413-414, 417 [extrajudicial accomplice confession introduced *not* for its truth, but for nonhearsay purpose of assessing defendant's testimony that his own confession was coerced, raised no confrontation clause concerns]; *People v. Ervine*, *supra*, 47 Cal.4th at p. 776; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210; cf. *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1128, 1131.)

*E. "Hidden Testimonial Hearsay" and the Right to Jury Trial*

Defendant Rodriguez indicates that Sergeant Livingston "did not precisely identify all the sources for his opinion . . . ." He contends that the admission of expert testimony predicated on "hidden testimonial hearsay" not revealed to the jury violates the defendant's right to a jury trial as construed in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348] (*Apprendi*). Defendant Rodriguez declares an expert witness relying on testimonial hearsay has "*ipso facto* determined that the hearsay is reliable, i.e. true," but the "right to jury trial makes the jury the only arbiter of whether reliability has been established." He argues that "the trial court's error in permitting the gang expert to rely on testimonial hearsay had the additional legal consequence of infringing [his] right to jury trial."

Defendant Rodriguez forfeited this challenge to the admission of the expert's testimony by not objecting on these grounds below. (Evid. Code, § 353.) In any case, it is without merit.

94

The Sixth Amendment to the U.S. Constitution guarantees criminal defendants a trial by jury and that right applies to the states through the Fourteenth Amendment (*Duncan v. Louisiana* (1968) 391 U.S. 145, 150 [88 S.Ct. 1444]). *Apprendi* held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. [Citations.] . . . When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment' [citation], and the judge exceeds his proper authority." (*Blakely v. Washington* (2004) 542 U.S. 296, 303-304 [124 S.Ct. 2531].) Defendant Rodriguez has failed to identify any fact found true by the judge that increased the penalty beyond the statutory maximum based on the facts reflected in the jury's verdicts.

"The purpose of trial by jury . . . is to prevent government oppression by providing a 'safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' [Citation.]" (*Burch v. Louisiana* (1979) 441 U.S. 130, 135 [99 S.Ct. 1623].) Defendant Rodriguez has not cited any authority establishing that admission of an expert opinion without disclosing to the jury its entire testimonial hearsay basis, including the declarants, implicates the constitutional right to jury trial. (See *ante*, fn. 16.)

F.  *Judicial Assurance that Witness French's Address Would Not Be Disclosed*

Defendant Hensley contends that the trial court violated his right to due process and a fair trial by improperly injecting itself into the case by assuring French that the witness's then current address would not be disclosed.  He asserts that "[o]nly if the

95

defendants were guilty could French need assurance that no one would learn where he lived and therefore his testimony would not endanger him."

At trial, the prosecutor asked witness French whether he lived in Campbell at the time of the incident. The prosecutor then asked French to confirm that he did not live there anymore. The court interjected, "Just whether or not you live in that house in Campbell." French indicated that he longer lived there. The prosecutor inquired, "Without asking where you live, you live in another state right now?" French responded, "Sir?" The court then asked, "Do you live in California?" French replied, "No." The court then stated, "No one's going to get your address." The prosecutor then asked whether this case was the cause of or a reason for defendant's move.

"A court commits misconduct if it creates the impression that it is denigrating the defense or otherwise allying itself with the prosecution. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1219.) But a defendant forfeits a claim of judicial misconduct if the defendant fails to object or request a curative admonition in the trial court. (*Id*. at p. 1231.) Defendant Hensley's claim of judicial misconduct was forfeited because there was no defense objection and request for admonition.

Defendant Hensley alternatively argues that his trial counsel provided ineffective assistance of counsel by failing to object to the court's comment. He has not made the requisite showing of either deficient performance or prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-689, 694, 700 [104 S.Ct. 2052]; see also *Harrington v. Richter* (2011) ___ U.S. ___, ___ [131 S.Ct. 770, 791-792].)

First, it does not appear his counsel had a basis to object. A trial judge has the duty "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) The judicial comment appears to fall within the court's proper authority.

96

Further, the decision whether to object is inherently tactical and a failure to object rarely establishes ineffective assistance of counsel. (*People v. Lopez* (2008) 42 Cal.4th 960, 972.) A defendant has the burden of demonstrating there was no tactical reason for his counsel's failure to object and the objection would have been meritorious. (*People v. Mattson* (1990) 50 Cal.3d 826, 876.)

Even assuming arguendo that defense counsel should have objected, defendant Hensley's ineffective assistance claim fails. The court instructed the jury: "Do not take anything I said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdict should be." Hence, there is no reasonable probability that the result of the proceeding would have been different had defendant Hensley's counsel objected to the court's comment to witness French. (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 694 ["defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"]; *Harrington v. Richter*, *supra*, 131 S.Ct. at p. 792 ["The likelihood of a different result must be substantial, not just conceivable. [Citation.]"].)

G. *Anonymous Threat*

At trial, French repeatedly denied receiving a death threat message on his cell phone or telling an officer that he had. He denied telling an officer that he was hiding at a friend's house because he was scared for his life. French did admit, however, that he had told the prosecutor that he was scared and he did not want to come to court. Without objection, Officer Rogers testified that, on July 25, 2008, he contacted French at another residence, where French was holed up in a back bedroom with the lights off. French explained that he was at that location because "he was scared for his life and he didn't want to stay home." French told the officer that he had received a voice mail death threat on his phone, which stated, "You're dead. We're coming after you."

Defendant Hensley maintains that evidence of the threat was irrelevant and inadmissible because French denied being afraid at trial and its admission violated due process. These claims were not preserved (Evid. Code, § 353) and, in any case, they are without merit. " 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.] Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946; see Evid. Code, §§ 210, 351; see also Evid. Code, §§ 785, 1235.) "For such evidence [of the basis for a witness's fear] to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1142, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Defendant Hensley also argues that the trial court's failure to give a limiting instruction violated his due process and jury trial rights, citing *People v. Collie* (1981) 30 Cal.3d 43, where the Supreme Court theorized "[t]here may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*Id*. at p. 64.) Trial courts generally have no duty to give a limiting instruction sua sponte. (*People v. Valdez, supra,* 55 Cal.4th 82, 139; see Evid. Code, § 355.) As in *Valdez*, the "[d]efendant's reliance on *Collie* fails because the evidence of the witnesses' fear was more than minimally relevant to a legitimate purpose . . . and was not 'a dominant part of the evidence against' defendant. [Citation.]" (*Id*. at p. 139 [no sua sponte duty to give limiting instruction that evidence of witnesses' fear in

98

testifying could be considered only to assess credibility].)  The trial court did not err by failing to give a limiting instruction.

Defendant Hensley finally argues that his counsel's failure to request a limiting instruction constituted ineffective assistance.  We reject this claim since defense counsel may have made a tactical decision not to request a limiting instruction because it might draw the jurors' attention to the threat and increase the risk that they would credit French's incriminating testimony or improperly attribute the threat to the defendant.  (See *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.  [Citation.]"].)  In any case, no prejudice has been shown since defendant Hensley testified to his participation in the crimes and, given the evidence, there is no reasonable probability that any defendant would have obtained a more favorable result if a limiting instruction had been given.  (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-689, 694, 700; *Harrington v. Richter*, *supra*, 131 S.Ct. at pp. 791-792].)

H.  *Codefendants' Arguments*

Defendants Hensley and Rodriguez join in all appellate arguments made by others insofar as those arguments would benefit them.  We have found no reversible errors.

I.  *Cumulative Impact of Alleged Errors*

Defendants assert that the cumulative impact of alleged errors deprived them of a fundamentally fair trial consistent with due process.  We recognize that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.  [Citations.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 844 -845.)  That is not the situation in this case.  Defendants were "entitled to a fair trial but not a perfect one.  [Citations.]"  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

DISPOSITION

The judgments are affirmed.

_____

ELIA, J.

I CONCUR:

_____

PREMO, J.

RUSHING, P.J., Dissenting

I respectfully dissent. I believe the trial court erred by permitting a police "gang expert" to recite numerous incriminating extrajudicial statements which had been gathered by police officers while investigating criminal street gangs and their activities. They were admitted on the rationale that the jury would not take them as proof of their contents but only to help in evaluating the gang expert's opinion that the defendants were members or associates of a gang and that the robbery jointly carried out by them was committed for the benefit of, or in association with, a gang. I would hold that the California practice of admitting such statements regardless of their testimonial or nontestimonial character violates a defendants' rights under the confrontation clause of the United States Constitution as applied in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), and its progeny. I do not believe this conclusion is foreclosed by any paramount authority, and I believe it is consistent with the opinions of a majority of members of the United States Supreme Court. Nor do I believe defendants can fairly be held to have forfeited their confrontation clause objections by failing to repeat them often enough in the trial court. The admission of these statements was therefore constitutional error. Because there is little other evidence that this garden-variety robbery of a drug dealer was committed in association with or for the benefit of a criminal street gang, I am unable to declare the admission of this evidence harmless beyond a reasonable doubt. I would therefore reverse the judgment.

## I. *Preservation of Objection*

The testimony in question has been referred to as "basis evidence," i.e., hearsay or other incompetent evidence admitted on the rationale that it is not introduced to establish its substantive content but only to demonstrate the basis for an expert opinion. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127; *Williams v. Illinois* (2012) ___ U.S. ___ (*Williams*) [132 S.Ct. 2221, 2239, 2258, 2269, 2271].) The question is whether such

1

evidence, when otherwise violative of a defendant's right to confront his or her accusers, is nonetheless admissible under this rationale. The majority seems to conclude that defendants failed to adequately raise this issue in the trial court with respect to some or all of the statements now complained of. (See maj. opn. at pp. 78-86, *ante*.) In my view the record amply establishes that the objection was repeatedly brought to the attention of the trial court, which overruled it both expressly and impliedly. That is all the law requires, and all it should require, to avoid a forfeiture of the objection.

"To preserve an evidentiary issue for appeal, the complaining party generally is required to make a timely and meaningful objection in the trial court. (Evid.Code, § 353, subd. (a).) The purpose of this rule 'is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial.' (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060.) Thus, an objection will be deemed sufficient so long as it 'fairly apprises the trial court of the issue it is being called upon to decide. [Citations.]' (*People v. Scott* (1978) 21 Cal.3d 284, 290.)" (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.)

Here defendants repeatedly objected to basis evidence while invoking the confrontation clause as articulated under *Crawford*. In his written motion in limine, defendant Hensley asserted, "It would be improper for the prosecution to use the gang expert to establish necessary elements of the offense or the gang enhancement as a substitute for testimony by percipient witnesses, and in a manner which may violate defendant's fundamental rights of due process, confrontation and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution." At the ensuing hearing, defendant Zavala raised a confrontation-clause objection to any extrajudicial statements by Kyle Moneyhun, and more generally urged the confrontation clause as a ground to bifurcate trial of the gang enhancements from the underlying charges. The prosecutor manifestly understood the scope of the objection, arguing that

2

*Crawford* did not apply because any extrajudicial statements repeated by Livingston would be offered only as a basis for his opinion and not as proof of their contents. In a further written motion in limine, Zavala again objected on confrontation grounds to any statements by Moneyhun and also to "hearsay reports that Zavala and Rodriguez planned the crime and that Zavala threatened to kill a victim or a witness."

The trial court appeared to understand that the application of the confrontation clause was at issue with respect to all extrajudicial statements Livingston might relate. The court exhibited this understanding when counsel for defendant Hensley objected to evidence that the mother of his client's girlfriend had identified Hensley as a Norteño gang member. Counsel failed to specify any statutory or constitutional ground for the objection, stating only that he did not "know how any expert can give [such a statement] any kind of weight" in determining a defendant's gang membership. But the court stated that in determining the admissibility of that and similar statements, the "question becomes whether or not the statement by the girlfriend's mother is testimonial in my view; or despite the fact that it's the type of thing that is relied upon by experts, it has no relevance unless it's true, and that, therein, lies the issue." Counsel for Zavala then referred to "at least three or four such incidents where Sergeant Livingston intended to testify . . . , where Sergeant Livingston was told by single individuals that Mr. Zavala was the shot-caller or the leader in SLG; that he was one of the three top leaders of SLG; and that he was in SLG; each one relying on the statement of a single witness who was not present and which was not corroborated by anything else at the time that the statements were made." Counsel went on to give details of those particular statements, concluding, "There are at least those three that I can recall, where he relies specifically on the statements by a single individual. [¶] And . . . I move to include those within my motion . . . to exclude for the reasons given in the in limine motion." After some further colloquy the court stated, "I think the issue is whether—if *Crawford* says you can't admit

3

this evidence that otherwise would be admissible because it violates confrontation clause, does that ruling apply in the context of an expert relying on that statement?" Counsel for Zavala agreed: "That is, indeed, the issue." The prosecutor agreed that this was the issue being raised by defendants, but stated that a "fair, close reading" of the cases would disclose that "it" (the confrontation clause) was "not applicable to this situation." He agreed with the court's observation that, under this view, "it then becomes a 352 issue," i.e., a question of discretionary exclusion under Evidence Code section 352.

The court clearly adopted the prosecution's view of the confrontation question. The trial included a number of unreported sidebar conferences, some of which almost certainly concerned these issues.[1] On at least one occasion, counsel for Zavala explicitly urged the confrontation clause against particular testimony of the type at issue— specifically, recapitulated statements reportedly made to police officers by third parties during an encounter with a group of men including defendants Zavala and Rodriguez.

---

[1] My colleagues describe me as "assum[ing]" that some of the sidebar conferences concerned confrontation issues. (Maj. Opn., *ante* at p. 83.) This is not an assumption but an inference I draw from the circumstances in which the conferences took place. The fact that these conferences were not recorded or otherwise memorialized is quite troubling. It is true that a court reporter is only required to transcribe proceedings if requested to do so. (See Code Civ. Proc., § 269, subd. (a)(2) [reporter must take down all proceedings in felony case "on the order of the court or at the request of the prosecution, the defendant, or the attorney for the defendant"]; see *People v. Manson* (1976) 61 Cal.App.3d 102, 214 ["In the absence of request that a record be made of a conference between court and counsel, none is required."].) Here, however, counsel for defendant Zavala objected to the court's practice of requiring all evidentiary objections to be addressed in unrecorded sidebar conferences. Counsel asserted, quite reasonably I think, that "it is just too difficult, in the heat of battle as it were, to remember all of the precise objections that are made and deferred to some later time when we have time" to put them on the record. The court refused to diverge from its practice, which had "served [it] well," of excusing the reporter from recording such conferences and casting the burden upon counsel to memorialize their contents by recital when opportunity arose. This clear violation of the statutory mandate has not been urged as error on appeal, but that hardly requires us to compound it by citing the very deficiencies of which counsel quite properly complained in support of our imposition of an appellate forfeiture.

4

The court overruled the objection. The record amply demonstrates that the court would have ruled similarly on any other specific objection on this ground. "The duty to object will be excused when an 'objection or request for admonition would have been futile . . . .' (*People v. McDermott* (2002) 28 Cal.4th 946.)" (*People v. Carrillo*, *supra*, 119 Cal.App.4th 94, 100-101.) " 'Where a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each examination of other witnesses; and his silence will not debar him from having the exception reviewed.' " (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 393, p. 549, quoting *Green v. Southern Pac. Co.* (1898) 122 Cal. 563, 565.)

In sum, I cannot conclude that defendants forfeited their objections under the confrontation clause. The rule of *Crawford* pervaded the pretrial proceedings and was clearly understood by both the trial court and the prosecutor to be at the heart of defendants' objections to Sergeant Livingston's recital of extrajudicial statements.[2] The trial court's rulings plainly demonstrate that it viewed *Crawford* as posing no impediment whatever to testimony of the type at issue. It follows that any further objections on that score, however technically perfect, would have been futile. Accordingly, I deem the point available on appeal.

## II. *Stare Decisis*

Perhaps the strangest question posed by this case is whether the California Supreme Court's decision in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), somehow precludes us from sustaining defendants' confrontation clause objections. The answer should be an obvious negative, because *Gardeley*—which was decided some

---

[2] Nor does respondent suggest otherwise. Rather, in a supplemental brief respondent states, "During the [Evidence Code section 402] hearing and at trial, appellants repeatedly challenged the proposed testimony on confrontation grounds."

eight years before *Crawford* reshaped the confrontation clause landscape—does not address, consider, or even mention that clause.  " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." ' [Citation.] 'An appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided." ' [Citation.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.)  Yet the majority treats *Gardeley* as binding authority on this subject.  (Maj. Opn. at pp. 91-92, 94, *ante*.)  And it is not the first court to do so. (See *People v. Hill*, *supra*, 191 Cal.App.4th 1127-1128.)[3]

Although the precise manner in which the relevant issues were framed in *Gardeley* is less than entirely clear from that opinion, it appears that the only evidentiary issue the court actually addressed was the *competence* of expert testimony, founded on extrajudicial statements not admissible in their own right, to establish elements of a gang enhancement.  A hearsay objection had been lodged in the trial court when a gang expert was asked about certain extrajudicial statements made to him by a particular person.  In overruling that objection, the trial court "informed the jury that certain 'hearsay' would be introduced," and that the jury was not to consider these statements "for the truth of the matter, but only as they give rise . . . to the expert opinion . . . ." (*Gardeley*, *supra*, 14 Cal.4th at p. 612.)  Nowhere does the opinion indicate that this ruling, as such, was charged as error on appeal.  Rather the matter came before the Supreme Court on the

---

[3] Indeed, I am sorry to say that among the many unpublished decisions relying on *Gardeley* in this context, I have joined in several and even authored one or two.  In theory I can simply ignore those cases because, not being published, they possess no precedential value. (See Cal. Rules of Court, rule 8.1115.)  In fact of course one cannot remain wholly insensible to the appearance of inconsistency.  Suffice it to say that my opinion in those cases rested on assumptions I have always considered dubious and now find constitutionally unsound, particularly in view of *Williams*, *supra*, ___ U.S. ___ [132 S.Ct. 1121].

6

state's petition for review after the Court of Appeal held that (1) the prosecution was required to prove that certain "predicate offenses," and not only the charged offense, were " 'gang related,' " and (2) the expert's opinion was not competent to prove gang-relatedness because it rested on matters not in evidence or personally known to him. (*Id.* at p. 614.) The Supreme Court rejected both holdings. (*Id.* at pp. 621-624.) With respect to the second, it explained at length "how the prosecution here satisfied the[] statutory requirements" for a gang enhancement with expert testimony. (*Id.* at p. 617, see pp. 617-626.) This included a recital of general principles governing the admissibility of expert opinion and the foundational facts on which an expert witness may rely. (*Id.* at pp. 617-620, see 625.) It is this passage of the opinion that the majority treats as binding authority on the question of the admissibility of such statements over a confrontation clause objection.

It is true that *Gardeley* generally endorsed the admission of testimony by gang experts, and the recital by them of data, including otherwise objectionable extrajudicial statements, on which they relied in concluding, e.g., that a crime was committed for the benefit of a gang's members. It is far from clear that this endorsement can be properly viewed as a *holding* concerning the *admissibility* of such evidence, since it does not appear that any such issue was squarely raised or addressed. But assuming the court's discussion may be viewed as an actual holding on that point, it still cannot be treated as binding with respect to a ground of objection the court never considered or even acknowledged—particularly an objection arising under the federal constitution, the last word on which is entrusted not to any state court, but to the United States Supreme Court. (See *Chesapeake & O. Ry. Co. v. Martin* (1931) 283 U.S. 209, 221 [determination by court on issue of federal law "is binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding"].)

7

I am not dissuaded from these views by *People v. Hill*, *supra*, 191 Cal.App.4th 1104, 1127. The court there agreed with me that testimonial hearsay admitted as basis evidence offends the confrontation clause, but declared itself powerless to reverse on that ground in light of *Gardeley*. The court did not attempt to reconcile this conclusion with the fundamental rule that cases are not authority for questions they do not consider. It simply cited *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, which states the familiar proposition that "[u]nder the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." (See *People v. Hill*, *supra*, 191 Cal.App.4th at pp. 1127-1128.) But this rule requires that one properly identify the "decision" embodied in a cited precedent. " 'The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion" (*Gogri v. Jack in the Box Inc.* (2008) 166 Cal.App.4th 255, 272.) "To determine the precedential value of a statement in an opinion, the language of that statement must be compared with the facts of the case and *the issues raised*.' [Citation.]" (*Ibid.*, italics added.) The application of the confrontation clause to testimonial basis evidence was not among the "issues raised" in *Gardely*. The "decision" in that case therefore cannot extend to that question.

Other published decisions appear to recognize this. They cite *Gardeley* in the *Crawford* context, but none of them suggests that it is controlling authority. (See *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210; *People v. Cooper* (2007) 148 Cal.App.4th 731, 747 [citing *Gardeley* with a "see also" signal]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153 ["[s]ee"]; *People v. Steppe* (2013) 213 Cal.App.4th 1116, 1127 [holding that admission of challenged evidence did not offend confrontation clause and, citing *Gardeley*,"was proper under California authority as well"].) Indeed, the earliest of these decisions noted that *Gardeley* concerned an analogous issue, but went

on to acknowledge that "no published California case has yet addressed whether *Crawford* applies to hearsay statements that are used not as direct evidence against the defendant but merely as the basis for an expert's opinion." (*People v. Thomas*, *supra*, 130 Cal.App.4th at p. 1210.)  It concluded that the evidence at issue did not offend the confrontation clause, but it relied for that conclusion on decisions from other jurisdictions.  (*Ibid*..)

I agree that *Gardeley* implicates an analogous question under state law, in that it discussed general principles concerning the admissibility of basis evidence over a hearsay objection, including the rules that "matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony," and "an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley*, *supra*, 14 Cal.4th at p. 618.)  However, the court noted, the expert's recital of such matter does not "transform [it] into 'independent proof' of any fact." (*Id.* at p. 619, quoting *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524-1525.)

The court thus alluded, if somewhat obliquely, to the proposition that evidence introduced solely to establish the basis of an expert opinion falls outside our code's definition of hearsay as an out-of-court statement "that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)  The decision has been understood to approve this not-for-truth rationale as a ground to overrule hearsay challenges to basis evidence from gang experts.  And that rationale does have some conceptual bearing on the scope of the confrontation clause, for it too is inapplicable to statements admitted "for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.)

It follows that the rule attributed to *Gardeley*, if applied identically to confrontation clause objections, would require that they be overruled.  But nothing in

9

*Gardeley* or in general principles of stare decisis requires that the not-for-truth rationale, as viewed by it, be extended to the confrontation clause. States are of course free to define the scope of their own evidentiary rules, and to adopt any rationale in doing so that seems meet to them, subject only to constitutional constraints. But nothing prevents the United States Supreme Court from rejecting the state rules, and their rationales, when delineating analogous areas of constitutional jurisprudence. As Justice Thomas wrote in *Williams*, *supra*, ___ U.S. ___ [132 S.Ct. 2221, 2256], "concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules. See *Barber v. Page*, 390 U.S. 719, 724–725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (defining a constitutional standard for whether a witness is "unavailable" for purposes of the Confrontation Clause); see also *Ohio v. Roberts*, 448 U.S. 56, 76, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (recognizing that Barber "explored the issue of *constitutional* unavailability" (emphasis added))."[4]

The question whether to follow *Gardeley*'s treatment of the confrontation clause should begin and end with the fact that the case contains no treatment of that subject. It cannot be good law—or bad law—on a subject it did not purport to consider.[5] Given this

---

[4] Similarly, Justice Kagan described "the plurality's not-for-the-truth rationale" as an "abdication to state-law labels." (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2272].) "[T]he plurality thinks this case decided by an Illinois rule holding that the facts underlying an expert's opinion are not admitted for that purpose. [Citations.] But we do not typically allow state law to define federal constitutional requirements. . . . [E]ven before *Crawford*, we did not allow the Clause's scope to be 'dictated by state or federal evidentiary rules.' . . . So the plurality's state-law-first approach would be an about-face." (*Id.* at p. ____ [132 S.Ct. at p. 2272], citations omitted.)

[5] The same is true of *People v. Linton* (2013) 56 Cal.4th 1146, 1199-1200, which respondent cites in a supplemental brief while conceding that it "did not involve a confrontation clause challenge to an expert's reliance on hearsay." I find the case remarkable chiefly for its refusal to allow a capital defendant to exploit the same loophole in the hearsay rule that the prosecutor exploited here, and that prosecutors around the

10

conclusion, I believe the central question is more properly framed as whether we should *extend* the not-for-truth rationale so as to allow the introduction of basis evidence by a gang expert over the objection that it violates a defendant's right to confront his accusers. For the reasons that follow, I believe that we should not.

### III. The Confrontation Clause vs. The "Not-for-Truth" Rationale

It appears likely to me that if squarely faced with the issue, the United States Supreme Court, as currently constituted, would rule that the wholesale admission of incriminating extrajudicial statements through police "experts," as occurred here, cannot be reconciled with the Sixth Amendment right of a criminal defendant to confront his or her accusers, at least when those statements are the product of police questioning, and thus "testimonial." I agree with the majority that our function is not to count noses but to " 'render the best interpretation of the law in light of the legal text and authorities binding on us.' (*People v. Lopez* (2012) 55 Cal.4th 569, 594 (dis. opn. of Liu, J.))." (Maj. opn. at p. 92, *ante*.) But since there are no binding texts or authorities on the precise point before us, I believe our job is to render "the best interpretation of the law" of which we are able in view of the existing *non*-binding authorities. This manifestly includes opinions of justices of the United States Supreme Court, five of whom have offered compelling and to me entirely persuasive reasons for repudiating the not-for-truth

state have routinely exploited to introduce mountains of prejudicial hearsay against gang and other defendants. The trial court there refused to allow a defense expert to recite extrajudicial statements made by the defendant. The Supreme Court upheld the trial court's finding that the statements had been " 'made under circumstances' indicating a 'lack of trustworthiness.' " (*Id.* at p. 1200, quoting Evid.Code, § 1252.) Similar results have been reached elsewhere. (See *People v. Bell* (2007) 40 Cal.4th 582, 607-608 [trial court properly barred psychological defense expert from repeating statements by defendant about killing; trial court may have overestimated prejudicial effect of testimony, but did not act arbitrarily or capriciously in finding that admonition would not cure prejudice].)

11

rationale as a basis to admit incriminating extrajudicial statements, over a confrontation clause objection, in support of expert opinion evidence.

Justice Thomas, who concurred in *Williams* on the ground that the statements at issue there were not testimonial, nonetheless emphatically repudiated the not-for-truth rationale as a ground for admitting basis evidence over a confrontation-clause objection. "There is no meaningful distinction," he wrote, "between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth. 'To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true.' D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.10.1, p. 196 (2d ed.2011) (hereinafter Kaye). 'If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert's conclusions.' *Ibid*." (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2257], fn. omitted (conc. opn. of Thomas, J.).)

The four dissenting justices shared this view. Writing on their behalf, Justice Kagan described reasoning to the contrary as "a prosecutorial dodge." (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2265 (dis. opn. of Kagan, J.).) Where "a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion," she wrote, "the statement's utility is . . . dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such 'basis evidence' comes in not for its truth, but only to help the factfinder evaluate an expert's opinion 'very weak,' 'factually implausible,' 'nonsense,' and 'sheer fiction.' D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence §

12

4.10.1, pp. 196–197 (2d ed.2011); *id.*, § 4.11.6, at 24 (Supp.2012). 'One can sympathize,' notes that treatise, 'with a court's desire to permit the disclosure of basis evidence that is quite probably reliable, such as a routine analysis of a drug, but to pretend that it is not being introduced for the truth of its contents strains credibility.' *Id.*, § 4.10.1, at 198 (2d ed.2011); see also, e.g., *People v. Goldstein*, 6 N.Y.3d 119, 128, 810 N.Y.S.2d 100, 843 N.E.2d 727, 732–733 (2005) ('The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful'). . . . [A]dmission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it *except* assess its truth and so the credibility of the conclusion it serves to buttress." (*Id.* at pp. ___-___ [132 S.Ct. at pp. 2268-2269], fn. omitted.)

The limiting instruction given on this point by the trial court here reflects this same logical contradiction, or circularity. At the time of Sergeant Livingston's testimony, the court advised the jury that extrajudicial statements repeated by him "are not offered for the truth of the matter that is said to him or said that he relies upon, and they cannot be considered by you for their truth. You can only consider [such a] statement insofar as it makes sense to you that he relies upon it and forms the basis of his opinion. . . . [¶] . . . They're not offered for the truth; they're only offered, and only can be considered by you, to support the witness' opinion, and you'll get more instructions about that at the end of the case."[6] But the jury could not use the statements to evaluate the expert's opinion without finding them to be either true or false. They could not—in the trial court's words—"support the witness's opinion" unless they were true. Simply telling the jurors that the extrajudicial statements *might* support the opinion was an

---

[6] In fact, as discussed *post* (pt. V(B)), the jury received *contradictory* instructions at the end of the case, being told that it should "consider . . . *the facts or information on which the expert relied in reaching that opinion*," and "*must decide whether information on which the expert relied was true and accurate*." (Italics added.)

invitation to accept them as true. To be sure, the limiting instruction declared them to be "not offered for the truth"; but faced with the rest of the instruction, the jurors could only find this, as the court described it too mildly, "a little bit complex."

Even without these baffling directions the basis evidence was highly likely to prejudice defendants. A jury required to choose between believing or doubting the accuracy of "basis evidence" will rarely have any basis to doubt it, precisely because its source—the out-of-court declarant—is insulated from cross-examination and immune from the visual and other scrutiny to which live witnesses are necessarily exposed. Here, for example, the officer was permitted to testify that one of the defendants was accused of gang membership by his girlfriend's mother. The jury had no way of judging whether the mother was a reliable witness or whether her accusation might have been the product of misperception, resentment, animosity, or some combination of such factors. All the jurors had to go on was a naked assertion of fact by a disembodied narrator— sympathetically described, incidentally—who was presumably in a good position to know the truth. Since the jury had no basis to affirmatively question the accuracy of the statement, I see no realistic possibility of its doing so.

Viewed another way, if a jury were to comprehend the instruction that such statements are "not admitted for their truth," it would presumably reason that the statements only had one legitimate purpose: to *discredit* the expert's opinion if and when they were *proven false*. Unfortunately the court here might be understood to preclude this interpretation by telling the jury that the hearsay statements recited by Sergeant Livingston were "only offered, and only can be considered by you, to *support* the witness' opinion . . . ." But even in the absence of that misdirection, any juror perspicacious enough to arrive at the interpretative inference just described would immediately discern one very good reason to reject it: if the only permissible effect of

14

the evidence is to discredit the opinion, why is it being introduced by the proponent of the opinion, and objected to by its opponent?

In fact no one honestly expects a jury to wholly disregard such evidence, however thoroughly it may be admonished. In my view, judicial protestations to the contrary make a mockery of our jurisprudence. (See pt. V(B), *post*.) If the evidence were really offered only to let the jury "evaluate" the witness's opinion, and if the jury were really expected to rise above its incriminating effect, the proponent of the evidence would not bother to offer it. That such evidence is routinely introduced by the boatload, over defense objection, reflects the widespread belief of prosecutors and defense attorneys alike that it can *only* operate to the prejudice of its opponent. It can have no permissible effect. Why then admit it?

Again, the record will rarely provide much ground for the factfinder to " 'doubt[] the accuracy or validity' " of the extrajudicial statement. (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2257] (conc. opn. of Thomas, J.).) The jury will thus ordinarily accept the evidence, by default, as "justif[ying]" the expert's opinion rather than casting doubt on it. (*Ibid.*) This imbalance of course might be redressed by cross-examination of the declarant, perhaps exposing grounds to doubt the truth of the questioned assertions. In the absence of such exploration, any extrajudicial assertion will naturally tend to reinforce the proffered opinion evidence.

I also find it highly relevant that *Williams* was concerned with circumstances that most would agree, and the plurality certainly insisted, were far removed from the paradigmatic confrontation clause violation. As Justice Breyer emphasized in his separate concurrence, that decision was only the latest of several in which the court had grappled—he felt inadequately—with the admissibility of extrajudicial statements concerning technical, scientific, or medical matters. (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at pp. 2244-2245]; see also *Melendez–Diaz v. Massachusetts* (2009) 557 U.S.

15

305; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705].) I think it is quite likely that at least one of the justices there voting to reject the confrontation clause challenge would view quite differently the practice in this state, where there is no need to postulate hypotheticals—as the dissent in *Williams* did—about the dangers posed to core confrontation concerns by prosecutorial experts armed with the not-for-truth rationale and mountains of incriminating testimonial hearsay. (See *Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2269] (dis. opn. of Kagan, J.).) Our courts see hundreds of examples of this stratagem every year. We need not speculate about the ability of an unfettered not-for-truth rationale to "end-run the Confrontation Clause, and make a parody of its strictures." (*Id.* at p. ___ [132 S.Ct. at p. 2269].) Nor need we rely on the conditional mood to describe the state's power, under such a rationale, to "bypass the Constitution" with "a wink and a nod." (*Id.* at p. ___ [132 S.Ct. at p. 2270].) That is precisely what took place in this case, as it has in dozens if not hundreds of other gang cases around this state.

Nor do I think the perniciousness of this practice will fail to take on constitutional significance for at some of the justices who signed only the plurality opinion in *Williams*. In that opinion, Justice Alito acknowledged the risk that an uncabined not-for-truth rationale might permit an expert to "express[] an opinion based on factual premises not supported by any admissible evidence, and . . . also reveal the out-of-court statements on which the expert relied." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2241] (plur. opn. of Alito, J.), fn. omitted.) He identified "four safeguards to prevent such abuses" (*ibid.*), but I am not persuaded that any of them provides genuine protection in gang trials in this state.

The first safeguard identified by Justice Alito is that "trial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge

16

[that] will help the trier of fact to understand the evidence or to determine a fact in issue.' Fed. Rule Evid. 702(a)." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2241] (plur. opn. of Alito, J.).) The comparable rule in California allows expert opinion testimony if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), and is based upon "matter . . . perceived by or personally known to the witness or made known to him at or before the hearing . . . of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"(*id*., subd. (b)).[7] However the rule is formulated, it can afford only so much protection as courts interpret it to afford. My perception is that the discretionary power to limit or exclude expert testimony has had precious little limiting effect on basis evidence in gang prosecutions. Instead, the rote application of the not-for-truth rationale to police gang experts has opened the gates to a veritable flood of incriminating hearsay, with appellate decisions providing little incentive for trial courts to restrain such testimony.[8] (See

---

[7] No one in this case has questioned the soundness of permitting police "gang experts" to tell jurors how street gangs generally work, or even to share more specific but still esoteric knowledge about them. Elsewhere, however, serious questions have been raised about the propriety of allowing police officers, with no training in the social sciences, to assume a mantle of expertise that might more appropriately be reserved to sociologists. (See McGinnis, et al., Interrogation Is Not Ethnography: The Irrational Admission of Gang Cops As Experts in the Field of Sociology (2010) 7 Hastings Race & Poverty L. J. 111, 130 [attacking the "incredible proposition that police officers are qualified to give sociological testimony"]; *id.* at p. 131 ["A venerable history of police officers passing as sociologists does not explain why police officers are reliably able to provide testimony on sociological concepts."].)

[8] Nor can I blind myself to the pressures that may be brought to bear on trial judges should they be deemed insufficiently accommodating to prosecutors' wishes. (See, e.g., Kaplan, *Santa Clara County DA tells attorneys to boycott judge who irked them* (Jan. 23, 2010) San Jose Mercury News, <http://www.mercurynews.com/search/ci_14254154> (as of Oct. 16, 2013); Payne, *Attorneys seek edge by swapping judges* (Dec. 4, 2010) The Press Democrat, <http://www.pressdemocrat.com/article/20101204/articles/101209729#page=3> (as of

Mahoney, Houses Built on Sand:  Police Expert Testimony in California Gang Prosecutions; Did Gardeley Go Too Far? (2004) 31 Hastings Const. L.Q. 385, 387 ["In *Gardeley*, the California Supreme Court missed a critical opportunity to reemphasize California's restrictive view of expert testimony and the importance of judicial gatekeeping."].)  Whatever the degree of protection afforded in other jurisdictions by these limits on expert testimony, they have had little protective effect in this state.

Justice Alito's next safeguard is that "experts are generally precluded from disclosing inadmissible evidence to a jury.  See Fed. Rule Evid. 703; *People v. Pasch*, 152 Ill.2d 133, 175–176, 178 Ill.Dec. 38, 604 N.E.2d 294, 310–311 (1992)."  (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2241] (plur. opn. of Alito, J.).)  This may be true in federal courts and jurisdictions applying variations on the Federal Rules of Evidence, but it is far from true in this state.  Earlier in the opinion Justice Alito addressed the same point in somewhat more detail, writing that "*in jury trials*, both Illinois and federal law generally bar an expert from disclosing such inadmissible evidence."  (*Id.* at p. ____ [132 S.Ct. at p. 2234], fn. omitted, emphasis in original.)  Under the applicable rule, he noted, such evidence may be placed before the jury only "if the value of disclosure 'substantially outweighs [any] prejudicial effect,' [citation], or "the probative value . . . outweighs the risk of unfair prejudice.' [Citation.]"  (*Id.* at

Oct. 16, 2013 [referring to blanket challenges to two Sonoma County judges in 1997 and 2001; district attorney's spokesperson quoted as saying, " 'There are some judges we may not want to send complicated gang cases to because they have had rulings that were adverse to the people.' "]; Moran, *Judge under boycott from DA* (Nov. 29, 2009) UTSanDiego.com <http://www.utsandiego.com/news/2009/nov/29/judge-under-boycott-da/all/> (as of Oct. 16, 2013); Moran, *Boycotting of judges nothing new to DA* (Feb. 29, 2009) UTSanDiego.com <http://www.utsandiego.com/news/2010/feb/28/boycotting-of-judges-is-nothing-new-to-da/all/> (as of Oct. 16, 2013); Stewart, *State's Trial Judges Dodge 'Paper' Bullets : Law Gives District Attorneys Veto Power Over Jurists in Criminal Cases* (Dec. 15, 1985) Los Angeles Times <http://articles.latimes.com/1985-12-15/local/me-550_1_district-attorney> (as of Oct. 16, 2013).)

p. \_\_\_\_ [132 S.Ct. at p. 2234, fn. 2.]) He emphasized that the matter there had been tried without a jury and that, had it been otherwise, the challenged testimony would have been inadmissible "[a]bsent an evaluation of the risk of juror confusion and careful jury instructions." (*Id.* at p. \_\_\_\_, 132 S.Ct. at p. 2236.)

The presumptive inadmissibility thus described by Justice Alito contrasts sharply with the law in California, where the governing code section declares unconditionally that an opinion witness may "state on direct examination the reasons for his opinion and the matter . . . upon which it is based . . . ." (Evid. Code, § 802.) There is no threshold requirement that the court weigh the "value of disclosure" against the matter's "prejudicial effect." At most the court is granted the "discretion" to "require that a witness testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." (*Id.*)

The only substantive restraints imposed by California law on an expert's repetition of incompetent basis evidence are (1) the requirement that the evidence be of the type on which experts in the relevant field may reasonably rely (see Evid. Code, § 801, subd. (b)), and (2) the trial court's general power to exclude *any* evidence whose probative value is outweighed by the "probability" that it will "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (see *id.*, § 352). Arguably this rule places the burden on the objector where the federal rule places it upon the proponent. In any event it cannot be said of our law, as Justice Alito said of federal and Illinois law, that an expert is "generally bar[red]" from "disclosing such inadmissible evidence" to a jury. (*Williams*, *supra*, \_\_\_ U.S. at p. \_\_\_\_ [132 S.Ct. at p. 2234] fn. omitted.) Such evidence is routinely disclosed to California juries with little restraint or hindrance.

Justice Alito's third safeguard is that "if such evidence is disclosed, the trial judges may and, under most circumstances, must, instruct the jury that out-of-court statements cannot be accepted for their truth, and that an expert's opinion is only as good as the

19

*independent evidence that establishes its underlying premises*. See Fed. Rules Evid. 105, 703; *People v. Scott*, 148 Ill.2d 479, 527–528, 171 Ill.Dec. 365, 594 N.E.2d 217, 236–237 (1992)." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2241]; italics added.) While California law recognizes a similar principle (see *Gardeley*, *supra*, 14 Cal.4th at p. 618), it does not appear that the jury in this case was ever intelligibly instructed on this point, and indeed the relevant pattern instruction, which was given here (see pt. V(B), *post*), is grossly inadequate to convey it. The instruction states in pertinent part, "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, *consider* the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and *the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.* You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332, italics added.) This language omits critical legal principles, apparently in the interest of comprehensibility. It fails entirely to tell the jury that facts relied upon by the expert must be disregarded, and operate in derogation of his opinion, unless proven *by independent, competent evidence*. Indeed, the directive to "decide whether information on which the expert relied was true and accurate" creates a grave risk of obliterating whatever protective effect earlier limiting instructions might have had on a jury's consideration of basis evidence. Apparently the drafters' intent was to avoid using the concept, which is actually critical to any proper evaluation of expert testimony, of what Justice Alito called "underlying premises." The question is not whether the expert's "information" is "true," as the instruction tells the jury, but whether the factual premises on which his opinion depends *have been proven* by competent evidence. By inviting the jury to consider the truth of his "information," without so much as mentioning the requirement of independent, competent corroboration, the pattern

20

instruction not only fails to afford the protection cited by Justice Alito but affirmatively conveys the highly prejudicial message that the jury "must" decide whether each inflammatory hearsay statement the expert may have repeated is in fact true.

Justice Alito's fourth safeguard is closely related to the third: "[I]f the prosecution cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2241], fn. omitted, italics added.) As just noted, however, the jury here—and California juries generally—are left completely in the dark about the necessity of "independent admissible evidence" to support an expert's factual suppositions, and the effect of its absence on the weight to be given his opinion.[9]

I thus find that under current California law, the safeguards cited by Justice Alito are weak to nonexistent. As I have noted, Justice Breyer joined in the plurality opinion but wrote separately to emphasize policy considerations which favored the result there but which apply chiefly, it not uniquely, to "the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2244].) This, in his view, was the central question in the case: "how, after *Crawford*, Confrontation Clause

---

[9] The older pattern instructions at least attempted to convey these points to the jury, instructing in part, "An expert witness is permitted to consider statements made to the witness or a third person that have not been made under oath in court. Statements considered by an expert witness which were made to the witness or a third person do not prove that what was said was true. The truth of those statements may come from other evidence. You should consider the failure to prove in court that it was made or is true in determining what weight to give to the opinion of the expert." (CALJIC No. 2.80.) They also recited the critical point noted in the above passage by Justice Alito: "An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion." (*Ibid*.)

21

'testimonial statement' requirements apply to crime laboratory reports." (*Id.* at p. 2248 [132 S.Ct. at p. 2246].) He did not object to the dissent's logic; indeed he was "willing to accept the dissent's characterization" that the not-for-truth rationale for admitting extrajudicial statements in support of opinion testimony was "artificial." (*Ibid.*) But he faulted the dissent for failing to "produce[] a workable alternative" in the context of scientific evidence. (*Ibid.*) "The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another." (*Ibid.*) He feared that under the dissent's view, the prosecution would be "require[d] . . . to call *all* of the laboratory experts" whose labors contributed to a reported test result. (*Ibid.*)

Critically, Justice Breyer believed that placing burdensome restrictions on the kind of scientific evidence at issue there "could undermine, not fortify, the accuracy of factfinding at a criminal trial." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2251].) He noted, as an example, that autopsy results might become impossible to prove if the examining pathologist died. (*Ibid.*) Moreover, such restrictions could "increase the risk of convicting the innocent" by increasing the cost of presenting laboratory tests and thus reducing the willingness or ability of prosecuting authorities to rely on them. (*Ibid.*) Without such evidence, states might be forced to rely on less reliable means of identification, such as eyewitness testimony. (*Ibid.*) Concerns such as these led Justice Breyer to "consider reports such as the DNA report before us presumptively to lie outside the perimeter of the Clause as established by the Court's precedents." (*Ibid.*)

Justice Breyer's concerns have no parallels where a police department's "gang expert" freely recapitulates incriminating extrajudicial statements, gleaned by himself and his fellow officers through the questioning of gang members and others, in support of opinions that the defendant is a member of a gang or that the charged offense was

22

committed for a gang's benefit. Nor is there any risk that excluding such evidence will reduce the "accuracy of factfinding" with respect to the defendant's gang membership or the gang-relatedness of a crime. Typically the most reliable evidence of these matters will be the defendant's own words and conduct, including gang-related tattoos or other regalia, and direct admissions. The opinions of third parties—such as a girlfriend's mother—are simply piling on.[10]

I conclude the use made of basis evidence in this case would be held by a majority of the Supreme Court to violate the confrontation clause, provided the evidence at issue were testimonial. I turn now to that question.

## IV. Testimonial Character

For an extrajudicial statement to offend the confrontation clause under *Crawford* it must not only be offered for its truth but must also be "testimonial" in character. (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) In *Williams*, five justices concluded that the statements there at issue were *not* testimonial. Four of them did so on the ground that, to be found testimonial, a statement's "primary purpose" must be to "accus[e] a targeted individual of engaging in criminal conduct." (*Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2242]; see *id*. at p. ___ [132 S.Ct. at p. 2244].) Justice Alito concluded that "the use at trial of a DNA report prepared by a modern, accredited laboratory 'bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.' " (*Id.* at p. ____ [132 S.Ct. at p. 2244], quoting *Michigan v. Bryant* (2011) 562 U.S.___, ___ [131 S.Ct. 1143, 1167] (conc. opn. of Thomas, J.).)

The foregoing rationale cannot be applied to the present case. In ostensible support of his opinions, Sergeant Livingston cited numerous statements made to him and

---

[10] Indeed, it is difficult to know why the statement from the girlfriend's mother was introduced unless it was to conjure in jurors' minds the highly prejudicial image of a distraught parent whose child had fallen into the clutches of a vicious miscreant.

other officers by declarants, often unidentified, concerning defendants' supposed membership and role in gangs and their activities in association with those gangs. There was no suggestion that any of these statements were taken by police to meet an ongoing emergency. (See *Michigan v. Bryant*, *supra*, 562 U.S. ___ [131 S.Ct. 1143].) They were manifestly gathered by police in anticipation of future gang prosecutions of precisely the type now before us. Indeed some of them were gathered in investigating this very case. Thus Sergeant Livingston testified that defendants Zavala and Rodriguez were not only "influential members of the Shalu Garden gang" but were "the two primary people planning the crime." (Maj. opn. at p. 25, *ante*.) This information, he said, was "based upon 'prior contacts, speaking with other people, reviewing police reports.' " (Maj. opn. at p. 25, *ante*.) It is obvious that at least some of this information must have come from interrogations relating specifically to the present offense.[11]

The trial court recognized that some of the material cited by Sergeant Livingston might be "testimonial" in character, but apparently concluded that it did not matter

---

[11] Again my colleagues describe me as "assum[ing]" that many of the extrajudicial gang-related statements conveyed by Sergeant Livingston were testimonial. (Maj. Opn., *ante* at p. 83, *ante*.) Again this is not an "assumption" but an inference drawn from the nature of the statements related and such other circumstances as can be gleaned from the record. And again, any deficiencies in the record in this regard appear at least partly attributable to the manner in which the trial court conducted the trial, and in particular its insistence that all objections be made off the record, which made it much more difficult than it would otherwise have been for counsel to conduct foundational voir dire to determine the precise source and character of the statements recited. In a perfect world, counsel would have approached the bench and demanded such voir dire with respect to every extrajudicial statement the witness mentioned. I am confident that the trial court would quickly have tired of that exercise in light of its manifest view—which the majority apparently shares—that the question whether the statements were testimonial was academic, since they were admissible in any event for a nonhearsay purpose. Given these circumstances, the majority's reliance on counsel's failure to conclusively establish the testimonial character of the statements would compel me to write separately even if I agreed with its treatment of the case in other respects.

24

because basis evidence was categorically exempt from the constraints imposed by the confrontation clause.  In this I believe the court erred.  I would therefore reverse unless I could say that the admission of this evidence was harmless.

## V. *Prejudice*

### A. *Insubstantiality of Evidence of Gang-Relatedness*

Where evidence has been admitted in violation of the confrontation clause, the judgment must be reversed unless we can say that the error was harmless beyond a reasonable doubt.  (*People v. Geier* (2007) 41 Cal.4th 555, 608, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681, and *Neder v. United States* (1999) 527 U.S. 1, 18.)

I assume there was sufficient competent evidence to establish that defendants robbed Mitchell French on July 23, 2008.  The expert testimony was principally addressed to prove two elements of the gang enhancement, i.e., that the crime was "committed for the benefit of, at the direction of, or in association with a[] criminal street gang, [and] with the specific intent to promote, further, or assist in . . . criminal conduct by gang members."  (Pen. Code, § 186.22, subd. (b)(1).)  Broadly read, this language could operate any time the defendant aided and abetted in the perpetration of a crime by persons he knows are members of a street gang.  Courts have recognized, however, that "Not every crime committed by gang members is related to a gang."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60; see *id.* at p. 62, italics in original [finding "substantial evidence that defendants came together *as gang members* to attack Amanda M. and, thus, that they committed these crimes in association with the gang"]; see *People v. Ochoa* (2009) 179 Cal.App.4th 650, 663 [gang enhancement "cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes"]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 227 (*Albarran*) [judgment reversed

where only evidence supporting gang-related motive for shooting was "the fact of Albarran's gang affiliation"].)

It may also be that even if all of the proscribed hearsay had been excluded, the evidence would have been sufficient to sustain the gang enhancement. (But see *People v. Ramon* (2009) 175 Cal.App.4th 843, 850-853 [expert testimony alone is not sufficient to sustain a gang enhancement, and facts cited by expert in support of opinion did not make it substantial evidence]; *In re Frank S.*(2006) 141 Cal.App.4th 1192, 1199 [to similar effect]; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 931 [enhancement was sustained by circumstances in conjunction with expert opinion, but opinion alone would not have been sufficient].) The pertinent inquiry is not whether the jury *could* have sustained the enhancement without the objectionable evidence, but whether it *would* have done so—or more precisely, whether it appears beyond a reasonable doubt that it would have done so. I find the evidence of gang-relatedness so vague and equivocal that I cannot help but doubt that the jury would have found that element had it not been exposed to the inflammatory hearsay recited by the gang expert in violation of the defendants' right to confrontation.

The first factor cited by the expert in favor of a finding of gang-relatedness was that the crime was planned by "two influential members of Shalu Gardens." This fact is simply the logical result of two subsidiary factual propositions: the crime was planned before it was perpetrated, and two of the planner/perpetrators were gang members. In other words, this factor is little more than a restatement of the fact of gang membership. Sergeant Livingston's testimony was pervaded by this reliance on logical corollaries or rhetorical restatements of the same fact to create an illusion of additional substance, along with references to abstract generalities that did not appear, or were not shown to be, applicable to the facts at bar.

26

He next alluded to the fact that, as he put it, the robbers "gather[ed] resources" from gang members, in that they "need[ed] transportation to go commit the robbery so members of San Jose Unidos [we]re called to provide transportation." This was apparently based on statements to police by the witness R.B., who was present when the robbery was planned, that Zavala and Rodriguez—whom he called Mark and J-Dog—talked about needing "stolen cars" to perpetrate the robbery, and raised the possibility of getting them from Hensley (Peanut) who was asserted to belong to an allied gang. This testimony seems extraordinarily weak for a number of reasons. First, it only describes the planning discussions, not the crime as actually perpetrated. The statute does not penalize a defendant for planning a gang-related crime. It penalizes him for *committing* a crime in association with or for the benefit of a gang. Moreover the only gang-relatedness this testimony points to directly is Hensley's supposed membership in a gang. If the planners' own gang membership did not make the crime gang-related, it is difficult to see how someone else's membership in a different gang—someone who might furnish cars—could make it gang-related.

Sergeant Livingston suggested that these facts fitted within a larger generalization, i.e., that gangs will often cooperate with one another in committing crimes "especially when it relates to—by Nuestra Familia," a prison gang he described as a kind of umbrella or parent organization to all of the Norteño gangs. But I can find no hint in the record that Nuestra Familia had anything to do with this case, and no evidence of any cooperation between the planners' gang and Peanut's, or any other, gang—or indeed, of involvement by any gang, as a gang—in this offense. Sergeant Livingston testified that gang members may sometimes procure "resources, like weapons, vehicles" from "another gang that you may associate with or have friends with," but there is no evidence that this happened here. All the evidence showed was that the planners *contemplated* procuring stolen vehicles from a supposed member of another gang. The specification that the cars

27

be stolen might suggest that their procurement would involve concerted activity—though even this seems speculative—but so what?  The only car shown to have been actually procured for the crime as executed was borrowed by Hensley from a female friend.  Unless she was a gang member—and for that matter, even if she was—it is difficult to see how his borrowing a car from her constituted "gathering resources" from an associated gang.  Once again the only gang connection was membership—in this case, Hensley's.

From there Sergeant Livingston's testimony descended into flights of illogic that I find both chilling and absurd.  Thus he cited, in support of a finding of gang-relatedness, evidence that one of the planners had said he would not be afraid to use a gun during the robbery.[12]  This supported a finding of gang-relatedness, he claimed, because "[i]f you're squeamish about using a gun, you're not going to garner much respect in the gang community but if you tell them ahead of time, 'I have no problem shooting somebody if I need to,' then, you know, you're basically making that statement.  [¶]  And if you're called on it and you need to shoot somebody during the course of that crime, you're basically expected to do that because you said that you would do that.  And if you don't do it, you're not going to gain as much respect within that gang 'cause you're basically kind of showing you're a coward and not following through with what you said."

In other words, Sergeant Livingston opined that a professed willingness to use a gun, as well as its actual use, supported a finding of gang-relatedness because these things would enhance one's reputation in a gang.  But young men hardly have to belong to a gang to feel that they enlarge themselves by talking and acting tough.  One would expect this behavior to be especially prevalent among the class of young men willing to seriously contemplate the commission of violent felonies.  Willingness to boast of such

---

[12]  R.B. testified that Zavala, whom the witness knew as Little Savage or Mark, said that "if he had to shoot somebody to do this robbery, he'd do it."

28

matters hardly points to gang involvement. The Brave Little Tailor of the Brothers Grimm famously boasted of killing "seven at one blow." Was that evidence that his subsequent exploits were performed with or for a gang? The inference proposed by the sergeant embodies something akin to that most fundamental of logical errors, affirming the consequent. It may very well be that gang members like to boast of their willingness to do violence because it will enhance their reputations in the gang. It does not follow that everyone boasting of such willingness is thereby acting for, with, or on behalf of any gang to which he may belong.

Presenting a somewhat more complex picture was Sergeant Livingston's attempt to justify an inference of gang-relatedness from the fact that the victim was engaged in selling marijuana. He testified, "[W]hat will happen is if gang members know of specific targets, and in this case I'll reference what we call drug rips, *gangs are involved with the sales of controlled substances so they oftentimes know who are holding quantities* of controlled substances so if they don't want to be involved in buying their own or selling their own and *they want to come up on money quick*, they will just go rob a drug dealer. [¶] So oftentimes, what will happen is *somebody within the gang may already know of a drug dealer*, they'll identify that person, and then they'll plan to do the robbery from there. And it's—*they target drug dealers specifically because more often than not, they won't contact the police* because the person's committing a felony themselves selling drugs so they know that the person most likely isn't going to call the police, and even if they do, *they probably won't cooperate with the police*, much less take the stand and be truthful on the stand. They know that they're probably going to try to cover up what they were actually doing. [¶] And then also, if the fear's instilled into them that they're dealing with a gang member, now they have to, you know, dealing—deal with the fact *they're going to have to sell drugs in the same area or same county as active gang*

29

*members who robbed them* so the chances of them actually testifying against them is pretty slim." (Italics added.)

The sergeant thus offered three reasons the robbery of a drug dealer supports a finding of gang-relatedness: (1) gangs have superior intelligence regarding who is engaged in drug dealing; (2) drug dealers are unlikely to report crimes or cooperate with authorities because of the inevitable disclosure of their own criminal conduct; and (3) drug dealers are afraid to cooperate because they must continue to do business in or near the gang's territory. These are interesting propositions but they had scarcely any factual connection to this case. First, there was no suggestion that the victim was targeted as the result of gang intelligence. On the contrary, while R.B. professed at trial not to remember who came up with the idea of robbing French, he acknowledged that he himself knew French was a dealer because he had bought marijuana from him—and that he declined to be involved in the robbery because he hoped to preserve that relationship, in addition to avoiding the risk that French could identify him. He acknowledged that Kyle Moneyhun, who was also present during the planning of the robbery, knew that French was a dealer. He thought he recalled accompanying Michelle Stojkovic to purchase marijuana from French, but denied any recollection that it was she who nominated French as a robbery victim. He thought it was probably Moneyhun who did so "'cause only him and I knew him." The record thus strongly suggests, if it does not conclusively prove, that the information on which the robbery was based had nothing to do with any gang intelligence but was derived from the personal knowledge of one or more persons at the planning meeting.

I readily see the logic in expecting that a drug dealer will be reluctant to report a robbery for fear of himself becoming a target of unwanted official attention. But that logic is completely divorced from any gang affiliation of the perpetrator. Anyone else might readily target a drug dealer for the same reason. The fact that a gang member

30

decides to rob someone whom a friend has identified as a drug dealer has virtually no logical tendency to show that the ensuing robbery was done in association with or for the benefit of the gang to which he belongs.

Of the victim-related factors cited by Sergeant Livingston, the only one having any genuine gang relationship is the idea that a drug dealer, or any other victim of a crime by persons known to be gang members, may be afraid to report the crime, or cooperate in its investigation and prosecution, because of the perceived risk that other gang members may retaliate. But had the robbers here intended to rely on their gang association to intimidate the victim in this manner, they might at least have taken the trouble to inform the victim that they were, or knew, gang members. The closest they came to doing so was the cryptic cliché "You don't know who you're [messing or] fucking with," apparently uttered not by any of the defendants, or any obvious gang member, but by a "girl" who accompanied them when they cased the victim's premises. The extent to which this hackneyed utterance served to intimidate French is perhaps best reflected in the fact he not only testified against defendants but exhibited such open hostility and defiance toward them in court as to trigger a motion for mistrial.

The perpetrators' failure to openly brand the robbery as a gang undertaking contrasts sharply with cases in which gang members have vociferously announced their gang affiliations, thereby explicitly identifying a crime as a gang venture. (See, e.g., *People v. Miranda* (2011) 192 Cal.App.4th 398, 404 [before shooting victim, defendant's companion asked victim's gang affiliation and identified self as " 'San Fer' "]; *id.* at p. 412 [Expert testified that "[w]hen a gang member announces his gang affiliation during commission of a crime, the entire gang is benefited by an enhanced reputation."]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 499 [participants in gang caravan got out of vehicles "yell[ing] 'norte,' 'fourteen,' and gang names"].) Here it never seemed to occur to the robbers to announce their gang affiliations. If anything, the intimidation factor

31

cited by Sergeant Livingston—depending as it necessarily does on the victim's knowledge that the perpetrator is a gang member—supports an inference in this case that the robbery was *not* committed in association with a gang, but was carried out for the sole personal benefit of its participants. (See *Albarran*, *supra*,. 149 Cal.App.4th at p. 227 [expert testified that gang member "gains such respect if his identity (or the identity of his gang) becomes known to the victim(s), within the gang community and/or the neighborhood," but record contained "no signs of gang member's efforts in that regard— there was no evidence the shooters announced their presence or purpose—before, during or after the shooting"]; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363 [crime could not enhance gang's reputation, as posited by police expert, where "nothing in the record indicate[d] that appellant or his companions did anything while in the supermarket to identify themselves with any gang, other than wearing clothing with red on it," and "there was no evidence that Chamblee or any of the other persons who witnessed the crime knew that gang members or affiliates were involved"].).

Next the sergeant asserted that robbing a drug dealer was a good way for gang members to "come up on money quick." He may as well have cited the robbers' beer drinking as evidence of gang relatedness, since I have no doubt that drinking a beer is a good way for gang members to quench a thirst, quick. Testimony so easily ridiculed should be recognized for what it is: ridiculous. Evidence that money was being stolen *for the gang*, or that the robbers would contribute a tithe to gang coffers, would support the proffered inference. But the mere fact that gang members committed robberies to get cash does not distinguish them or their robberies in any way from non-gang robbers or robberies. Here again, the actual evidence showed no gang connection beyond membership. Indeed Sergeant Livingston described the planners as "talking about doing a robbery because *they* need[ed] money." (Italics added.) This motive has no more relation to gang membership or association than it does to eye color.

32

The facts properly adduced to establish a gang-related purpose here appear weaker than those found insufficient in *Albarran*, *supra*, 149 Cal.App.4th at pages 227-228. The defendant there was charged with crimes and a gang enhancement on evidence that he and another young man fired a volley of shots at a house where a party was taking place. The prosecutor had no percipient witnesses concerning any gang-related purpose for the crime, instead relying entirely on the testimony of a police gang expert. In support of his opinion he cited three factors: "(1) the shooting occurred in Palmdale; (2) it occurred at a party and gang members often commit crimes during parties; and (3) more than one shooter was involved." (*Id.* at p. 221.) He also testified that the defendant's gang was involved in "an active gang war" and that an occupant of the targeted house belonged to another gang, though he was unfamiliar with the latter and unaware of any rivalry between it and the defendant's gang. (*Ibid.*) After the prosecutor referred extensively to the defendant's gang involvement, the jury sustained the gang enhancement. The trial court, however, set the enhancement aside for want of substantial evidence. On appeal, the defendant contended that the court should have granted a new trial on the underlying charge because of the prejudicial effect of the gang evidence introduced in support of the enhancement.

The Court of Appeal found the introduction of the gang evidence so prejudicial that it rendered the trial fundamentally unfair in violation of the federal guarantee of due process. In discussing the rationale on which the evidence had been admitted, the court rejected the prosecutor's claim that "the motive for the shooting was to gain respect and enhance the shooter's reputation." (*Albarran*, *supra,* 149 Cal.App.4th at p. 227.) "On the contrary," the court continued, "the motive for the underlying crimes . . . was not apparent from the circumstances of the crime. The shooting occurred at a private birthday party . . . . [T]here was no evidence the shooters announced their presence or purpose—before, during or after the shooting. There was no evidence presented that any

33

gang members had 'bragged' about their involvement or created graffiti and took credit for it. In fact, at the [Evidence Code] section 402 hearing Deputy Gillis conceded he did not know the reason for the shooting, though he had 'heard' that gang members were present at the party. There is nothing inherent in the facts of the shooting to suggest any specific gang motive. In the final analysis, the only evidence to support the respect motive is the fact of Albarran's gang affiliation." (*Ibid*.; fn. omitted.) Given these facts, the tendency of the expert's testimony to inflame the jury against the defendant rendered the trial of the underlying charges fundamentally unfair.

### B. Ineffectuality of Limiting Instruction

Nor do I think the prejudicial effect of this evidence was reduced to any appreciable degree by the limiting instruction the trial court gave to the jury at the time of Sergeant Livingston's testimony.[13]

There is an oft-repeated judicial shibboleth to the effect that limiting instructions of this kind are presumed to be effective. (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury."]; *People v. Coffman* (2004) 34 Cal.4th 1, 43-44; *People v. Osorio* (2008) 165 Cal.App.4th 603, 618 ["In the absence of evidence to the contrary, we presume the jury followed the

---

[13] The court instructed: "Ladies and Gentlemen, during the course of this witness' testimony, you either have heard or may hear that he relies on statements by others. To the extent that you hear what those statements are, those statements are only offered to form the basis of his opinion as things that he relied upon in forming his opinion.

"Those statements are not offered for the truth of the matter that is said to him or said that he relies upon, and they cannot be considered by you for their truth. You can only consider the statement insofar as it makes sense to you that he relies upon it and forms the basis of his opinion. "Okay?

"I know that that's a little bit complex to some, for lack of a better word, but that is the reason that those statements are permitted into court. They're not offered for the truth; they're only offered, and only can be considered by you, to support the witness' opinion, and you'll get more instructions about that at the end of the case."

court's instructions."].)[14]  As discussed below, I believe this presumption has been applied far more freely than can be justified by the competing concerns at stake.  But whatever its proper scope, it can hardly apply here, because the trial quite explicitly told jurors, in its concluding instructions, that they *must* determine the truth or falsity of any "information" on which the gang expert had relied.  The court instructed that "[i]n evaluating the believability of an expert witness," the jury must "consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, *and the facts or information on which the expert relied in reaching that opinion*."  (Italics added.)  Worse, the court went on immediately to tell the jury that it "*must decide whether information on which the expert relied was true and accurate*." (Italics added.)  No attempt was made to qualify this statement as it applied to basis evidence.  Taken literally—and the jurors had no reason to take it otherwise—this instruction told them to decide not only whether the hearsay report of a defendant's girlfriend's mother was something on which the expert could reasonably rely, but *whether that report was true*.

This logically obliterated whatever curative effect the limiting instruction during trial might otherwise have had.  At best jurors were forced to choose between two

---

[14]  I find it rather disingenuous to suggest that in a proper case a defendant might be able to present "evidence to the contrary."  I am unable to imagine how a record could ever be realistically expected to contain evidence that an admonition had failed to cure prejudice, given that the most probable forms of prejudice consist of psychological effects of which jurors themselves are likely to be unconscious.  Even if one or more jurors self-consciously chose to disregard such an instruction, how would such defiance ever become a matter of record?  (See Evid. Code, § 1150, subd. (a) [prohibiting admission of evidence "concerning the mental processes by which [the verdict] was determined"]; *People v. Morris* (1991) 53 Cal.3d 152, 231 [" '[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror 'felt' or how he understood the trial court's instructions is not competent.' "], disapproved on another point in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1.)

35

conflicting directives. One, given nearly two weeks before they retired to deliberate, rested on the challenging concept—"a little bit complex to some," as the trial court acknowledged—that basis evidence was not offered for "the truth," but only "to form the basis of [the expert's] opinion as things that he relied upon in forming his opinion." (See fn. 13, *ante*.) Then, as part of their final, formal instructions immediately before retiring, they received the far simpler instruction to "decide whether information on which the expert relied was true and accurate." Can anyone doubt which of these directives the jury was more likely to follow? At a very minimum, the later instruction created a conflict in the treatment of basis evidence which is more than sufficient to dispel any presumed curative effect that the earlier instruction might otherwise have had.

As a more general matter, I believe we have gone overboard in our reliance on the presumption of cure to insulate from substantive judicial review rulings that expose jurors to prejudicial matter. Indeed I find a curious discrepancy between our rote reliance on that presumption as a basis for rejecting claims of error, and the recognition, in a different appellate context, that the actual benefits of such an instruction may be so "questionable" that a defendant may quite reasonably elect to forego them. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 [finding that counsel did not render ineffective assistance by failing to request an instruction limiting jury's use of gang evidence].) Our Supreme Court has repeatedly stated that a defense attorney may reasonably elect not to request a limiting instruction because it would only " 'emphasize the evidence' " it supposedly neutralizes. (*Ibid.*, quoting *People v. Freeman* (1994) 8 Cal.4th 450, 495; see *People v. Maury* (2003) 30 Cal.4th 342, 394; *People v. Hawkins* (1995) 10 Cal.4th 920, 942, overruled on another point in *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

If counsel can reasonably believe that an admonition would be ineffectual—even counterproductive—perhaps the facility with which courts have "presumed" otherwise should be reconsidered. Certainly the presumption should be cautiously applied where

36

federal constitutional interests are at stake. The United States Supreme Court has not shown an inclination to entrust cherished constitutional rights to such legal fictions. (See *Williams*, *supra*, ___ U.S. at p. ____ [132 S.Ct. at p. 2256] (conc. opn. of Thomas, J.), citing *Bruton v. United States* (1968) 391 U.S. 123 ["we have held that limiting instructions may be insufficient in some circumstances to protect against violations of the Confrontation Clause"].) Here the fictive presumption that a limiting instruction "cures" any improper incrimination otherwise flowing from inadmissible evidence coincides with the logical fiction that extrajudicial statements offered solely to explain an expert's opinion are, for that reason, not offered for the truth of the matter asserted. If both of these fictions are given free play in applying the rule of *Crawford*, then the protections afforded by the confrontation clause are puny indeed.

It seems to me that the bucket-loads of incriminating hearsay introduced here in violation of defendants' right to confront witnesses must have had an inflammatory effect upon the jury. I believe that the staggering illogic of much of Sergeant Livingston's testimony would have been more readily perceived by a jury that had not been prejudiced against the defendants in this manner. I certainly cannot pronounce the evidence harmless beyond a reasonable doubt. I must therefore conclude that the judgment is marred by reversible error.

## CONCLUSION

I am relieved at the prospect that confrontation clause jurisprudence, as reconfigured and revitalized in *Chapman* and its progeny, may at last put a stop to practices I have long viewed as antithetical to our most fundamental precepts of criminal justice. I would not wait for the United States Supreme Court to condemn these practices; I would seize this opportunity to step back from the precipice and restore the right of criminal defendants—even the most feared and despised—to face their accusers.

_____
RUSHING, P.J.

37